No. 22-30333

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

PRESS ROBINSON; EDGAR CAGE; DOROTHY NAIRNE; EDWIN
RENE SOULE; ALICE WASHINGTON; CLEE EARNEST LOWE;
DAVANTE LEWIS; MARTHA DAVIS; AMBROSE SIMS; NATIONAL
ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE
LOUISIANA STATE CONFERENCE, also known as NAACP; POWER
COALITION FOR EQUITY AND JUSTICE,
*Plaintiffs-Appellees*

v.

KYLE ARDOIN, in his official capacity as Secretary of State for
Louisiana,
*Defendant-Appellant*

CLAY SCHEXNAYDER; PATRICK PAGE CORTEZ; STATE OF
LOUISIANA—ATTORNEY GENERAL JEFF LANDRY,
*Intervenor Defendants-Appellants*

EDWARD GALMON, SR.; CIARA HART; NORRIS HENDERSON;
TRAMELLE HOWARD,
*Plaintiffs-Appellees*

v.

KYLE ARDOIN, in his official capacity as Secretary of State for
Louisiana,
*Defendant-Appellant*

CLAY SCHEXNAYDER; PATRICK PAGE CORTEZ; STATE OF
LOUISIANA—ATTORNEY GENERAL JEFF LANDRY,
*Movants-Appellants*

On Appeal from the United States District Court
for the Middle District of Louisiana
(Nos. 3:22-cv-00211-SDD-SDJ, 3:22-cv-00214-SDD-SDJ)

### *GALMON* PLAINTIFFS-APPELLEES' RESPONSE BRIEF

*(Counsel listed on next page)*

Darrel J. Papillion
Renee C. Crasto
Jennifer Wise Moroux
WALTERS, PAPILLION, THOMAS,
CULLENS, LLC
12345 Perkins Road,
Building One
Baton Rouge, Louisiana 70810
(225) 236-3636

Abha Khanna
Jonathan P. Hawley
ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(206) 656-0177

Lalitha D. Madduri
Olivia N. Sedwick
Jacob D. Shelly
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, D.C. 20002
(202) 968-4490

*Counsel for the* Galmon *Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS

1.     In the district court, this case is captioned as *Press Robinson et al. v. Kyle Ardoin*, No. 3:22-cv-00211-SDD-SDJ (lead case), consolidated with *Edward Galmon, Sr. et al. v. R. Kyle Ardoin*, No. 3:22-cv-00214-SDD-SDJ. In this Court, it is captioned as *Press Robinson et al. v. Kyle Ardoin et al.*, No. 22-30333.

2.     Counsel for the *Galmon* Plaintiffs-Appellees further certify that the following listed persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### *Galmon* Plaintiffs-Appellees

      a.    Edward Galmon, Sr.
      b.    Ciara Hart
      c.    Norris Henderson
      d.    Tramelle Howard

*The following attorneys have appeared on behalf of the* Galmon *Plaintiffs-Appellees either before this Court or in the district court:*

Darrel J. Papillion
Renee C. Crasto
Jennifer Wise Moroux
WALTERS, PAPILLION, THOMAS, CULLENS, LLC
12345 Perkins Road, Building One
Baton Rouge, Louisiana 70810
(225) 236-3636

Abha Khanna
Jonathan P. Hawley
ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(206) 656-0177

Lalitha D. Madduri
Olivia N. Sedwick
Jacob D. Shelly
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, D.C. 20002
(202) 968-4490

## *Robinson* **Plaintiffs-Appellees**

a.  Press Robinson
b.  Edgar Cage
c.  Dorothy Nairne
d.  Edwin René Soulé
e.  Alice Washington
f.  Clee Earnest Lowe
g.  Davante Lewis
h.  Martha Davis
i.  Ambrose Sims

j.    National Association for the Advancement of Colored People Louisiana State Conference

k.    Power Coalition for Equity and Justice

*The following attorneys have appeared on behalf of the* Robinson *Plaintiffs-Appellees either before this Court or in the district court:*

John Adcock
ADCOCK LAW LLC
3110 Canal Street
New Orleans, Louisiana 70119
(504) 233-3125

Leah Aden
Stuart Naifeh
Kathryn Sadasivan
Victoria Wenger
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
(212) 965-2200

R. Jared Evans
Sara Rohani
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, D.C. 20005
(202) 682-1300

Robert A. Atkins
Yahonnes Cleary
Jonathan H. Hurwitz
Daniel S. Sinnreich
Amitav Chakraborty
Adam P. Savitt
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

Nora Ahmed
Megan E. Snider (withdrew on June 6, 2022)
Stephanie Willis
ACLU FOUNDATION OF LOUISIANA
1340 Poydras Street, Suite 2160
New Orleans, Louisiana 70112
(504) 522-0628

T. Alora Thomas
Sophia Lin Lakin
Samantha Osaki
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004

Sarah Brannon
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, D.C. 20005

Tracie Washington
LOUISIANA JUSTICE INSTITUTE
3157 Gentilly Boulevard, Suite 132
New Orleans, Louisiana 70122
(504) 872-9134

## Louisiana Legislative Black Caucus Intervenor Plaintiff

      a.    Louisiana Legislative Black Caucus

      b.    Vincent Pierre

*The following attorneys have appeared on behalf of the Louisiana Legislative Black Caucus Intervenor-Plaintiff-Appellee either before this Court or in the district court:*

Stephen M. Irving
STEVE IRVING, LLC
111 Founders Drive, Suite 700
Baton Rouge, Louisiana 70810-8959
(225) 752-2688

Ernest L. Johnson
ATTORNEY AT LAW
3313 Government Street
Baton Rouge, Louisiana 70806
(225) 413-3219

## Defendant-Appellant

      a.    R. Kyle Ardoin, in his official capacity as Louisiana Secretary of State

*The following attorneys have appeared on behalf of Defendant-Appellant either before this Court or in the district court:*

John Carroll Walsh
SHOWS, CALI & WALSH, L.L.P.
628 Saint Louis Street
Baton Rouge, LA 70802
(225) 346-1461

Alyssa M. Riggins
Cassie Holt
John E. Branch, III
Phillip Strach
Thomas A. Farr
NELSON MULLINS RILEY & SCARBOROUGH LLP
4140 Parklake Ave., Suite 200
Raleigh, NC 27612
(919) 329-3800

## State Intervenor Defendant-Appellant

    a.    The State of Louisiana, by and through Attorney General Jeff Landry

*The following attorneys have appeared on behalf of the State Intervenor-Defendant-Appellant either before this Court or in the district court:*

Elizabeth Baker Murrill
Carey T. Jones
Jeffrey Michael Wale
Morgan Brungard
OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF LOUISIANA
P.O. Box 94005
Baton Rouge, LA 70804-9005
(225) 326-6766
Angelique Duhon Freel
Shae McPhee
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. 3rd Street
Baton Rouge, LA 70802

Jason B. Torchinsky
Dallin B. Holt,
Phillip Michael Gordon
HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC
Suite 643a
2300 N Street, N.W.
Washington, DC 20037

## **Legislative Intervenor Defendants-Appellants**

    a.    Clay Schexnayder, in his official capacity as Speaker of the Louisiana House of Representatives

    b.    Patrick Page Cortez, in his official capacity as President of the Louisiana Senate

*The following attorneys have appeared on behalf of the Legislative Intervenor-Defendants-Appellants either before this Court or in the district court:*

Richard B. Raile
Katherine L. McKnight
E. Mark Braden
Renee M. Knudsen
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 861-1711

Michael W. Mengis
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002

Patrick T. Lewis
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, OH 44114

Erika Dackin Prouty
BAKER & HOSTETLER LLP
200 Civic Center Dr., Suite 1200
Columbus, OH 43215

## **Amici Curiae**

a.    Michael Mislove
b.    Lisa J. Fauci
c.    Robert Lipton
d.    Nicholas Mattei

*The following attorneys have appeared on behalf of the Amici Curiae either before this Court or in the district court:*

Alex S. Trepp
Andrew J. Plague
Jessica Ring Amunson
Keri L. Holleb Hotaling
Sam Hirsch
JENNER & BLOCK LLP
1099 New York Avenue, NW,
Suite 900
Washington, D.C. 20001
(202) 639-6000

Judy Y. Barrasso
Viviana Helen Aldous
BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, LLC
909 Poydras Street, Suite 2350
New Orleans, LA 70112
Tel: (504) 589-9700

*/s/ Abha Khanna*
Abha Khanna
ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(206) 656-0177

## STATEMENT REGARDING ORAL ARGUMENT

The Court has scheduled oral argument for July 8, 2022.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT ................................ x

TABLE OF AUTHORITIES.................................................................. xiv

INTRODUCTION.................................................................................. 1

STATEMENT OF THE ISSUES............................................................ 3

STATEMENT OF THE CASE .............................................................. 3

    I.    Louisiana's new congressional map contains a single
        Black-opportunity district...................................................... 3

    II.    The district court concluded that Plaintiffs were likely
        to succeed on their Section 2 claims and preliminarily
        enjoined HB 1. ..................................................................... 5

    III.    The motions panel denied Defendants' motions for a
        stay. ..................................................................................... 11

    IV.    The district court declined to extend the remedial
        deadline after hearing testimony from legislative
        leaders. ............................................................................... 12

    V.    The district court is currently undertaking a remedial
        process. ............................................................................... 13

SUMMARY OF ARGUMENT ............................................................. 13

STANDARD OF REVIEW................................................................... 15

ARGUMENT ...................................................................................... 17

    I.    Plaintiffs demonstrated a clear likelihood of success on
        the merits. ........................................................................... 18

        A.    Plaintiffs satisfied the first *Gingles* precondition. ...... 20

1.    The illustrative maps are reasonably compact as defined by objective metrics and traditional redistricting criteria. ...................... 21

    a.    The illustrative districts are geographically compact............................ 22

    b.    The illustrative districts comply with traditional redistricting principles. .......... 25

    c.    The illustrative districts unite communities of common interest.............. 27

    d.    Defendants rely on mischaracterizations of the district court proceedings. ...................................... 32

2.    Defendants' claims of racial gerrymandering are without merit.................... 37

    a.    The district court and motions panel considered and rejected Defendants' assertions of racial predominance. .......... 38

    b.    Defendants' predominance arguments are unpersuasive...................................... 42

    c.    *Hays* is another red herring...................... 51

B.    Plaintiffs satisfied the third *Gingles* precondition..... 55

1.    Defendants' argument focuses on the wrong districts............................................... 57

2.    Defendants misunderstand the relevance of white crossover voting. ...................................... 61

C.    Section 2 confers a private right of action.................. 64

II.    The equities weigh in favor of injunctive relief. .................. 67

A.    Preliminary relief is appropriate in this case. .......... 67

B.  The district court's injunction is not
    unconstitutional. ........................................................ 69

C.  *Purcell* does not bar the injunction............................ 70

    1.  Defendants' position is inconsistent with
        their prior representations. ............................... 70

    2.  The preliminary injunction was not issued
        in the period close to an election. ..................... 72

    3.  A new congressional map can be feasibly
        implemented....................................................... 75

CONCLUSION ....................................................................... 79

CERTIFICATE OF SERVICE................................................ 81

CERTIFICATE OF COMPLIANCE....................................... 82

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Johnson,*
521 U.S. 74 (1997) ............................................................. 21

*Alabama Legis. Black Caucus v. Alabama,*
575 U.S. 254 (2015) ........................................................... 42

*Alabama State Conf. of NAACP v. Alabama,*
949 F.3d 647 (11th Cir. 2020) ........................................... 66

*Anderson v. City of Bessemer,*
470 U.S. 564 (1985) ..................................................... 17, 18

*Arkansas State Confernece NAACP v. Arkansas Board of
Apportionment,*
No. 4:21-cv-01239-LPR, 2022 WL 496908 (E.D. Ark. Feb.
17, 2022) ........................................................................... 66

*Bartlett v. Strickland,*
556 U.S. 1 (2009) ............................................. 46, 47, 61, 62

*Bethune-Hill v. Virginia State Board of Elections,*
137 S.Ct. 788 (2017) ............................................. 41, 43, 44

*Brnovich v. DNC,*
141 S.Ct. 2321 (2021) ........................................................ 66

*Canal Authority v. Callaway,*
489 F.2d 567 (5th Cir. 1974) ............................................. 68

*Chen v. City of Houston,*
206 F.3d 502 (5th Cir. 2000) ............................................. 30

*Clark v. Calhoun County,*
88 F.3d 1393 (5th Cir. 1996) ............................................. 39

*Cooper v. Harris*,
   137 S.Ct. 1455 (2017) ................................................ *passim*

*Covington v. North Carolina*,
   316 F.R.D. 117 (M.D.N.C. 2016) ............................. 56, 58, 60

*Davis v. Chiles*,
   139 F.3d 1414 (11th Cir. 1998) ........................................ 46

*Favors v. Cuomo*,
   No. 11-CV-5632 (RR)(GEL)(DLI)(RLM), 2012 WL 928223
   (E.D.N.Y. Mar. 19, 2012) .................................................. 69

*Georgia v. Ashcroft*,
   539 U.S. 461 (2003) ......................................................... 19

*Golden Gate Restaurant Association v. City & County of San
   Francisco*,
   512 F.3d 1112 (9th Cir. 2008) ......................................... 69

*Gonidakis v. LaRose*,
   No. 2:22-cv-0773, 2022 WL 1709146 (S.D. Ohio May 27,
   2022) (per curiam) ........................................................... 69

*Growe v. Emison*,
   507 U.S. 25 (1993) ..................................................... 57, 63

*Harding v. County of Dallas*,
   948 F.3d 302 (5th Cir. 2020) ........................................... 35

*Hays v. Louisiana*,
   936 F.Supp. 360 (W.D. La. 1996) (per curiam) ........... 51, 54

*Johnson v. De Grandy*,
   512 U.S. 997 (1994) ......................................................... 33

*Johnson v. Wisconsin Elections Commission*,
   972 N.W.2d 559 (Wis. 2022) ........................................... 74

*LULAC v. Abbott,*
No. EP-21-CV-00259-DCG-JES-JVB, 2021 WL 5762035
(W.D. Tex. Dec. 3, 2021) ..................................................... 66

*LULAC v. Perry,*
548 U.S. 399 (2006) ...................................... 24, 33, 58, 65

*Melendez v. Secretary, Florida Department of Corrections,*
No. 21-13455, 2022 WL 1124753 (11th Cir. Apr. 15, 2022) ............... 69

*Merrill v. Milligan,*
142 S.Ct. 879 (2022) .................................... 17, 72, 73, 75

*Miller v. Johnson,*
515 U.S. 900 (1995) ........................................................... 45

*Mixon v. Ohio,*
193 F.3d 389 (6th Cir. 1999) ............................................ 66

*Morse v. Republican Party of Virginia,*
517 U.S. 186 (1996) ................................................... 64, 65

*Pendergrass v. Raffensperger,*
No. 1:21-CV-05339-SCJ, 2022 WL 1518234 (N.D. Ga. Jan.
28, 2022) ...................................................................... 66

*Purcell v. Gonzalez,*
549 U.S. 1 (2006) (per curiam) .................................... 72, 73

*Raleigh Wake Citizens Association v. Wake County Board of
Elections,*
827 F.3d 333 (4th Cir. 2016) .......................................... 50

*Republican National Committee v. Democratic National
Committee,*
140 S.Ct. 1205 (2020) (per curiam) ................................. 72

*Rodriguez de Quijas v. Shearson/American Express, Inc.,*
490 U.S. 477 (1989) ........................................................ 65

*Schwab v. Secretary, Department of Corrections*,
    507 F.3d 1297 (11th Cir. 2007) (per curiam) .................................... 17

*Seminole Tribe of Florida v. Florida*,
    517 U.S. 44 (1996) ..................................................................... 65

*Sensley v. Albritton*,
    385 F.3d 591 (5th Cir. 2004) ................................................. 16, 25, 26

*Shaw v. Reno*,
    509 U.S. 630 (1993) ................................................................. 41, 45

*Shelby County v. Holder*,
    570 U.S. 529 (2013) ..................................................................... 65

*Singleton v. Merrill*,
    Nos. 2:21-cv-1291-AMM, 2:21-cv-1530-AMM, 2022 WL
    265001 (N.D. Ala. Jan. 24, 2022) (per curiam) ................................ 66

*Speaks v. Kruse*,
    445 F.3d 396 (5th Cir. 2006) ........................................................ 15

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ............................................................. 55, 58, 63

*University of Texas v. Camenisch*,
    451 U.S. 390 (1981) ..................................................................... 68

*Wenner v. Texas. Lottery Commission*,
    123 F.3d 321 (5th Cir. 1997) ........................................................ 69

*Wisconsin Legislature v. Wisconsin Elections Commission*,
    142 S.Ct. 1245 (2022) (per curiam) ................................................ 74

*Wise v. Lipscomb*,
    437 U.S. 535 (1978) ..................................................................... 16

*Women's Medical Center of Northwest. Houston v. Bell*,
    248 F.3d 411 (5th Cir. 2001) .................................................... 15, 16

## Other Authorities

Fed. R. Civ. P. 52 ........................................................................ 17

Fed. R. Civ. P. 65 .................................................................. 15, 67

## INTRODUCTION

Following a five-day evidentiary hearing—and having considered two sets of preliminary-injunction briefing, the testimonies of 21 expert and fact witnesses, and hundreds of pages of proposed findings of fact and conclusions of law—the district court applied governing precedent and found a substantial likelihood that Louisiana's new congressional map dilutes the electoral strength of Black voters in violation of Section 2 of the Voting Rights Act ("VRA"). After hearing from state officials and considering the representations made by the same defendants in prior litigation, the district court further found that a remedial map can be feasibly implemented ahead of Louisiana's November primary. A motions panel of this Court agreed: Considering and rejecting the same arguments that Appellant-Defendant and Intervenor Defendants-Appellants ("Defendants") again advance here, the three-judge panel issued a per-curiam opinion, denied a stay, and expedited this appeal.

With neither the law nor the facts on their side, and the weight of two carefully reasoned judicial opinions against them, Defendants seem to argue a *different* case—a case with different evidence, different legal standards, and different election deadlines. They distort the *Gingles*

preconditions beyond recognition, disregarding decades of Section 2 precedent. They baselessly mischaracterize the illustrative maps submitted by Plaintiffs-Appellees ("Plaintiffs") as "racial gerrymanders," even though the district court found that the maps comply with neutral districting criteria and that race *did not predominate*. And Defendants' perfunctory recitation of *Purcell* ignores Louisiana's uniquely late election calendar, the testimony from state officials, and their own representations in state court.

Defendants are offering a bill of goods that four federal judges have properly rejected. Under Defendants' sweeping and inverted logic, any attempt to satisfy the *Gingles* preconditions necessarily violates the U.S. Constitution, and even the most protracted election calendar is too compressed to implement a new congressional plan. Both of these arguments are inconsistent with the law and the facts in the record. Simply put: Plaintiffs readily met their burden. The district court's preliminary injunction should be affirmed, and the voting rights of Black Louisianians vindicated in the midterm elections.

## STATEMENT OF THE ISSUES

1.    Have Plaintiffs established a sufficient likelihood of proving that Louisiana's enacted congressional plan violates Section 2 of the VRA, where the district court found that Plaintiffs' illustrative districts satisfy the numerosity and compactness requirements, that Black Louisianians vote cohesively for candidates who are usually defeated by white bloc voting, and that the totality of circumstances supports a finding of vote dilution?

2.    Does Section 2 confer a private right of action?

3.    Did the district court abuse its discretion when it concluded that the equities warrant a prohibitory injunction, where the district court found that Plaintiffs will be irreparably harmed absent preliminary relief and that a lawful congressional map can be feasibly implemented ahead of the 2022 midterm elections?

## STATEMENT OF THE CASE

## I.    Louisiana's new congressional map contains a single Black-opportunity district.

Since 2011, Black Louisianians have had the opportunity to elect their preferred congressional candidates in only one of the state's six districts, Congressional District ("CD") 2. But Louisiana's Black

population has continually increased: The 2020 census showed that the state's population growth over the past decade was driven entirely by minority Louisianians, with nearly half attributable to the Black community. ROA.6655-56. Louisiana's white population, by contrast, *decreased* by over 5%, an enduring trend since the 1990s. *Id.*

Throughout the redistricting process that followed the 2020 census, Black Louisianians, community leaders, and civil-rights groups called for the enactment of a second Black-opportunity congressional district. Ignoring this chorus—and rejecting multiple maps featuring two majority-Black districts that were introduced during the legislative process—the Legislature passed House Bill 1 ("HB 1") during a special legislative session in February 2022. ROA.6638. HB 1 largely mirrors the 2011 congressional plan and preserves Louisiana's lone majority-Black congressional district, CD 2. Governor John Bel Edwards vetoed the proposed map for its failure to include two majority-Black congressional districts, which he viewed as a violation of the VRA. ROA.6639; ROA.6714. Rather than heed this warning and draw a new congressional plan that complies with Section 2, the Legislature overrode Governor Edwards's veto on March 30. ROA.6639.

Louisiana's new congressional map packs Black voters into CD 2 and cracks others among districts that extend into the predominantly white reaches of the state. CD 2 achieves its 58.65% Black voting-age population ("BVAP") by snaking through New Orleans and Baton Rouge. ROA.6658-59. Meanwhile, three of the state's five parishes with the highest Black populations—East Carroll Parish (70.68%), Madison Parish (63.52%), and Tensas Parish (55.75%)—are located in the predominantly white CD 5. ROA.1130-31.

## II.    The district court concluded that Plaintiffs were likely to succeed on their Section 2 claims and preliminarily enjoined HB 1.

Within hours of the Legislature's veto override, two sets of plaintiffs filed complaints alleging that the new congressional map violates Section 2 by diluting the votes of Black Louisianians. ROA.6639. Consolidation of the cases and preliminary-injunction motions followed soon after and, after delaying the proceedings at Defendants' request, the district court adopted an expeditious scheduling order. ROA.6639; ROA.6760 n.350.

Although the Secretary of State was initially the only defendant in these matters, two sets of intervenor-defendants moved for intervention: the State of Louisiana, by and through the Attorney General, and

Speaker of the Louisiana House of Representatives Clay Schexnayder and President of the Louisiana Senate Patrick Page Cortez. ROA.1715. Although the district court expressed some skepticism as to the grounds on which they sought intervention and shared Plaintiffs' concern that their participation would unnecessarily duplicate efforts, it nonetheless granted intervention, noting that any risk of delay or inefficiency "can be mitigated by careful management of the briefing process and the evidentiary hearing." ROA.1718-25.

On May 9, 2022, the district court convened a hearing on the preliminary-injunction motions. Over five days, the court heard testimony from 21 witnesses and admitted 232 exhibits—including 14 expert reports—into the record. Plaintiffs presented evidence on each element of their claims, including the expert testimonies of:

- **William Cooper and Anthony Fairfax**, who prepared multiple illustrative plans that included an additional majority-Black congressional district consistent with traditional redistricting principles, ROA.6655-58; ROA.6664-66;

- **Drs. Maxwell Palmer and Lisa Handley**, who proved through ecological-inference analysis that Black Louisianians vote

cohesively and that white bloc voting serves to defeat Black-preferred candidates in the area where Plaintiffs have proposed an additional Black-opportunity district, ROA.6685-94; and

- **Drs. Allan Lichtman, Traci Burch, and R. Blakeslee Gilpin**, who demonstrated that the totality-of-circumstances analysis supports a finding of vote dilution, ROA.6698-707.

Plaintiffs also offered fact-witness testimony demonstrating the common historic, economic, and cultural interests shared by Black voters in Baton Rouge, the Delta Parishes along the Mississippi border, and St. Landry Parish—the area comprising Plaintiffs' illustrative majority-Black districts. ROA.6671-74. Plaintiffs also offered the testimony of Matthew Block, Governor Edwards's executive council, who spoke about the responsiveness and resiliency of Louisiana's elections system. ROA.6713-14.

On June 6, 2022, the district court issued a thorough, 152-page order granting the preliminary-injunction motions. ROA.6635-786. Notably, the district court credited the testimonies of Plaintiffs' witnesses, including their mapping experts, whose opinions the district court found "qualitatively superior and more persuasive on the

requirements of numerosity and compactness" when compared to Defendants' experts. ROA.6731. The district court found that, "[l]ike the question of numerosity, Defendants did not meaningfully refute or challenge Plaintiffs' evidence on compactness." ROA.6726. Indeed, the district court concluded that not one of Defendants' seven experts rebutted Plaintiffs' evidence as to the *Gingles* preconditions or the Senate Factors.

- **Thomas Bryan's** conclusions on racial predominance in Plaintiffs' illustrative plans were "unsupported by the facts and data in this case and thus wholly unreliable" because they were based on "factual assumptions ... absent in this case" and failed to account for traditional districting criteria. ROA.6727.

- **Dr. Christopher Blunt's** opinions on racial predominance "merit[ed] little weight" not only because "has no experience, skill, training or specialized knowledge in the simulation analysis methodology that he employed to reach his conclusions," but also because "the simulations he ran did not incorporate [] traditional principles of redistricting." ROA.6728-29.

- **Dr. M.V. Hood's** conclusions on core retention and numerosity measurements were "not particularly helpful to the Court" and "unilluminating," as he "willingly admitted and agreed that a desire to preserve core retention does not trump the [VRA]" and "offer[ed] no opinion" on which metric "should be used to measure BVAP." ROA.6729-30.

- "[I]t [wa]s clear to the Court" that **Dr. Alan Murray's** "spatial analysis" of the location of Black and white populations in Louisiana was "untethered to the specific facts of this case and the law applicable to it" given that he "has no background or experience in redistricting; he did not review any of Plaintiffs' illustrative plans, and most notably, he testified that he has no basis to disagree with any of the opinions offered by Plaintiffs' experts." ROA.6730-31.

- **Dr. John Alford's** opinions on the potential causes of the observed racially polarized voting "border[ed] on *ipse dixit*," as they were "unsupported by meaningful substantive analysis and [were] not the result of commonly accepted methodology in the field." ROA.6754-55.

- **Dr. Tumulesh Solanky's** analysis was "of limited utility, since at most it sp[oke] to White voting behavior in one parish out of 64"

and thus was "unhelpful and d[id] not inform the Court's analysis under *Gingles II*." ROA.6756.

- **Dr. Jeffrey Lewis's** analysis of electoral performance in Plaintiffs' illustrative districts was "informed by a single election" and thus "simply unsupported by sufficient data and [was] accordingly unreliable." ROA.6759-60.

Among its extensive factual findings, the district court concluded that, "[g]iven the timing of Louisiana's election and election deadlines, the representations made by Defendants in related litigation, and the lack of evidence demonstrating that it would be administratively impossible to do so, ... the State has sufficient time to implement a new congressional map without risk of chaos." ROA.6783.

Based on its findings of fact and conclusions of law, the district court preliminarily enjoined "Secretary Ardoin from conducting any congressional elections under the map enacted by the Louisiana Legislature" and gave the Legislature the opportunity to enact a remedial plan by June 20, 2022. ROA.6636. In addition, the district court extended the deadline for candidates to qualify by nominating petition in lieu of filing fees—a process that, the State's elections commissioner testified,

has not been used by any congressional candidate in recent memory, ROA.6779; ROA.6885—by about two weeks, until July 8, ROA.6636-37. The district court emphasized that "[t]he candidate qualifying period set for July 20-22, 2022 and all other related deadlines are unaffected ... and shall proceed as scheduled." ROA.6637.

## III. The motions panel denied Defendants' motions for a stay.

Shortly after the district court issued its preliminary-injunction order, Defendants filed a joint motion to stay the order pending appeal with the district court and—after that request was denied, ROA.6848-50—three separate emergency motions with this Court.

In a 33-page per curiam opinion, the motions panel denied Defendants' motions. ROA.6858-90. It methodically delineated and rejected each of Defendants' four contentions of legal error, ROA.6862-81, and confirmed the district court's conclusion that sufficient time remains to adopt a remedial map in advance of the state's November primary elections, ROA.6881-87. The motions panel further expedited the appeal. ROA.6890.

**IV.   The district court declined to extend the remedial deadline after hearing testimony from legislative leaders.**

On June 16, the district court heard live testimony from Speaker Schexnayder and President Cortez regarding their motion to extend the time for the Legislature to enact a remedial plan—which was filed a week after the district court's injunction and only after the motions panel denied Defendants' stay motions. ROA.15554-55. The district court credited testimony from President Cortez that the June 20 deadline provided sufficient time to enact a remedial map and that legislators could refer to public comments on congressional redistricting that were offered during the map-drawing process earlier this year. ROA.16590-91. The district court further found that the House's efforts at producing a remedial map had been dilatory and "disingenuous": Committee hearings had not been promptly scheduled, and the chamber adjourned after meeting for only 90 minutes. ROA.16591-92. Consistent with the motions panel's recognition that the Legislature was given sufficient opportunity to adopt a remedial map, ROA.6889, the district court denied the motion for an extension, ROA.16592.

The June 20 deadline came and went without any enactment from the Legislature. Dist.Ct.Dkt.225 at 3 & n.1.

## V.   The district court is currently undertaking a remedial process.

Pursuant to the district court's remedial schedule, ROA.15589-90, Plaintiffs submitted a proposed remedial map on June 22, Dist.Ct.Dkt.225. Their proposed map "remedies the Section 2 violation [by] provid[ing] Black voters with the opportunity to elect candidates of their choice in an additional congressional district that adheres to both traditional redistricting principles and the State of Louisiana's articulated policy preferences." *Id.* at 11-12. "Indeed," Plaintiffs' remedial plan "in many instances *better* adheres to these principles than HB 1." *Id.* at 12. Defendants did not submit a proposed map.

The district court's evidentiary hearing on Plaintiffs' proposed map is scheduled for June 29. ROA.15590. In the meantime, "[l]imited discovery of the mapmakers and [the parties'] experts" is ongoing. *Id.*

## SUMMARY OF ARGUMENT

This is a textbook Section 2 case. The district court made thorough and well-supported factual findings and, like the motions panel, correctly applied governing caselaw. The result is a preliminary injunction that is consistent with both the law and the facts.

By recasting caselaw to serve their preferred narratives and disregarding the factual record, Defendants have attempted to inject confusion into these proceedings and muddy the legal waters. Their arguments are without merit.

**First *Gingles* precondition.** The undisputed factual record confirms the district court's finding that Plaintiffs satisfied the numerosity and compactness requirements of the first *Gingles* precondition. Plaintiffs' illustrative districts comply with neutral redistricting criteria and unite communities with shared interests, and Defendants offered no evidence to the contrary.

**Racial gerrymandering.** The district court concluded—and the motions panel confirmed—that race *did not predominate* in the drawing of Plaintiffs' illustrative maps. As such, they are not racial gerrymanders.

**Third *Gingles* precondition.** Plaintiffs demonstrated—and Defendants did not refute—that white bloc voting usually defeats Black-preferred candidates in the area where Plaintiffs' have drawn their illustrative districts. They have thus satisfied the third *Gingles* precondition—notwithstanding Defendants' attempt to concoct a new test wholly divorced from precedent.

**Preliminary relief.** Because Plaintiffs satisfied the elements of a preliminary injunction, the district court properly ordered injunctive relief. There is no redistricting exception to Federal Rule of Civil Procedure 65, and the district court's injunction is consistent with this Court's precedent.

**Equities.** The record in this case confirms what Defendants previously represented in state court: There is sufficient time to adopt and implement a new congressional map in advance of the November elections.

## STANDARD OF REVIEW

"A district court's grant of a preliminary injunction is reviewed for abuse of discretion." *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 418-19 (5th Cir. 2001). "A preliminary injunction should issue if the movant establishes":

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006). Each of these elements "presents a mixed question of fact and law. Findings of fact are

reviewed only for clear error; legal conclusions are subject to *de novo* review." *Women's Med. Ctr.*, 248 F.3d at 419.[1]

This Court has emphasized the significant deference owed to district courts that undertake the Section 2 inquiry. "[B]ecause Section 2 vote dilution disputes are determinations 'peculiarly dependent upon the facts of each case that require an intensely local appraisal of the design and impact of the contested electoral mechanisms,' [the Court] review[s] the district court's findings on the *Gingles* threshold requirements and its ultimate findings on vote dilution for clear error," which "preserve[s] the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law." *Sensley v. Albritton*, 385 F.3d 591, 595 (5th Cir. 2004) (first quoting *NAACP v. Fordice*, 252 F.3d 361, 364 (5th Cir. 2001); and then quoting *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986)). The clear-error standard is also

---

[1] Defendants provide the standard of review for mandatory injunctions, Br.28-29, but here Plaintiffs sought a *prohibitory* injunction barring the use of Louisiana's enacted congressional plan—which is precisely what the district court ordered, ROA.6636. That the district court gave the Legislature an *opportunity* to craft a remedial map—as Supreme Court precedent generally requires, *see, e.g.*, *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (plurality opinion)—does not transform the prohibitory injunction into a mandatory injunction.

consistent with the "singular deference" courts give to a district court's credibility determinations. *Cooper v. Harris*, 137 S.Ct. 1455, 1474 (2017); *see also Anderson v. City of Bessemer*, 470 U.S. 564, 575-76 (1985) (holding that "[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings," which "can virtually never be clear error").[2]

## ARGUMENT

Defendants' arguments sound the same themes that the district court and motions panel properly rejected.

Although ostensibly couched in legalese and grounded in precedent, their merits arguments are strikingly audacious: thinly veiled attempts to rewrite federal law and overturn binding precedent. But the law governing VRA claims is what this Court and the U.S. Supreme Court have said it is—not what Defendants might wish it were. Their merits

---

[2] Defendants suggest that Justice Kavanaugh's concurrence in *Merrill v. Milligan*, 142 S.Ct. 879 (2022), imposed additional "obligat[ions]" on Plaintiffs. Br.30. But a two-justice concurring opinion to a stay order—which itself is "not [a] precedential decision[]," since stay orders "do not extend beyond the case in which they are entered," *Schwab v. Sec'y, Dep't of Corr.*, 507 F.3d 1297, 1301 (11th Cir. 2007) (per curiam)—is obviously not binding on this or any other court. Regardless, Plaintiffs would satisfy that heightened standard in any event. *See infra* at 71-77 & n.19.

arguments, which disregard settled precedent and the extensive factual record, should not be credited.

Likewise, Defendants' equities arguments are short on substance but long on hyperbole. Their feverish portents of chaos and electoral disaster have no basis whatsoever in the district court's findings or even the testimony of their lone equities witness. Their ultimate position is that the district court should have abdicated its obligation to enforce federal law based on nothing more than Defendants' own say-so. The district court declined that invitation; this Court should do the same.

## I.    Plaintiffs demonstrated a clear likelihood of success on the merits.

The district court's finding that HB 1 violates Section 2 can be reversed only if, "on the entire evidence," this Court "is left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Defendants have fallen far short of establishing any compelling errors of law or fact justifying reversal.

To start, Plaintiffs note the elements of their Section 2 claims that Defendants do *not* dispute. Other than a half-hearted criticism of the

BVAP metric regularly employed in Section 2 cases,[3] Defendants do not disagree with the district court's finding that "Plaintiffs are substantially likely to prove *Gingles I* numerosity." ROA.6724. They do not dispute the finding that "Black voters in Louisiana are politically cohesive" as required by the second *Gingles* precondition. ROA.6757. And they do not refute—or even address—the district court's conclusion that "the totality of the circumstances weighs in favor of Plaintiffs' request for relief." ROA.6775.

Defendants' appeal on the merits is limited to the compactness component of the first *Gingles* precondition and legally sufficient racial bloc voting under the third precondition. Significantly, Defendants provided *no* compelling evidence as to either precondition; their appeal instead relies on mischaracterizations of both Plaintiffs' evidence and binding caselaw. Their arguments should once again be rejected.

---

[3] Specifically, Defendants question Plaintiffs' use of the any-part BVAP metric to assess numerosity. Br.53 n.9. But as both the district court and motions panel concluded, use of this metric is consistent with Supreme Court caselaw. *See Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003).

### A.    Plaintiffs satisfied the first *Gingles* precondition.

The district court "f[ound] that the illustrative plans developed by Plaintiffs' experts satisfy the reasonable compactness requirement of *Gingles* I." ROA.6740. The motions panel, deferring to the district court's factual findings and applying precedent, agreed. ROA.6862-72.

Defendants offer little to dispute the district court's findings on compactness, instead opting for a strategy of obfuscation, mischaracterization of (or outright disregard for) the factual record, and distortions of precedent to fit their preconceived narrative of racial gerrymandering. When viewed through the proper lens, Plaintiffs' satisfaction of the first precondition is clear: Their illustrative majority-Black districts—CD 5 in each illustrative plan—establish that Black Louisianians are indeed "'sufficiently large and geographically compact to constitute a majority' in some reasonably configured [congressional] district," *Cooper*, 137 S.Ct. at 1470 (quoting *Gingles*, 478 U.S. at 50), and race did not predominate.

### 1. The illustrative maps are reasonably compact as defined by objective metrics and traditional redistricting criteria.

Plaintiffs' illustrative districts satisfy "traditional districting principles such as maintaining communities of interest and traditional boundaries." *Abrams v. Johnson*, 521 U.S. 74, 92 (1997). The district court found, based on the extensive factual record before it, that Plaintiffs "demonstrated that they are substantially likely to prove that Black voters are sufficiently 'geographically compact' to constitute a majority in a second congressional district." ROA.6724 (footnote omitted) (quoting *Cooper*, 137 S.Ct. at 1470). And, as the motions panel noted, "[D]efendants did not meaningfully refute or challenge Plaintiffs' evidence on compactness," a "tactical choice [that] has consequences" because "[i]t leaves the plaintiffs' evidence of compactness largely uncontested." ROA.6864; ROA.6726.[4]

---

[4] Defendants claim that they offered "robust arguments below regarding the first *Gingles* precondition," Br.38, but all they cite is evidence from the legislative record that does not actually refute Plaintiffs' evidence, *see infra* at 30-31.

### a. The illustrative districts are geographically compact.

Under "objective measures" and "upon a visual inspection," Plaintiffs' illustrative districts are geographically compact. ROA.6726, 6865. Indeed, the district court concluded not only that "the districts proposed in the illustrative maps are regularly shaped," but also that, "[c]ompared to the shape of CD 2 and the wraparound shape of CD 6 in the enacted plan, the illustrative plans are visually *more* compact," ROA.6733 (emphasis added), while undisputedly achieving compactness scores "demonstrably superior" to the enacted districts, ROA.6726.

| **Enacted Plan** | ***Galmon* Illustrative Plan 1** |
|:---:|:---:|
|  |  |

ROA.6638; ROA.6656.

Defendants are apparently dissatisfied with *any* measure of geographic compactness, as they fault both the district court for its analysis of "mathematical measures provided by the plaintiffs' map-

drawing experts" and the motions panel for "choosing to examine the shape of proposed districts." Br.35 (cleaned up). Their attempt to discount the geographic compactness of Plaintiffs' illustrative districts is understandable—after all, neither they nor their experts provided any evidence to refute it[5]—but this Court should not disregard a fundamental component of the compactness inquiry.

The district court properly considered mathematical measures of compactness. While both Defendants and the motions panel fault the district court for "assess[ing] geographic compactness with mathematical measures .... on a plan-wide basis, not a district-by-district basis," ROA.6866, the district court noted that "Cooper and Fairfax demonstrated, without dispute, that in terms of the objective measures of compactness, the congressional districts *in* the illustrative plans are demonstrably superior to the enacted plan," ROA.6726 (emphasis added). Indeed, the district court reported the compactness scores of Plaintiffs' illustrative plans *on a district-specific basis*. ROA.6661. These district-

---

[5] Only Dr. Murray attempted to analyze compactness, and his "unhelpful and unilluminating" conclusion was "nothing more than a commonsense observation which is not a whit probative of the compactness of the districts in the Plaintiffs' illustrative plans." ROA.6731.

by-district measurements confirm the district court's overall conclusion as to compactness: Plaintiffs' illustrative districts are reasonably compact compared against the enacted map's plan-wide average *and* its component districts.[6]

As for the motions panel's visual inspection, Defendants suggest that *LULAC v. Perry*, 548 U.S. 399 (2006) (plurality opinion), precluded consideration of geographic compactness as part of this inquiry. Br.35-36. But while *LULAC* indicated that this inquiry might not *alone* be dispositive—"the relative smoothness of the district lines," the Court explained, cannot justify "combining [] discrete communities of interest"—it did not state that geographic compactness is irrelevant. 548

---

[6] The motions panel similarly faulted the district court for "analyzing consistency with traditional redistricting criteria on a plan-wide basis" rather than a district-by-district basis; specifically, "by comparing the number of split political subdivisions in the illustrative and benchmark plans." ROA.6867. But Mr. Cooper's report and its accompanying exhibits provided this information on a district-by-district basis, which confirms that his illustrative CD 5s limit splits of political subdivisions. *See* ROA.1106-08; ROA.1179-84; ROA.1213-19; ROA.1240-46; ROA.1269-75; ROA.2805-08. At any rate, the motions panel concluded that "the rest of [the district court's] analysis is enough to show that the plaintiffs are likely to succeed in showing the first *Gingles* precondition," ROA.6867, and there is no countervailing evidence in the record suggesting that Plaintiffs' illustrative districts do not satisfy traditional redistricting criteria.

U.S. at 432-33. Ultimately, "while ... a compactness determination should not *hinge* on the shape of a district, the shape of a district certainly cannot be disregarded in a compactness inquiry" given that "the geographical shape of any proposed district necessarily directly relates to the geographical compactness and population dispersal of the minority community in question." *Sensley*, 385 F.3d at 596. Both the district court and motions panel treated geographic compactness properly—not as a "substitute for the relevant question," Br.35, but as one criterion among many.

### b. The illustrative districts comply with traditional redistricting principles.

Contrary to Defendants' suggestion, the district court's compactness analysis did not end with Reock scores, "geometric figures, [and] visual inspection of lines." Br.40. Both the district court and the motions panel properly concluded that Plaintiffs' illustrative districts respect the panoply of traditional redistricting criteria. As the motions panel summarized, Messrs. Cooper and Fairfax

> testified that they took criteria such as "political subdivision lines, contiguity" and "the Legislature's Joint Rule 21" [enumerating the Legislature's adopted redistricting criteria, ROA.6637] into account when drawing their maps. Fairfax also said he grouped populations with similar economic

demographics together and attempted to keep census designated places together when possible. And Cooper stated that he had declined to draw maps for plaintiffs in the past when doing so would require him to violate traditional redistricting criteria.... [T]heir testimony indicates that the districts they drew—including CD 5—are likely consistent with traditional redistricting criteria. Accordingly, the population of black voters in those districts is likely to be reasonably compact as well.

ROA.6866-67 (citations omitted); ROA.6657.[7] Specifically, the district court found that the illustrative plans "are contiguous and equalize population across districts"; "respect political subdivision boundaries as much or more so than the enacted plan with regard to parish splits"; and "respect political subdivision boundaries with regard to precinct splits."

---

[7] Defendants suggest that the district court erred by examining the compactness of the illustrative districts rather than the Black community within them. But, as the motions panel noted, this is a distinction without a difference—"the geographic compactness of a district is a reasonable proxy for the geographic compactness of the minority population *within* that district." ROA.6871 n.4; *see also Sensley*, 385 F.3d at 596. Moreover, the evidentiary record confirms that Louisiana's Black population is itself "concentrated in very compact, easily definable areas, partly as a result of historical housing segregation which still prevails in the current day." ROA.6662. Indeed, Mr. Cooper testified that "[t]his compactness in the Black population made it easy to join Black areas to other Black areas to draw a majority-Black district." ROA.6663.

ROA.6733-34. Defendants offered no evidence to refute these findings at the district court, nor do they challenge them now.[8]

### c. The illustrative districts unite communities of common interest.

Finally, "the illustrative CD 5 preserves communities of interest." ROA.6867. The district court found that "Plaintiffs made a strong showing that their maps respect [communities of interest] and even unite communities of interest that are not drawn together in the enacted map," which Defendants did "not meaningfully dispute[]." ROA.6737.

In addition to their mapping experts, who "employed different approaches to identifying communities of interests and considering them in their illustrative maps," ROA.6668-70; ROA.6735, "Plaintiffs also presented several lay witnesses who spoke to the shared interests, history, and connections between East Baton Rouge Parish and two areas

---

[8] The National Republican Redistricting Trust's amicus brief chides the district court's dismissal of core retention as a relevant criterion. But, as the motions panel noted, "[D]efendants have not explained why Louisiana's previous districting should be used as a measuring stick for compactness." ROA.6869. Indeed, the Legislature's own redistricting guidelines did *not* include core retention as an enumerated criterion. ROA.6739. Ultimately, "[c]ore retention is not and cannot be central to *Gingles I*, because making it so would upend the entire intent of Section 2, allowing states to forever enshrine the status quo regardless of shifting demographics." *Id.*

included together with it in [their] illustrative CD 5," ROA.6671. Christopher Tyson, a law professor at Louisiana State University and former candidate for statewide office, described "the strong historical connection between East Baton Rouge and the Delta parishes," including the "pattern of migration from the Mississippi Delta to Baton Rouge" and "educational ties between the Delta parishes and Baton Rouge." ROA.6671-72. Charles Cravins, former district attorney of St. Landry Parish, testified that "St. Landry and Baton Rouge share common policy concerns" stemming from educational and economic ties. ROA.6672-74.

Instead of citing countervailing evidence, Defendants mount an unpersuasive attack on these witnesses, suggesting that they "did not agree" because one referred to Baton Rouge as "south Louisiana" while the other described connections between Baton Rouge and the Delta Parishes to the north. Br.36-37. But Mr. Tyson and Mr. Cravins identified *several* communities of interest that are united in Plaintiffs' illustrative districts, bringing together Louisianians who share cultural, historical, and economic ties. The preservation of these communities— and not the unrealistic pursuit of complete homogeneity, which Defendants would seemingly require—led the district court to conclude

that, "[b]ased on the testimony in this matter, ... Plaintiffs' plans consider and preserve communities of interest to a practical extent." ROA.6737. Defendants' suggestion that *any* dissimilarities within a congressional district renders it noncompact, Br.33, defies both common sense and the Legislature's own criteria, which called for "maintenance of communities of interest within the same district," ROA.6734, not uniform communities throughout a district.[9]

Moreover, Defendants conspicuously ignore that Mr. Tyson and Mr. Cravins were *not* the only witnesses the district court heard on this issue. Mr. Cooper, in drawing his illustrative maps, examined (and preserved) "Core Based Statistical Areas [], which are regions defined by the Office of Management and Budget comprised of urban centers and the

---

[9] Indeed, under Defendants' approach to this criterion, the enacted CD 2 would confront significant problems: As the district court explained,

> the accusations that Defendants level at Plaintiffs' illustrative plans—that they pick up areas of BVAP with "surgical precision" and unite far-flung areas with little in common—apply equally to the enacted plan's CD 2. Testimony at the hearing established that the enacted CD 2 is very non-compact and includes Baton Rouge and New Orleans, two major cities with significantly different economies and representation needs, in the same district.

ROA.6752.

surrounding areas" and are "influenced by commuting patterns, commercial activity, and communities of interest." ROA.6660. Mr. Fairfax "testified that socioeconomic data"—including "median household income, educational attainment, food stamp percentage, poverty level, percentage of renter households, and community resilience estimates"—"was another important guiding factor for assessing communities of interest and to ensure respect for commonalities in mapping the districts. This information led him to conclude that areas in Ouachita Parish, Rapides Parish, Evangeline Parish, Baton Rouge, and Lafayette could be appropriately grouped together." ROA.6668. This evidence—which informed the district court's conclusion that Plaintiffs' illustrative districts respect communities of interest, ROA.6735—also went unrebutted by Defendants.

Having failed to proffer their own witnesses or experts to testify about communities of interest, Defendants do nothing more than nitpick. They note, for example, that the Legislature identified *other* communities of interest when it drew HB 1. Br.33-34, 38. But, as this Court has noted, "there is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles." *Chen v.*

*City of Houston*, 206 F.3d 502, 519 (5th Cir. 2000); *see also* ROA.6736-37 ("The inquiry under *Gingles I* is not whether Plaintiffs' illustrative maps represent the most perfect or preferable way to draw a majority-Black district; there is no need to show that the illustrative maps would 'defeat a rival compact district' in a 'beauty contest.'" (cleaned up) (quoting *Bush v. Vera*, 517 U.S. 952, 977-78 (1996) (plurality opinion))). The fact that the Legislature chose to draw a *different* CD 5 does not mean that Plaintiffs' illustrative CD 5s fail to preserve communities of interest— indeed, the evidentiary record and the district court's findings as properly relied upon by the motions panel demonstrate that they do.

Similarly, while Defendants repeatedly note that Baton Rouge and the Delta Parishes are separated by a distance of 180 miles, Br.24, 31, they never explain why distance is a proxy for dissimilarity—or, as the motions panel observed, "why those distances are too great—especially for rural regions such as the delta parishes included in CD 5. Indeed, it is not unusual for districts in rural parts of Louisiana to span such distances." ROA.6870.

Ultimately, Defendants can repeat the term "farflung" as much as they wish, but Plaintiffs' evidence (and the district court's findings)

confirm that the illustrative plans combine communities "together in an illustrative district [that] have similar 'needs and interests' *beyond* race"—just as Defendants would require. Br.32 (quoting *LULAC*, 548 U.S. at 435). Defendants' claim that "Plaintiffs did not analyze the non-racial similarities and differences between the rural Delta region and Baton Rouge," *id.* at 33, is simply wrong: Plaintiffs' expert and lay witnesses did *precisely* that. Here, unlike in *LULAC*, the district court looked at a range of criteria—indeed, the very criteria that *the Legislature itself adopted* when it drew the enacted map, ROA.6637—and concluded that the illustrative maps satisfied them all. The motions panel agreed. And nothing Defendants argue now (and certainly nothing they offered into evidence) indicates otherwise.

### d. Defendants rely on mischaracterizations of the district court proceedings.

In the words of the motions panel, "actions speak louder than words, and the defendants mention very little of what they introduced before the district court in connection with the compactness inquiry." ROA.6868. The limited degree to which Defendants rely on their expert mapping witnesses is telling—countervailing evidence is simply not in the record. Without an evidentiary leg to stand on, Defendants offer a

misleading account of the proceedings below and attack both Plaintiffs' case and the district court's adjudicative process. These arguments are both factually inaccurate and legally nonsensical.

*First*, Defendants repeatedly claim that Plaintiffs were guided solely by a quest for proportionality. Br.31, 34. Not so: Both Plaintiffs *and* the district court properly treated proportionality as just one piece of "evidence of whether the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by Black Louisianians. *LULAC*, 548 U.S. at 437 (cleaned up); *see also Johnson v. De Grandy*, 512 U.S. 997, 1012 (1994). Proportionality is not dispositive, but Defendants cannot deny that it is a legitimate consideration when undertaking the totality-of-circumstances analysis.

*Second*, what Defendants dismiss as "noisy datapoints," Br.36, were actually evidence that Plaintiffs' illustrative plans satisfy traditional redistricting criteria, *see supra* at 22-26—exactly what is required to demonstrate Section 2 compactness, *see LULAC*, 548 U.S. at 433 (holding that the Section 2 compactness inquiry "should take into account

traditional districting principles such as maintaining communities of interest and traditional boundaries" (cleaned up)).

*Third*, as to the one criterion Defendants *do* address—maintaining communities of interest—they wrongly suggest that Plaintiffs submitted only lay testimony, Br.36, which ignores the expert evidence discussed above. And they disingenuously claim that "a *single* Louisiana citizen [] suppl[ied] the basis for Plaintiffs to establish that the Delta Parishes and Baton Rouge are appropriate communities of interest," Br.37 (cleaned up), which ignores that fact *and expert* witnesses testified not only that Plaintiffs' illustrative maps unite communities with shared interests, but also that the enacted map—which joins Baton Rouge and New Orleans together in CD 2—does *not, see supra* at 29 n.9. Defendants, by striking contrast, "did not call *any* witnesses to testify about communities of interest"—"a glaring omission, given that [the Legislature's own] Joint Rule 21 requires communities of interest to be prioritized over and above preservation of political subdivisions." ROA.6735 (emphasis added).[10]

---

[10] Defendants repeatedly claim that "the district court's breakneck-speed for briefing the preliminary-injunction motion" foreclosed their presentation of an effective defense. Br.36 n.6. They lodged similar complaints with the district court, which rejected them:

*Fourth*, Defendants claim that Plaintiffs "view[ed] Black voters as fungible" when moving them between districts in their illustrative maps. Br.39. But redrawing district lines is required by the first precondition— and moving Black voters from a packed district to an illustrative Black-opportunity district remedies the dilution of Black voting strength. *See Harding v. County of Dallas*, 948 F.3d 302, 307 (5th Cir. 2020). Indeed,

---

Throughout these proceedings, Defendants have complained that the deadlines imposed by the Court left them unable to prepare a full defense. It had been widely known and reported on at least six months before the *Complaints* were filed in these cases that the enacted maps would likely be the subject of litigation. Defendants can hardly claim surprise, especially when they were already participating in related litigation in state court when this suit was filed. And Attorney General Landry and the Legislators chose to participate in this suit by intervention, rendering any prejudice they suffered strictly self-imposed. Moreover, the Court accommodated Defendants' request to re-set the preliminary injunction hearing after they complained that the timeline was too tight. Overall, the Court finds that Defendants' attempt to use the Court-imposed deadlines as a shield is meritless. A preliminary injunction hearing is expedited by its nature.

ROA.6760 n.350. Defendants' grumbling is no more compelling now than before—and no less inconsistent, given that *they themselves* claim that time is running short. And it certainly does not excuse their wholesale failure to present effective evidence; after all, they put on *seven* experts at the preliminary-injunction hearing, each of whom was found to be unhelpful and unpersuasive. *See supra* at 8-10. Indeed, Defendants *did* have time to secure an expert on communities of interest—and then chose to abandon his testimony without explanation.

it is *Defendants* who paint Black voters with an inappropriately broad brush: Having been presented with unrebutted evidence that Plaintiffs' illustrative plans connect Black Louisianians with shared cultural, economic, and educational ties, Defendants myopically conclude that the only unifying factor is race.

Defendants resort to faulting Plaintiffs for not offering *more* witnesses and the district court for crediting the witnesses who *did* testify. Br.36-37, 39. But this is how litigation works: a party presents evidence to satisfy its burden, and the court considers the evidence (along with any counterevidence the opposing party provides) and reaches a conclusion. Here, the district court weighed the evidence and concluded that Plaintiffs met their burden as to the first *Gingles* precondition. Plaintiffs have thus "carried the burden of persuasion" on this precondition. Br.37 (cleaned up). Defendants might not like the result, but if they object simply because the district court credited witnesses and rendered a judgment, then their dispute is with Coke and Blackstone— not Plaintiffs' evidence.

*       *       *

In short, Defendants did not meaningfully dispute Plaintiffs' satisfaction of *any* of the traditional redistricting principles that together led to a finding of sufficient compactness. There are no "significant legal errors undermining the district court's decision [to] compel this Court, at a minimum, to reverse its ruling and remand." Br.40. And there is certainly nothing "speculative" about the district court's conclusions given that it undertook the correct inquiries and made factual findings based on the evidentiary record. *Id.* Notably, the phrase "clear error" does not appear *once* in Defendants' analysis of compactness—unsurprisingly, since they have no credible basis to second-guess the district court's findings or the legal conclusions that these findings informed. Plaintiffs satisfied the first *Gingles* precondition.

### 2.   Defendants' claims of racial gerrymandering are without merit.

On page 40 of their brief, Defendants' preferred narrative truly takes form: that race predominated in the drawing of Plaintiffs' illustrative maps and, by extension, that *any* consideration of race as part of the *Gingles* undertaking constitutes impermissible racial gerrymandering. This is the same tactic Defendants chose at the district court, where they "put all their eggs in the basket of racial

gerrymandering." ROA.6864. But their analysis is wrong as a matter of law and a matter of fact. As the motions panel correctly concluded, "racial consciousness in the drawing of illustrative maps does not defeat a *Gingles* claim," and "even if it did, the defendants have not shown that the plaintiffs' maps prioritized race so highly as to commit racial gerrymandering." ROA.6872. Neither these conclusions nor the district court's findings underpinning them should be disturbed.

### a.    The district court and motions panel considered and rejected Defendants' assertions of racial predominance.

Defendants spill considerable ink shadowboxing with a phantom opponent. They begin by claiming that "[t]he district court (and the motions panel) erred [] in viewing the predominance test as *irrelevant* to Plaintiffs' showing," Br.41, and then proceed to counter this view with extensive discussion of history, caselaw, and scholarship. Noticeably absent, however, is any discussion of the actual findings in this case. In fact, neither the district court nor the motions panel disregarded the predominance inquiry; the motions panel stated that "a *Gingles* showing transparently dependent on racial gerrymandering might fail under *Gingles*'s totality-of-the-circumstances assessment," ROA.6875, and

though the district court questioned the extent to which the racial-gerrymandering doctrine should apply to *Gingles*—as this Court has, *see Clark v. Calhoun County*, 88 F.3d 1393, 1406-07 (5th Cir. 1996)—it concluded that, "*[r]egardless*, the record does not support a finding that race predominated in the illustrative map-making," ROA.6750 (emphasis added).[11]

The relevance of the racial-predominance inquiry is the first of Defendants' red herrings. Neither the district court nor the motions panel—nor *this* Court—need resolve the issue. The district court thoroughly considered both the direct and circumstantial evidence and found that, regardless of the extent to which the racial-gerrymandering doctrine intersects with Section 2, race *did not predominate* here. The district court "credit[ed] Cooper's testimony" that, although "he was aware of race during the map drawing process," "race was *not* a predominant consideration in his analysis," as he "considered all of the relevant principles in a balanced manner." ROA.6732 (emphasis added);

---

[11] Defendants' treatment of *Clark* is a sideshow. Given the district court's finding that race did not predominate in the creation of Plaintiffs' illustrative maps, neither "the meaningful prospect that the Supreme Court will intervene and abrogate *Clark*" nor the possibility of "*en banc* review," Br.48, is of any consequence.

- 39 -

*see also* ROA.6732-33 (crediting Mr. Fairfax's testimony "that race did not predominate in his mapping process"). These factual findings were based on the district court's comprehensive review of the expert testimony, *see, e.g.*, ROA.6726-29; ROA.6731 (rejecting Defendants' expert testimony regarding racial predominance), and a detailed assessment of the witnesses' credibility, *compare* ROA.6732-33; ROA.6750-51 (finding Mr. Cooper and Mr. Fairfax credible), *with* ROA.6726 (declining to exclude Mr. Bryan but finding "his methodology to be poorly supported"), *and* ROA.6728 (finding that Dr. "Blunt has no experience, skill, training or specialized knowledge").

Moreover, the district court found that "if Plaintiffs' experts engaged in race-predominant map drawing, their illustrative plans would surely betray this imbalanced approach by being significantly less compact, by disregarding communities of interest, or some other flaw." ROA.6752. But in fact "Plaintiffs' plans *outperformed* the enacted plan on every relevant criteria." *Id.* (emphasis added); *see also* ROA.6740 (finding that Plaintiffs' illustrative maps satisfy neutral criteria as well as or better than enacted map). The satisfaction of neutral districting

criteria further "serve[s] to defeat a claim that a district has been gerrymandered on racial lines." *Shaw v. Reno*, 509 U.S. 630, 647 (1993).[12]

The district court's thorough factual findings—informed by consideration of both Plaintiffs' *and* Defendants' expert witnesses— confirm that Defendants' digressions into predominance are misplaced. It is simply untrue, as Defendants claim, that the district court "read[] §2 to compel presumptively unconstitutional redistricting" and that the motions panel subsequently "endorse[d] the district court's incorrect conclusion that no predominance inquiry is even required in a §2 case." Br.43-44. Instead, both courts simply found that race *did not predominate* in the first place, and thus that the constitutional question

---

[12] Defendants suggest that *Bethune-Hill v. Virginia State Board of Elections*, 137 S.Ct. 788 (2017), removed adherence to traditional redistricting principles from the racial-gerrymandering inquiry. But *Bethune-Hill* merely emphasized that "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition ... to establish a claim of racial gerrymandering"; it did *not* change the fact that "inconsistency may be persuasive circumstantial evidence tending to show racial predomination" or otherwise undermine *Shaw*. *Id.* at 799.

over which Defendants continue to obsess has no actual bearing in this case.[13]

### b. Defendants' predominance arguments are unpersuasive.

Notwithstanding the district court's clear finding that race did not predominate when Plaintiffs' mapping experts drew their illustrative maps, Defendants maintain that "racial predominance *is* 'inevitable' in a remedy in this case." Br.46. But the arguments on which they rely mischaracterize precedent or the factual record—or both.

---

[13] Even if race *had* predominated, Defendants conspicuously ignore the second part of the "two-step analysis": whether "the design of the district [] withstand[s] strict scrutiny." *Cooper*, 137 S.Ct. at 1463-64. "When a State invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had 'a strong basis in evidence' for concluding that the statute required its action." *Id.* (quoting *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)). Here, the sum total of Plaintiffs' evidence and the district court's findings, along with the numerous maps rejected during the legislative process and Governor Edwards's veto, provide indisputably "good reasons" to believe that a second Black-opportunity district is required under the VRA. *Ala. Legis. Black Caucus*, 575 U.S. at 278 (cleaned up). Plaintiffs' illustrative plans would thus satisfy the requirements of strict scrutiny against a hypothetical racial-gerrymandering claim. Moreover, this entire exercise is essentially academic at this point—a remedial map is already being considered by the district court, and there is certainly no evidence that *that* map constitutes an unlawful gerrymander.

*First*, Defendants suggest that *Cooper* and *Bethune-Hill v. Virginia State Board of Elections*, 137 S.Ct. 788 (2017), compel a finding of racial predominance in this case. Br.49-50. In *Cooper*, the Supreme Court reiterated that a racial-gerrymandering charge "entails demonstrating that the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.'" *Cooper*, 137 S.Ct. at 1463-64 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). It also reaffirmed that "the [district] court's findings of fact—most notably, as to whether racial considerations predominated in drawing district lines—are subject to review only for clear error." *Id.* at 1465. The *Cooper* Court's conclusion that "the District Court did not clearly err in finding that race predominated" was premised on, among other things, direct evidence from the mapmakers—who "were not coy in expressing" their race-based goal and testified that achieving "an announced racial target" was "more important" than adhering to other criteria—and the resulting "*subordinat[ion of] other districting criteria [that] produced boundaries amplifying divisions between blacks and whites.*" *Id.* at 1468-69 (emphasis added). Defendants conspicuously omit the emphasized text, repeatedly suggesting that a racial target

- 43 -

*alone* "is ... what the Supreme Court held *compels* a predominance finding in *Cooper*." Br.50. But the *Cooper* Court made clear that its decision was based on a "body of evidence," 137 S.Ct. at 1469, that does not exist here.

Nor did a racial target alone lead to a racial-gerrymandering finding in *Bethune-Hill*. While the Court noted that "use of an express racial target" might serve as "relevant districtwide evidence" of racial gerrymandering, it also emphasized that "[a] *holistic analysis* is necessary to give that kind of evidence its proper weight." *Id.* at 800 (emphasis added). Defendants' incorrigible cherry-picking—of both the evidentiary record *and* controlling caselaw—is flatly incompatible with the holistic analysis that is required in racial-gerrymandering cases.

*Second*, Defendants emphasize instances in the record where Plaintiffs' mapping experts acknowledged that they considered race when drawing their illustrative plans. Br.50. The district court effectively dispatched this argument in its preliminary-injunction order:

> This is not the "gotcha" moment that Defendants make it out to be. It is well-established that in a vote dilution case, the method by which a plaintiff can prove numerosity to satisfy *Gingles I* is the production of illustrative maps demonstrating that it is possible to draw an additional 50% + majority-minority district. So, the fact that Plaintiffs asked Cooper to draw such a map is no surprise. And, while Cooper did testify that Plaintiffs asked him to draw two majority-Black districts,

he also testified that he "did not have a goal to under all circumstances create two majority-Black districts" because "when developing a plan you have to follow traditional redistricting principles." And Fairfax's testimony established how he considered socioeconomic data extensively in deciding where to draw his lines. Overall, the Court ... credits their testimony that race did not predominate in their drawing as sincere.

ROA.6751 (footnote omitted); ROA.6073. Throughout their brief, Defendants wrongly conflate racial *consciousness* with racial *predominance*. The Supreme Court has explained that racial-gerrymandering claims require a showing "that race was the *predominant factor* motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916 (emphasis added). But "[i]t does *not* follow that race predominates in the redistricting process" from mere "aware[ness] of racial demographics." *Id.* (emphasis added). Indeed, "redistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines .... That sort of race consciousness does not lead inevitably to impermissible race discrimination." *Shaw*, 509 U.S. at 646. And because courts "*require* plaintiffs to show that it is possible to draw majority-minority voting districts," "[t]o penalize [plaintiffs] ... for attempting to make the very

showing that *Gingles*[ and its progeny] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." *Davis v. Chiles*, 139 F.3d 1414, 1425-26 (11th Cir. 1998).

Here, both the district court and motions panel concluded that Plaintiffs' mapping experts merely *considered* race—and correctly noted that consideration is not the same as predominance. *See* ROA.6874 ("Though the plaintiffs considered race, the defendants have not shown that that consideration predominated over more traditional redistricting principles."); ROA.6751-52 ("[A]ll Defendants have demonstrated is that the mapdrawers considered race after they were asked to consider race— that is, to analyze whether it is possible to draw an illustrative plan adhering to traditional criteria and satisfying the first condition of *Gingles*. This does not offend the Constitution."). Defendants gloss over this critical distinction.

*Third*, Defendants note that Plaintiffs' illustrative districts contain BVAPs only slightly above 50%, suggesting this too is an indication of racial predominance. Br.53. But *Bartlett v. Strickland* established an "objective, numerical test: Do minorities make up more than 50 percent

of the voting-age population in the relevant geographic area?" 556 U.S. 1, 18 (2009) (plurality opinion). Neither there nor anywhere else has a numerosity threshold beyond 50% been imposed. Defendants try to move the goalpost, but Plaintiffs satisfied the first *Gingles* precondition precisely as the Supreme Court has defined it.

*Fourth*, Defendants rely on their expert witnesses, who purportedly provided evidence of racial predominance. Br.51-56. But the district court *and* the motions panel properly discounted these experts' contributions for their myriad methodological and analytical shortcomings.

**Thomas Bryan.** Defendants make several references to Mr. Bryan, suggesting that his testimony as to compactness "stands strong" and is equally as probative as the testimonies of Plaintiffs' mapping experts. Br.39. This is disingenuous: The district court found that "his methodology [was] poorly supported" and his "analysis lacked rigor and thoroughness." ROA.6726-27.[14] His racial predominance analysis was not only based on assumptions that, "he admitted, are not supported by the evidence in this case," but also failed to take account of *any* of the

---

[14] The district court was not the first to "afford[] his testimony very little weight"—that was the same result when "Bryan testified as an expert in a redistricting case for the first time earlier this year." ROA.6726.

neutral criteria set forth in Joint Rule 21 that guided Plaintiffs' mapping experts. ROA.6676; ROA.6727. It is no surprise that Mr. Bryan's analysis—which looked at race *to the exclusion of all else*—saw racial predominance where none actually existed.

Notwithstanding these methodological flaws, Defendants cite Mr. Bryan's analysis as proof that "Plaintiffs' experts' illustrative plans consistently and precisely 'segregate the races.'" Br.51 (quoting *Shaw*, 509 U.S. at 642). But, as the motions panel noted, Mr. Bryan's testimony *at most* demonstrates that Plaintiffs' illustrative maps "split[] Baton Rouge and Lafayette between congressional districts such that the black neighborhoods were included in CD 5"—and "evidence of a minor departure in one area of the district has only limited probative value with respect to the compliance of the district with traditional redistricting criteria *on the whole*" and "is outweighed by the plaintiffs' direct testimony that the black populations in CD 5 are culturally compact." ROA.6868. In other words, Mr. Bryan's findings do not indicate that traditional principles were subordinated to race in these isolated line-drawing decisions; to the contrary, given Plaintiffs' community-of-interest evidence, they are *consistent* with the district court's and motions

panel's conclusion that the illustrative districts unite Louisianians with shared interests.

**Dr. Christopher Blunt.** Defendants also tout the findings of Dr. Blunt, who ran computerized simulations of alternative congressional plans "without regard to racial data," none of which resulted in a majority-minority district. Br.54. But the district court found not only that "Dr. Blunt's simulation analysis experience is best described as novice," but also that "the simulations he ran did not incorporate the traditional principles of redistricting required by law"—including "minimizing precinct splits, respecting communities of interest, incumbency protection, [and] even the criterion considered paramount by Defendants, core retention"—and accordingly "merit little weight." ROA.6728-29. "In accord with that finding of fact," the motions panel similarly "discount[ed] his opinion as well for whatever purpose it could serve in showing the compactness (or lack thereof) among the black voting population." ROA.6869. Like Mr. Bryan, Dr. Blunt failed to account for the actual criteria that the Legislature announced in Joint Rule 21 and that Plaintiffs' mapping experts used to develop their illustrative maps—including communities of interest, which the

Legislature prioritized in its redistricting efforts. ROA.6636. Dr. Blunt's flawed simulations thus demonstrate nothing of consequence—least of all that race predominated in Plaintiffs' illustrative maps.[15]

In short, the district court considered the credibility and contributions of these and Defendants' other experts and concluded that their testimonies were neither helpful nor illuminating—and the motions panel agreed. Defendants point to nothing in the record that the previous courts overlooked, let alone any evidence that would provide good cause

---

[15] Defendants suggest that it was clear error for the district court to discount Dr. Blunt's flawed simulations analysis by pointing to the Fourth Circuit's consideration of expert redistricting simulations in the partisan-gerrymandering context. Br.55-56. But the use of simulations analysis in partisan-gerrymandering cases only further illustrates its deficiencies in *this* case. Unlike the expert in North Carolina, *see Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 344 (4th Cir. 2016), Dr. Blunt omitted key relevant criteria from his analysis, ROA.6773, resulting in an unhelpful, apples-to-oranges analysis that cannot show the extent to which racial considerations (or any other) motivated Plaintiffs' maps. More fundamentally, the purpose of simulations analysis in partisan-gerrymandering cases is to determine whether partisan considerations *influenced* a map's drawing. Even if Dr. Blunt had employed the proper methodology, at best his analysis could show whether two majority-minority districts would be likely to result from "a race-blind redistricting process." ROA.6679-80. But Plaintiffs' mapping experts never purported to be "race-blind," and racial predominance is not the necessary alternative to racial blindness. *See supra* at 44-46.

to upend the "singular deference" that the district court's findings are owed. *Cooper*, 137 S.Ct. at 1474.

### c. *Hays* is another red herring.

As a final arrow in their racial-gerrymandering quiver, Defendants frequently (and disingenuously) raise the specter of the *Hays* litigation of the 1990s. Br.1, 7-9, 13, 31-32, 37, 74. The implication of this recurring invocation is clear: that a second majority-Black congressional district in Louisiana is necessarily foreclosed by litigation that occurred almost 30 years ago.

The district court correctly dismissed this argument as "a red herring." ROA.6744. "Defendants' assertion that *Hays* automatically vitiates the validity of Plaintiffs' illustrative plans is refutable by a cursory visual inspection of the *Hays* maps," which in no way resemble Plaintiffs' illustrative maps. ROA.6742. The challenged districts in *Hays* resembled "a giant but somewhat shaky 'Z' across the state" and "an inkblot which has spread indiscriminately across the Louisiana map." *Hays v. Louisiana*, 936 F.Supp. 360, 363-64 (W.D. La. 1996) (per curiam) (three-judge court) (cleaned up).

**1992 Map**                                    **1994 Map**



ROA.1150; <u>ROA.1152</u>. By contrast, none of the illustrative CD 5s drawn

by Messrs. Cooper and Fairfax resembles either of these meandering,

eccentric districts:

***Galmon* Illustrative Plan 1**          ***Galmon* Illustrative Plan 2**



### *Galmon* Illustrative Plan 3



### *Galmon* Illustrative Plan 4



### *Robinson* Illustrative Plan 1



### *Robinson* Illustrative Plan 2



ROA.536; ROA.1197; ROA.1224; ROA.1253; ROA.2845; ROA.3076.

Indeed, both of Plaintiffs' mapping experts testified that they would never have drawn as "diffuse and nonsensical" a district as the districts challenged in *Hays*. ROA.6744; *see also* ROA.4986; ROA.5046.

Moreover, "the Black population in Louisiana has increased significantly since the 1990 census that informed the *Hays* map." ROA.6744. "*Hays*, decided on census data and demographics 30 years ago, is not a magical incantation with the power to freeze Louisiana's

congressional maps in perpetuity." *Id.* That case "is distinguishable and inapplicable," *id.*, and yet another example of Defendants' insistence on litigating any case other than the one in front of them.

\* \* \*

Defendants' endgame is apparent from their brief: By selectively quoting from *Cooper*, *Bethune-Hill*, and other racial-gerrymandering cases—and selectively pulling pieces of testimony from the record—they hope to transform *any* consideration of race as part of the Section 2 analysis into unlawful gerrymandering. *See, e.g.*, Br.59 ("The obvious motive in achieving majority-minority districts is *evidence* of predominance, not an *argument* against it." (citation omitted)). Courts have rightly rejected that approach as both inconsistent with Supreme Court precedent and incompatible with the requirements of a Section 2 claim. *Gingles* remains good law. The VRA remains on the books. And this Court should reject Defendants' gambit to foreclose satisfaction of the first *Gingles* precondition based on a distortion of the racial-gerrymandering doctrine.

**B.     Plaintiffs satisfied the third *Gingles* precondition.**

It is undisputed in this case that "whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates" in the area encompassed by Plaintiffs' illustrative districts. *Gingles*, 478 U.S. at 56. Plaintiffs have thus satisfied the third precondition.

This is a straightforward inquiry; as the motions panel explained, "the question posed by the third *Gingles* precondition is concrete: If the state's districting plan takes effect, will the voting behavior of the white majority cause the relevant minority group's preferred candidate 'usually to be defeated'?" ROA.6876 (quoting *Covington v. North Carolina*, 316 F.R.D. 117, 171 (M.D.N.C. 2016) (three-judge court), *aff'd*, 137 S.Ct. 2211 (2017)). The district court's factual findings confirm that the answer to that question is a resounding yes. Specifically, the district court found that Plaintiffs' racially polarized voting experts independently "examined this issue, amassed detailed data, and arrived at the same conclusion: that White voters consistently bloc vote to defeat the candidates of choice of Black voters." ROA.6757-58. The motions panel confirmed that Plaintiffs' experts appropriately "tailored their analysis" to the "right question" by "consider[ing] the outcomes of elections" in the enacted plan

and determining that "'no Black-preferred candidate' had won a statewide or congressional race in the elections they examined except in CD 2, the preexisting majority-minority district." ROA.6877-78; ROA.6757.

Defendants offered nothing to rebut this evidence; to the contrary, one of their own racially polarized voting experts *agreed* that white-preferred candidates usually defeat Black-preferred candidates in Louisiana. ROA.5844. Nor do they dispute the district court's finding now. Instead, they turn the third *Gingles* precondition on its head by rewriting the relevant inquiry. But try as they might to argue for a different legal standard, they do not and cannot dispute that Plaintiffs have satisfied the standard *actually* established by caselaw—and properly applied by both the district court and motions panel.

Defendants' analysis relies on a redefinition of "legally significant racially polarized voting." But that term has been clearly defined as "majority bloc voting at such a level that it enables the majority group 'usually to defeat the minority's preferred candidates.'" *Covington*, 316 F.R.D. at 167 (quoting *Gingles*, 478 U.S. at 56). In other words, legally

significant racially polarized voting exists where the third *Gingles* precondition is satisfied. *That's all*.

Rejecting this simple (and binding) definition, Defendants concoct a new test based on the hypothetical performance of illustrative districts, suggesting that legally significant racially polarized voting does not exist where "there is sufficient white crossover voting to obviate the need for majority-minority districts." Br.60. This definition is flawed twice over.

### 1. Defendants' argument focuses on the wrong districts.

Defendants wrongly focus on the effect of bloc voting in illustrative and remedial districts. The motions panel explained why this misses the mark: "The plaintiffs must show that [legally significant] bloc voting would be present in the *challenged* districting plan." ROA.6876. An unbroken line of Supreme Court precedent confirms that the Section 2 inquiry examines whether legally sufficient racially polarized voting exists in *existing* districts, not potential *remedy* districts. *See, e.g.*, *Cooper*, 137 S.Ct. at 1470 (*Gingles* preconditions are needed to establish "that racially polarized voting prevents" minority group from electing its candidates of choice "in the district *as actually drawn*" (emphasis added)); *Growe v. Emison*, 507 U.S. 25, 40 (1993) (first and second *Gingles*

preconditions "are needed to establish that the *challenged districting* thwarts a distinctive minority vote by submerging it in a larger white voting population" (emphasis added)); *LULAC*, <u>548 U.S. at 427</u> (noting that second and third *Gingles* preconditions "are present in District 23" as drawn in challenged map); *see also Gingles*, <u>478 U.S. at 91</u> (O'Connor, J., concurring) ("The Court requires the minority group that satisfies the threshold requirements of size and cohesiveness to prove that it will *usually* be unable to elect as many representatives of its choice *under the challenged districting scheme* as its undiluted voting strength would permit." (second emphasis added)).[16]

Accordingly, "[D]efendants' observation that a hypothetical district could elect black-preferred candidates with as little as 40% BVAP" is just not "relevant." <u>ROA.6879</u>. Nor would this approach make any sense, since "it would be bizarre if a state could satisfy its VRA obligations

---

[16] The precise map that the third precondition analyzes differs between affirmative and defensive Section 2 cases. In an affirmative case like this one, bloc voting is analyzed under the *challenged* (enacted) map. But in a racial-gerrymandering case like *Covington* or *Cooper*, where map-drawers rely on Section 2 to *justify* challenged districts, the relevant map is the *prior* map that was purportedly redrawn to satisfy Section 2. In all the cases, the relevant map is the one that is the subject of the Section 2 inquiry—in other words, the map "without a VRA remedy." *Covington*, <u>316 F.R.D. at 168</u>.

merely by pointing out that it could have—but did not—give minority voters an opportunity to elect candidates of their choice without creating a majority-minority district." *Id.* While Plaintiffs' illustrative maps do indeed demonstrate "that 'the minority group has the *potential* to elect a representative of its own choice' in a *possible* district," the third *Gingles* precondition examines something different: whether "racially polarized voting prevents" a minority group from electing its candidates of choice "in the district *as actually drawn* because it is 'submerged in a larger white voting population.'" *Cooper*, 137 S.Ct. at 1470 (emphases added) (cleaned up) (quoting *Growe*, 507 U.S. at 40).

Neither *Covington* nor *Cooper* supports Defendants' misplaced emphasis on illustrative maps rather than enacted maps. To the contrary, these cases support the district court's and motions panel's correct understanding of the third precondition. Both involved attempted *defenses* under the VRA, not affirmative Section 2 claims. In both, racial-gerrymandering challenges were lodged against enacted districts that the legislature argued were required by Section 2. This proffered justification was rejected because the legislature failed to establish the existence of racial bloc voting in the pre-existing districts "that, absent

some remedy, would enable the majority usually to defeat the minority group's candidate of choice." *Covington*, 316 F.R.D. at 167-68. Indeed, as *Cooper* explained, "electoral history provided no evidence that a § 2 plaintiff could demonstrate the third *Gingles* prerequisite" because Black-preferred candidates *already prevailed* in the pre-existing districts. 137 S.Ct. at 1460. The consistent pattern of electoral success among Black-preferred candidates under the previous districts thus "gave the State no reason to think that the VRA required it to ramp up" the districts' BVAPs above 50%. *Id*. at 1470.

Here, by contrast, Plaintiffs *did* demonstrate that, under Louisiana's existing congressional plan, white bloc voting usually defeats Black-preferred candidates in the area encompassed by the illustrative majority-Black districts. *See* ROA.6879-80 (distinguishing *Cooper* from this case). Black-preferred candidates have not prevailed and *will not prevail* in this area "without a VRA remedy," *Covington*, 316 F.R.D. at 168—and Plaintiffs have thus satisfied the third *Gingles* precondition.

### 2.     Defendants misunderstand the relevance of white crossover voting.

Defendants also misread *Bartlett*'s discussion of white crossover voting in the context of the *first* precondition as altering the legal standard for the *third* precondition. It did no such thing.

*Bartlett* established the now-familiar 50% threshold for the first *Gingles* precondition. 556 U.S. at 18. In other words, unless a minority group is sufficiently numerous to constitute a majority of the eligible electorate in a potential district, it has no right to a Section 2 remedy. The decision did *not* change the third precondition. Indeed, *Bartlett* only mentioned the third precondition in passing to explain that its holding on the threshold evidentiary requirement for Section 2 plaintiffs should not be interpreted by states to require majority-minority districts where the minority group is already able to elect its preferred candidates in "effective crossover districts." *Id.* at 24. *Bartlett*'s observation that "[i]n areas with substantial crossover voting it is unlikely that the plaintiffs would be able to establish the third *Gingles* precondition," *id.*, was just a logical application of *Gingles*—after all, if enough white voters support a Black-preferred candidate in the existing map, then they would not vote as a bloc to defeat that candidate, the third precondition would go

unsatisfied, and a Section 2 remedy would not be justified. (Indeed, that is *precisely* the takeaway from *Cooper* and *Covington*. *See supra* at 58-59.) Here, by contrast, Defendants *cannot* point to an "effective crossover district[]" in the enacted map as evidence of legally insufficient bloc voting under the third *Gingles* precondition.

Defendants read *Bartlett* as foreclosing the third precondition whenever an illustrative district could perform with a BVAP below 50%. But setting aside the fact that illustrative districts are *not* the focus of the third precondition, *see supra* at 56-60, *Bartlett*'s holding "that § 2 does not require crossover districts," 556 U.S. at 23, does not mean that Section 2 violations cannot be *remedied* with crossover districts. In fact, the *Cooper* Court criticized State defendants for their similarly "mistak[en]" reasoning "that if, as [*Bartlett*] held, § 2 does not *require* crossover districts (for groups insufficiently large under *Gingles*), then § 2 also cannot be *satisfied by* crossover districts (for groups in fact meeting *Gingles*' size condition)." 137 S.Ct. at 1472. The fact that Plaintiffs' illustrative districts "could be drawn below 50% and enable the Black community to elect its preferred candidates," Br.65, demonstrates only that Plaintiffs have identified a viable remedy to the Section 2

violation they have established. It does nothing to undermine Plaintiffs' showing under the third precondition "that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population." *Growe*, 507 U.S. at 40.

Ultimately, levels of crossover voting insufficient to overcome white bloc voting in a challenged map—like the level observed in Louisiana where Plaintiffs drew their illustrative districts—do *not* negate the third precondition. To the contrary, *Gingles* explicitly noted that "a white bloc vote that normally will defeat the combined strength of minority support *plus white 'crossover' votes* rises to the level of legally significant white bloc voting." 478 U.S. at 56 (emphasis added). Accordingly, as the motions panel explained, "the proportion of these so-called 'crossover' votes is not directly relevant. Instead, white crossover voting is indirectly relevant because it influences the outcome of elections and, therefore, what really matters for the third *Gingles* precondition: whether minority-preferred candidates would usually lose under the challenged plan." ROA.6876; *see also* ROA.6760 ("White crossover voting was inherently included in the analysis performed by Dr. Palmer and Dr. Handley[.]"). Because Plaintiffs established—and Defendants do not dispute—that Black-

preferred candidates will usually lose under Louisiana's enacted congressional plan notwithstanding the existence of white crossover voting, Plaintiffs have satisfied the third *Gingles* precondition.

### C.      Section 2 confers a private right of action.

As a final merits gamble, Defendants suggest that Section 2 does not confer a private right of action, Br.69-71—an argument that is at odds with precedent and has been routinely rejected.

In *Morse v. Republican Party of Virginia*, a majority of the U.S. Supreme Court agreed that "the existence of the private right of action under Section 2 ... has been clearly intended by Congress since 1965." 517 U.S. 186, 232 (1996) (Stevens, J.) (plurality opinion on behalf of two justices) (quoting S. Rep. No. 97-417, pt. 1, at 30 (1982)); *accord id.* at 240 (Breyer, J., concurring) (expressly agreeing with Justice Stevens on this point on behalf of three justices). Contrary to Defendants' reading, Br.70-71, the *Morse* Court reached its conclusion as an essential part of its rationale for holding that another VRA provision, Section 10, confers a private right of action. *See* 517 U.S. at 232 (Stevens, J.) ("It would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express

authorizing language."); *see also id.* at 240 (Breyer, J., concurring) (agreeing that rationale behind "private right of action to enforce § 5 ... applies with similar force not only to § 2 but also to § 10").

"When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which [courts] are bound." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996). And where "a precedent of [the Supreme] Court has direct application in a case," courts "should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions"—even if it "appears to rest on reasons rejected in some other line of decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). *Morse* has not been overruled, and the Supreme Court has given no indication that a majority of justices intends to revisit its conclusion; indeed, it has repeatedly heard private cases brought under Section 2 without questioning this predicate foundation. *See, e.g., LULAC*, 548 U.S. at 409; *see also Shelby County v. Holder*, 570 U.S. 529, 537 (2013) ("Both the Federal Government *and individuals* have sued to enforce § 2." (emphasis added)). Only Justice Thomas joined Justice Gorsuch's recent suggestion that this is "an open question,"

*Brnovich v. DNC*, 141 S.Ct. 2321, 2350 (2021) (Gorsuch, J., concurring)—a concurrence that did not cite *Morse* or any post-*Morse* Section 2 cases.

In the past several months, seven federal judges on three district courts have expressly rejected the argument that Defendants offer here. *See Pendergrass v. Raffensperger*, No. 1:21-CV-05339-SCJ, 2022 WL 1518234, at *6-7 (N.D. Ga. Jan. 28, 2022); *Singleton v. Merrill*, Nos. 2:21-cv-1291-AMM, 2:21-cv-1530-AMM, 2022 WL 265001, at *78-79 (N.D. Ala. Jan. 24, 2022) (per curiam) (three-judge court); *LULAC v. Abbott*, No. EP-21-CV-00259-DCG-JES-JVB, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court); *see also* Statement of Interest of the United States at 1, *LULAC v. Abbott*, No. 3:21-cv-259 (DCG-JES-JVB) (W.D. Tex. Nov. 30, 2021) ("Private plaintiffs can enforce Section 2 as a statutory cause of action[.]"). Other circuit courts previously took this position as well. *See, e.g.*, *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 651-54 (11th Cir. 2020), *vacated on other grounds*, 141 S.Ct. 2618 (2021); *Mixon v. Ohio*, 193 F.3d 389, 406 (6th Cir. 1999). Against this backdrop, the contrary conclusion of a single district court, *see Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, No. 4:21-cv-01239-LPR,

2022 WL 496908, at *9 (E.D. Ark. Feb. 17, 2022), can be understood only as an outlier.

## II.     The equities weigh in favor of injunctive relief.

Like their merits arguments, Defendants' equities arguments distort the factual record and mangle legal precedent. Both the district court and motions panel were correct: The preliminary injunction was appropriate, and a remedial plan can be feasibly implemented ahead of the midterm elections.

### A.     Preliminary relief is appropriate in this case.

Defendants challenge the district court's authority to grant a preliminary injunction in the first instance. Contrary to their representations, it is neither "exceptional" nor "unprecedented" for courts to order preliminary injunctive relief. Br.72. Federal Rule of Civil Procedure 65 does not carve out redistricting cases from its broad recognition that courts may issue preliminary injunctions; the only restriction is that notice must be made to the adverse party, Fed. R. Civ. P. 65(a), something Defendants could hardly contend was lacking here. And, as discussed throughout this brief—and as found by the district court—Plaintiffs have satisfied the four elements to secure the equitable

remedy of preliminary relief. Defendants' identification of a handful of cases where plaintiffs failed to make the showing required for injunctive relief, Br.73, does not support the inference that injunctive relief is categorically beyond a court's authority in this case or any other.

Defendants fault the district court's reliance on this Court's decision in *Canal Authority v. Callaway*, but fail to contend with the operative instruction in that case: "If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury[.]" 489 F.2d 567, 576 (5th Cir. 1974). Indeed, "[t]he focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Id.* Plaintiffs have sufficiently demonstrated that Louisiana's new congressional map dilutes the electoral strength of Black voters, and so the status quo—a congressional map that violates the VRA—must be disrupted to prevent irreparable harm to Plaintiffs' fundamental rights. The district court's injunction ably adhered to this Court's guidance and is thus a "proper order" that should not be vacated.[17]

---

[17] Defendants (over)read *University of Texas v. Camenisch*, 451 U.S. 390 (1981), as effectively overruling *Callaway*. But that case merely

Moreover, preliminary court-ordered redistricting plans are not unprecedented. *See, e.g.*, *Gonidakis v. LaRose*, No. 2:22-cv-0773, 2022 WL 1709146, at *1 (S.D. Ohio May 27, 2022) (per curiam) (three-judge court); *Favors v. Cuomo*, No. 11-CV-5632 (RR)(GEL)(DLI)(RLM), 2012 WL 928223, at *7 (E.D.N.Y. Mar. 19, 2012) (three-judge court). As with any preliminary injunction, these plans are simply means of preventing irreparable harm in upcoming elections. The scope of the relief does not change this basic equitable calculus.

## B.    The district court's injunction is not unconstitutional.

Defendants' argument that "a new court-ordered plan" poses "a risk of a constitutional violation," Br.74-75, is simply a rehash of their racial-gerrymandering claim. Because neither Plaintiffs' illustrative maps nor the remedial plan they proposed constitutes an unlawful racial gerrymander, *see supra* at 37-54, this argument fails.

---

confirmed that "[p]reliminary injunctions *commonly* favor the status quo." *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) (emphasis added). Courts have continued to rely on *Callaway* for the proposition that "[m]aintaining the status quo is not a talisman" when granting preliminary relief tailored to prevent a particular harm. *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008); *see also, e.g.*, *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 WL 1124753, at *18 (11th Cir. Apr. 15, 2022).

### C. *Purcell* does not bar the injunction.

Having failed to dispute the merits of Plaintiffs' Section 2 claims, Defendants' last resort is to wave the banner of *Purcell*. But mere repetition of the term without *any* evidence in support cannot mandate judicial abdication. Moreover, in earlier litigation, Defendants *insisted* that a redistricting plan for the state's 2022 congressional elections was not urgently needed—a position ultimately supported by the factual record in this case.

### 1. Defendants' position is inconsistent with their prior representations.

During state-court litigation in March of this year, Louisiana's legislative leaders made on-the-record representations about how the state's unique election calendar permits redistricting to occur during the summer—or even the autumn—of an election year. As the district court recounted, the legislative leaders

> asserted that: "the candidate qualification period could be moved back, if necessary, as other states have done this cycle, without impacting voters." They further represented that: *"[t]he election deadlines that actually impact voters do not occur until October 2022. … Therefore, there remains several months on Louisiana's election calendar to complete the process."* There was no rush, they assured the court, because Louisiana's "election calendar is one of the latest in the nation."

ROA.6780 (alterations in original) (emphasis added) (footnotes omitted); ROA.2928; ROA.2931. Rather than explain their extraordinary about-face, Defendants now act as if it never happened.

Defendants' newfound insistence that a congressional map is urgently needed is further belied by their persistent—and baseless—attempts to delay this litigation. *See, e.g.*, ROA.3185-90 (legislative intervenors' motion to restart proceedings before three-judge court due to new claim purportedly asserted in footnote of reply brief); ROA.3192-96 (State's motion to stay proceedings on eve of preliminary-injunction hearing); ROA.15564-73 (State's proposal to delay remedial hearing); ROA.15574-82 (legislative intervenors' proposal to delay remedial hearing by nearly one month); ROA.15583-84 (Secretary of State's submission endorsing legislative intervenors' proposed remedial timeline); *see also* Dist.Ct.Dkt.223 at 3 (order denying State's motion for extension as "a red herring for a delay"). The district court has refused the many invitations to slow-walk these proceedings and remains on pace to adopt a remedial map well in advance of the July 20-22 candidate-qualifying period, and several months before the start of early voting on

October 25. *See* ROA.15589-90 (ordering remedial hearing to be held on June 29). In short, this case has proceeded exactly as it should.

After three months of asking both state and federal courts to slow down, Defendants now have the temerity to suggest that time has run out. But while their litigation tactics have apparently changed, the election calendar remains the same: The October deadlines they cited in March remain October deadlines today. And the Legislature could postpone the candidate-qualifying period now just as it could have months ago—though that will not even be necessary. *See* ROA.6637.

### 2.   The preliminary injunction was not issued in the period close to an election.

Neither *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), nor *Merrill v. Milligan*, 142 S.Ct. 879 (2022), alters this analysis.[18] *Purcell* vacated an appellate order that reversed a district court and suspended voter-identification rules mere weeks before an election. 549 U.S. at 4.

---

[18] Defendants' other citations are even further afield. *See* Br.76. No party has suggested "enjoining impending elections," *id.* (quoting *Chisom v. Roemer*, 853 F.2d 1186, 1190 (5th Cir. 1988)), and the only case in Defendants' potpourri of stay orders that referenced an impending election is *Republican National Committee v. Democratic National Committee*, where the district court entered an unrequested injunction *five days* before the scheduled election, 140 S.Ct. 1205, 1206 (2020) (per curiam).

The Supreme Court faulted the court of appeals for failing "to give deference to the discretion of the District Court" and explained that the risk of disenfranchisement created by the challenged rules had to be weighed against the risk that the appellate decision itself could "result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4-5. Like *Purcell* admonished, the district court's factual findings here are due considerable deference. But that is where the parallels end; Defendants cannot seriously suggest that voters will avoid the polls in November due to confusion over a new congressional map adopted in July. *Merrill* is also readily distinguishable. Because the stay in that case was not accompanied by any opinion for the Court, Defendants rely on Justice Kavanaugh's concurrence, which suggested that an election-related injunction may be appropriate even "in the period close to an election" where "the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Merrill*, 142 S.Ct. at 881 (Kavanaugh, J., concurring).[19] Although Justice Kavanaugh

---

[19] Justice Kavanaugh would also consider the underlying merits, the irreparable harm suffered by plaintiffs absent the injunction, and whether plaintiffs unduly delayed in bringing suit. *See Merrill*, 142 S.Ct. at 881 (Kavanaugh, J., concurring). Each of these considerations weighs

did not define what constitutes "the period close to an election," it clearly does not encompass the period here—where the injunction was issued *155 days* before Louisiana's primary elections—because after *Merrill* the Supreme Court held that "sufficient time" remained for Wisconsin's high court "to take additional evidence" and adopt new state legislative maps *139 days* before that state's primary elections. *Wis. Legislature v. Wis. Elections Comm'n*, 142 S.Ct. 1245, 1248, 1251 (2022) (per curiam). Every method of calculating the relevant period before the election confirms that more time remains in this case than in the Wisconsin litigation, and *much* more time than the truncated period that concerned the Court in *Merrill*. After remand, final districts in Wisconsin were not adopted until April 15, 116 days before the August 9 primary. *See Johnson v. Wis. Elections Comm'n*, 972 N.W.2d 559, 586 (Wis. 2022). The parallel date for Louisiana's November 8 primary is July 15—well after the deadline the district court ordered for remedial maps. In *Merrill*, the Court's order

---

in favor of Plaintiffs: Both the district court and motions panel determined that Plaintiffs are likely to succeed on the merits, *see supra* at 18-66; Defendants do not dispute that a stay will irreparably harm Plaintiffs and other Black Louisianians; and Plaintiffs filed their underlying complaints the day the challenged map was enacted.

issued on February 7, 106 days before Alabama's May 24 primary. The parallel date in Louisiana is July 25.

The efficiency of Louisiana's remedial process compares favorably to Wisconsin's in other respects. Whereas Wisconsin's legislative maps include 132 districts, Louisiana is apportioned only *six* congressional seats. And while the Supreme Court faulted the Wisconsin Supreme Court for citing insufficient evidence to justify the application of Section 2 in a malapportionment challenge, the district court here held a week-long hearing and issued a 152-page opinion with the necessary factual findings. No reopening of the evidentiary record is necessary.

### 3.    A new congressional map can be feasibly implemented.

Because Louisiana is not in the "period close to an election," there is no need to further analyze whether remedying the Section 2 violation is "feasible" without "significant cost, confusion, or hardship." *Merrill*, 142 S.Ct. at 881 (Kavanaugh, J., concurring). But that proposed test is satisfied in any event.

Defendants rely exclusively on the testimony of Sherri Hadskey, Louisiana's Commissioner of Elections, but nothing in her testimony indicates that implementation of a new congressional map at this

juncture would be unduly burdensome or otherwise infeasible. Ms. Hadskey claimed that the adoption of a remedial redistricting map would require her to redo a few tasks and otherwise prepare for the congressional primary in addition to her other duties. *See* Br.82-83. For a 30-year veteran of election administration, these routine assignments do not require heroic efforts. As the district court and motions panel both recognized, a recitation of administrative redistricting tasks resolves nothing—the operative question is whether there is time for usual duties to be completed, and Ms. Hadskey's testimony does not suggest otherwise. *See* ROA.6779-83; ROA.6882-87.

The district court and motions panel had little trouble debunking Defendants' related argumentation. Defendants note that "[a]ssigning voters to districts is complicated work." Br.79. That might be so, but Defendants cite no evidence for how much time that work will require, let alone how it could lead to voter confusion. *See* ROA.6778; ROA.6884-85.[20] Next, they report that the candidate-qualifying period runs from

---

[20] The citations offered do not clarify matters. *Compare* Br.79 (citing ROA.5962 for claim that "elections administrators worked for a week studying the plan before any coding actually began"), *with* ROA.5962 (unrelated testimony). Additionally, Defendants' vague reference to an

July 20-22. Br.80. But the district court remains on track to adopt a remedial map without disturbing this or any subsequent deadline, and there is no reason to believe that prospective candidates rely on voter assignments in the ERIN database to decide whether or where to run for office. Defendants further assert—again without citation—that "[b]allot programing must begin no later than August 1, 2022." *Id.* That is wrong: Ms. Hadskey testified that August 1 is the relevant date for her office to receive absentee-ballot *envelopes*, due to Louisiana's unique affidavit flap. *See* ROA.5980-81. Envelope purchases have nothing to do with redistricting. *See* ROA.6779 (questioning "how paper usage is affected by the shape of Louisiana's congressional districts"). Finally, Defendants flag that "voter registration week begins on September 26," followed by registration deadlines and the start of early voting in October. Br.81. Here, Plaintiffs agree: *These* are the relevant deadlines, and there is no risk that the remedial process will disrupt them.

The district court credited the testimony of Mr. Block, Governor Edwards's executive counsel, who explained that Louisiana has a

---

election in Calcasieu Parish is immaterial without any evidence—and Defendants offered none—about how the specific issues there compare to the issues here.

responsive elections apparatus that is not only capable of implementing last-minute adjustments to election dates and deadlines, but has done so several times in just the past decade. *See* ROA.6713.[21] The district court thus found, consistent with the evidence presented, that "the implementation of a remedial congressional map is realistically attainable well before the [] November elections." ROA.6776. There is no basis to second-guess this well-reasoned, record-based finding.

Ultimately, this Court should not allow gamesmanship to circumvent the requirements of federal law, nor should it allow a State to evade its legal obligations by invoking *Purcell* without providing *any* supporting evidence. In contrast to Defendants' unjustified attempts at delay, Plaintiffs filed their complaints mere hours after the Legislature enacted HB 1 and have diligently pressed their case. The district court adopted a remedial schedule on the same timeline that Defendants

---

[21] Defendants grossly mischaracterize the testimony of Mr. Block, who never suggested the November election could be moved, *cf.* Br.86; he merely recognized that pre-election deadlines could be postponed, ROA.5463-64. And Mr. Block did not say that preparing for this year's elections "was now a 'huge challenge,'" Br.86; he testified that holding elections weeks after a hurricane struck was a huge challenge—which the State did successfully because local election officials have experience being flexible and efficient, ROA.5465-66.

previously proposed in state-court litigation. The equities weigh heavily in Plaintiffs' favor.

## CONCLUSION

Defendants began their brief on a strident note: "This Court rarely will encounter a redistricting case as consequential as this or district-court order as imprudent." Br.1. Everything that followed belies this introduction. While this case is indeed important, it is also straightforward: Despite Defendants' best efforts to confound the Section 2 inquiry and distort the record, the law and facts are clear. And far from imprudent, the district court's order applied that (settled) law to those (unrebutted) facts, crafting a preliminary injunction consistent with precedent and the equities.

Four judges have dismissed Defendants' arguments as hokum. This Court should do the same, and the district court's preliminary injunction should be affirmed.

Dated: June 28, 2022

Darrel J. Papillion
Renee C. Crasto
Jennifer Wise Moroux
WALTERS, PAPILLION, THOMAS,
CULLENS, LLC
12345 Perkins Road,
Building One
Baton Rouge, Louisiana 70810
(225) 236-3636

Respectfully submitted,

By: */s/ Abha Khanna*
Abha Khanna
Jonathan P. Hawley
ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(206) 656-0177

Lalitha D. Madduri
Olivia N. Sedwick
Jacob D. Shelly
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, D.C. 20002
(202) 968-4490

*Counsel for the* Galmon
*Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that counsel for Appellants are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Abha Khanna*
Abha Khanna

## CERTIFICATE OF COMPLIANCE

This document contains 14,930 words, excluding parts exempted by Federal Rule of Appellate Procedure 32(f), pursuant to this Court's order of June 15, 2022, granting the *Galmon* Plaintiffs-Appellees "leave to file their brief in excess of the word count limitation, but not to exceed 15,000 words."

This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1) because it has been prepared in a proportionally spaced, serifed typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Abha Khanna*
Abha Khanna