No. 22-30333

## IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

PRESS ROBINSON, et al.,
*Plaintiffs-Appellees,*

v.

KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana,
*Defendant-Appellant,*

CLAY SCHEXNAYDER, et al.,
*Intervenor Defendants-Appellants.*

_____

EDWARD GALMON, SR., et al.,
*Plaintiffs-Appellees,*

v.

KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana,
*Defendant-Appellant,*

CLAY SCHEXNAYDER, et al.,
*Movants-Appellants.*

On Appeal from the Middle District of Louisiana
Case Nos. 3:22-cv-211, 3:22-cv-214
The Honorable Shelly D. Dick

## Reply Brief for Appellants

*(Counsel listed on next page)*

RICHARD B. RAILE
KATHERINE L. MCKNIGHT
E. MARK BRADEN
RENEE M. KNUDSEN
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Phone: (202) 861-1711
Email: rraile@bakerlaw.com

MICHAEL W. MENGIS
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002

PATRICK T. LEWIS
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, OH 44114

ERIKA DACKIN PROUTY
BAKER & HOSTETLER LLP
200 Civic Center Dr., Suite 1200
Columbus, OH 43215

*Attorneys for Clay Schexnayder and Patrick Page Cortez*

JEFF LANDRY
*Louisiana Attorney General*
ELIZABETH B. MURRILL
*Solicitor General*
SHAE MCPHEE
*Deputy Solicitor General*
MORGAN BRUNGARD
*Assistant Solicitor General*
ANGELIQUE DUHON FREEL
CAREY TOM JONES
JEFFREY M. WALE
*Assistant Attorneys General*
OFFICE OF THE ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
P.O. Box 94005
Baton Rouge, LA 70804
murrille@ag.louisiana.gov

JASON B. TORCHINSKY
PHILLIP M. GORDON
EDWARD M. WENGER
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Highway
Haymarket, VA 20169

*Attorneys for the State of Louisiana*

PHILLIP J. STRACH
THOMAS A. FARR
ALYSSA M. RIGGINS
NELSON MULLINS RILEY &
SCARBOROUGH LLP
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
phil.strach@nelsonmullins.com

JOHN C. WALSH
SHOWS, CALI & WALSH, LLP
P.O. Box 4046
Baton Rouge, LA 70821

*Attorneys for the Secretary of State*

# **TABLE OF CONTENTS**

INTRODUCTION ....................................................................... 1

ARGUMENT ............................................................................ 5

    I.   There Is No Longer Any Threat of Irreparable Harm Pending Trial
    and Plaintiffs' Motion For A Preliminary Injunction Is Moot ............. 5

  II.  Plaintiffs Have Not Shown A Likelihood Of Success On The Merits ... 9

      A.   Plaintiffs Have Not Shown A Likelihood Of Success As To
        The Third *Gingles* Precondition .................................................... 9

      B.   Plaintiffs Have Failed To Show They Are likely To Establish
        A Private Right Of Action Under Section 2 .............................. 20

 III.  The District Court's Preliminary Injunction Erroneously Provides
    Final Relief That Changes the Status Quo On A Provisional Basis.... 24

CONCLUSION ......................................................................... 31

CERTIFICATE OF COMPLIANCE ........................................... 33

CERTIFICATE OF SERVICE .................................................... 34

# TABLE OF AUTHORITIES

## Cases

*Alabama v. Alabama State Conf. of NAACP,*
    141 S. Ct. 2618 (2021)................................................................. 23

*Alabama State Conf. NAACP v. Alabama,*
    949 F.3d 647 (11th Cir. 2020)................................................... 23

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ...........................................................21, 22

*Allen v. Milligan,*
    143 S. Ct. 1487 (2023).............................................................. 1, 2

*AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n,*
    141 S. Ct. 1341 (2021)................................................................ 24

*Arana v. Ochsner Health Plan,*
    338 F.3d 433 (5th Cir. 2003) ...................................................... 6

*Ardoin v. Robinson,*
    142 S. Ct. 2892 (2022)............................................................. 1, 5

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment,*
    586 F. Supp. 3d 893 (E.D. Ark. 2022)..................................21, 23

*Armour & Co. v. Wantock,*
    323 U.S. 126 (1944) .................................................................. 23

*Bartlett v. Strickland,*
    556 U.S. 1 (2009).........................................3, 10, 11, 16, 17, 18

*Bethune-Hill v. Va. State Bd. of Elections,*
    580 U.S. 178 (2017) .................................................................. 19

*Blaylock v. Cheker Oil Co.,*
    547 F.2d 962 (6th Cir. 1976) ................................................... 26

*Brnovich v. DNC,*
    141 S. Ct. 2321 (2021).............................................................. 23

*Canal Auth. of State of Florida v. Callaway*,
  489 F.2d 567 (5th Cir. 1974) .......................................... 6, 26, 29

*Coastal Corp. v. Tex. Eastern Corp.*,
  869 F.2d 817 (5th Cir. 1989) ................................................. 30

*Cooper v. Harris*,
  581 U.S. 285 (2017) ...............................................4, 14, 17, 18

*Covington v. North Carolina*,
  270 F. Supp. 3d 881 (M.D.N.C. 2017).................................... 11

*Covington v. North Carolina*,
  316 F.R.D. 117 (M.D.N.C. 2016)................................. 10, 13, 18

*Dillard v. Baldwin Cnty. Comm'n*,
  376 F.2d 1260 (11th Cir. 2004)........................................16, 18

*Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.*,
  774 F.2d 1371 (9th Cir. 1985).................................................. 26

*E. Jefferson Coal. For Leadership & Dev. v. Parish of Jefferson*,
  926 F.2d 487 (5th Cir. 1991) .................................................. 16

*Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*,
  441 F.2d 560 (5th Cir. 1971) .................................................. 25

*Fairley v. Hattiesburg*,
  584 F.3d 660 (5th Cir. 2009) .................................................. 14

*FTC v. Credit Bureau Ctr., LLC*,
  937 F.3d 764 (7th Cir. 2019) .................................................. 24

*FTC v. Weyerhaeuser Co.*,
  648 F.2d 739 (D.C. Cir. 1981)................................................. 26

*Gearlds v. Entergy Servs., Inc.*,
  709 F.3d 448 (5th Cir. 2013) .................................................. 11

*Gomez v. United States*,
  490 U.S. 858 (1989) ............................................................... 19

*Growe v. Emison,*
    507 U.S. 25 (1993) ................................................................... 15

*Harris v. City of Houston,*
    151 F.3d 186 (5th Cir. 1998) ..................................................... 7

*Indus. Bank of Washington v. Tobriner,*
    405 F.2d 1321 (D.C. Cir. 1968) ................................................ 27

*Kos Pharms., Inc. v. Andrx Corp.,*
    369 F.3d 700 (3d Cir. 2004) ...................................................... 25

*Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB,*
    501 U.S. 190 (1991) ................................................................... 7

*Marilyn T., Inc. v. Evans,*
    803 F.2d 1383 (5th Cir. 1986) ................................................... 7

*Martinez v. Mathews,*
    544 F.2d 1233 (5th Cir. 1976) ................................................. 27

*Matos ex rel. Matos v. Clinton Sch. Dist.,*
    367 F.3d 68 (1st Cir. 2004) ....................................................... 7

*Mayorkas v. Innovation L. Lab,*
    141 S. Ct. 2842 (2021) ............................................................... 8

*McClelland v. Gronwaldt,*
    155 F.3d 507 (5th Cir. 1998) ..................................................... 6

*Mixon v. State of Ohio,*
    193 F.3d 389 (6th Cir. 1999) ................................................... 23

*Morse v. Republican Party of Virginia,*
    517 U.S. 186 (1996) ................................................................. 22

*Moore v. Consol. Edison Co. of New York,*
    409 F.3d 506 (2d Cir. 2005) ..................................................... 27

*Nipper v. Smith,*
    39 F.3d 1494 (11th Cir. 1994) ................................................. 17

*North Carolina v. Covington*,
　137 S. Ct. 2211 (2017)................................................................. 10

*PCI Transp., Inc. v. Fort Worth & W. R. Co.*,
　418 F.3d 535 (5th Cir. 2005) ...................................................... 20

*Porter v. Lee*,
　328 U.S. 246 (1946) .................................................................... 27

*Robinson v. Ardoin*,
　37 F.4th 208 (5th Cir. 2022) ........................................................ 1

*Robinson v. Ardoin*,
　605 F. Supp. 3d 759 (M.D. La. 2022) ...................................5, 6, 7, 27, 29

*Ross v. Blake*,
　578 U.S. 632 (2016) .................................................................... 21

*Schrier v. Univ. of Co.*,
　427 F.3d 1253 (10th Cir. 2005) .................................................. 27

*Seafarers Int'l Union of N. Am. v. Nat'l Marine Servs., Inc.*,
　820 F.2d 148 (5th Cir. 1987) ........................................................ 7

*Slatery v. Adams & Boyle, P.C.*,
　141 S. Ct. 1262 (2021)................................................................... 8

*Stemple v. Bd. of Ed. of Prince George's Cnty.*,
　623 F.2d 893 (4th Cir. 1980) ...................................................... 26

*Texas v. Wellington Resources Corp.*,
　706 F.2d 533 (5th Cir. 1983) ...................................................... 28

*Thomas v. Bryant*,
　919 F.3d 298 (5th Cir. 2019) ...................................................... 22

*Thornburg v. Gingles*,
　478 U.S. 30 (1986)....................................................................9, 10

*Turkiye Halk Bankasi A.S. v. United States*,
　143 S. Ct. 940 (2023) .................................................................. 23

*United States v. Munsingwear, Inc.*,
340 U.S. 36 (1950) ........................................................................ 8

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ................................................. 6, 8, 25, 27

*Washington Capitols Basketball Club, Inc. v. Barry*,
419 F.2d 472 (9th Cir. 1969) ................................................. 26

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ...................................................................... 6

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) ..................................................................... 6, 8

*Wis. Legislature v. Wis. Election Comm'n*,
142 S. Ct. 1245 (2022) .............................................................. 10

**Statutes**

28 U.S.C. § 2284 ......................................................................... 22

52 U.S.C. § 10302 ....................................................................... 21

52 U.S.C. § 10310 ....................................................................... 21

**Other Authorities**

Black's Law Dictionary 904 (10th ed. 2014) .................................. 27

S. REP. 97-417, 1982 U.S.C.C.A.N. 177................................20, 22

## INTRODUCTION

This appeal is from an order granting two motions for a preliminary injunction filed by two sets of plaintiffs-appellees (the Galmon and Robinson Plaintiffs, respectively; collectively, Plaintiffs). The defendant-appellant Louisiana Secretary of State and two sets of intervenor-defendant-appellants (collectively, Appellants) appealed from the preliminary-injunction order over one year ago, on June 6, 2022. After this Court denied Appellants' motion for a stay pending appeal, *see Robinson v. Ardoin*, 37 F.4th 208 (5th Cir. 2022), two sets of Appellants renewed their stay request in the Supreme Court, and it issued a stay on June 28, 2022. *Ardoin v. Robinson*, 142 S. Ct. 2892 (2022). The Supreme Court also granted certiorari before judgment and held the case in abeyance pending the appeal then styled *Merrill v. Milligan*. (No. 21-1086 and No. 21-1087). *Id.* That occurred after Appellants' opening and Plaintiffs' appellee briefs were filed in this Court, but before Appellants filed their reply brief.

Now that the Supreme Court has remanded the case to this Court after its decision in what was ultimately styled *Allen v. Milligan*, 143 S. Ct. 1487 (2023), this Court has requested that Appellants file a reply brief and supplemental briefing concerning *Allen*. This is the requested reply brief; the supplemental briefing

will follow on the Court's schedule and will address the deficiencies Plaintiffs face with respect to *Gingles'* first precondition.[1]

However, the Supreme Court's stay pending appeal achieved the functional impact of a denial of Plaintiffs' preliminary-injunction motions and full relief for Appellants in this appeal. By consequence of the stay, Louisiana conducted its 2022 congressional elections under the redistricting plan challenged in this case. That relief moots Plaintiffs' claim to irreparable harm pending trial. To be sure, Plaintiffs' Voting Rights Act (VRA) claim remains live for adjudication, but the purpose of a preliminary injunction is to secure relief before trial can be held on the merits. In this case, Plaintiffs can with reasonable diligence prosecute their claim to trial well in advance of the 2024 congressional elections, and they cannot establish irreparable harm before then. Accordingly, this Court should dismiss this appeal and vacate the preliminary-injunction order as moot.[2]

---

[1] *Allen* addressed the first *Gingles* precondition at length. *See* 143 S. Ct. at 1504–17. Appellants' opening brief demonstrates deficiencies in Plaintiffs' claim under that precondition, and Plaintiffs' appellees' brief respond. But, because there is no feasible manner to disentangle *Allen*-related argumentation concerning the first precondition from other argumentation, Appellants will address the first precondition in the supplemental briefing the Court directed and will there demonstrate, *inter alia*, that Louisiana and Alabama are factually and legally distinct. This brief should not be deemed, in whole or in part, a waiver of any argument with respect to *Gingles'* first precondition.

[2] On July 17, 2023, the district court entered an order setting a hearing on Plaintiffs' request for the imposition of a remedial congressional plan, *Robinson v. Ardoin,* Nos. 22-cv-211 and 22-cv-214, ECF No. 250 (M.D. La. July 17, 2023), but

On the merits, the district court's preliminary-injunction order is infirm because it does not address the threshold preconditions to Section 2 liability, known as the *Gingles* preconditions, in a legally sound way. As relevant here, the district court did not find, and could not have found, legally significant white bloc voting to satisfy the third precondition, which demands proof that Black-preferred candidates will usually lose in the absence of a VRA remedy.[3] Contrary to the Robinson Plaintiffs' assertions, Plaintiffs' experts clearly testified below that majority-minority districts are not essential to secure equal Black electoral opportunity because, as they admitted, districts below 50% black voting-age population (BVAP) are likely to perform as opportunity districts.

Both sets of Plaintiffs seek to alter the third precondition by redefining a "VRA remedy"—meaning, a remedy a court may impose upon a State to redress a violation of Section 2—to include crossover districts below 50% BVAP. But they concede (as they must) that *Bartlett v. Strickland*, 556 U.S. 1 (2009), held that Section 2 does not mandate crossover districts. Plaintiffs attempt to contort that holding by arguing that crossover districts can be a VRA remedy even though

---

did not set the case for trial on the merits or order any briefing addressing the impact of *Allen*. That approach makes little sense when the district court could bring the case to final judgment in time for the 2024 election cycle.

[3] As already noted, because *Allen* addresses the first *Gingles* precondition, Appellants will consolidate their discussion of that precondition in supplemental briefing, rather than provide the Court with piecemeal analysis. *See* note 1, *supra*.

Section 2 does not require them, but that is a contradiction in terms: a remedy is what the law both requires and authorizes a court to impose. Plaintiffs also contend that the third precondition does not address the level of performance in a hypothetical district, but cannot avoid the fact that the Supreme Court in *Cooper v. Harris*, 581 U.S. 285 (2017), found the third precondition unmet because a hypothetical crossover district could perform. It is simply not true that (as Plaintiffs insist) *Cooper* addressed an "actual" crossover district. The district Plaintiffs call "actual" existed only in the prior decade's plan, it did not exist in the plan challenged in *Cooper*, and it was as hypothetical as any district can be.

The end result of the district court's order is to mandate crossover districts in contravention of *Bartlett*. The Louisiana Legislature could not have adopted a plan with two majority-minority districts under *Cooper*. Race would have predominated, and the Legislature could not have shown narrow tailoring because, as in *Cooper*, a crossover district would perform. Thus, to avoid the liability the district court's order forecasts here, the only option for Louisiana was a crossover district. But Plaintiffs cannot square that outcome with *Bartlett*.

Finally, the court below erroneously found that Plaintiffs had shown a likelihood that there is a private right of action under Section 2. Whether a right of action exists under Section 2 is a threshold gating question, as Plaintiffs have

solely relied on Section 2 in this case, and Plaintiffs' briefs reveal their position to be atextual and resting on non-binding precedent that is not persuasive.

For at least these reasons, and those set forth below and in other briefing, this Court should—if it does not vacate the injunction below—reverse it.

## ARGUMENT

### I. There Is No Longer Any Threat of Irreparable Harm Pending Trial and Plaintiffs' Motion For A Preliminary Injunction Is Moot.

This Court lacks continued jurisdiction over this appeal because Plaintiffs no longer need a preliminary injunction. Their request for an injunction to avoid irreparable harm for the 2022 congressional elections is moot, and they have no prospect of showing irreparable harm in advance of the 2024 elections because trial and judgment on the merits can occur before then. The Court should vacate the injunction and remand.

This appeal stems from the preliminary injunction the district court entered on June 6, 2022, which prohibits Louisiana's use of the 2022 congressional districting plan for future congressional elections, premised on a showing that irreparable harm would result from using the challenged plan in the 2022 elections, which were then imminent. *See Robinson v. Ardoin*, 605 F. Supp. 3d 759, 851–52 (M.D. La. 2022). But the Supreme Court stayed that injunction, and held the case in abeyance pending its consideration of *Merrill v. Milligan* (which became *Allen*). *See Ardoin v. Robinson*, 142 S. Ct. 2892 (2022). In the interim,

Louisiana conducted its congressional elections in 2022 under the plan Plaintiffs challenge.

The district court observed that "the purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Robinson*, 605 F. Supp. 3d at 856 (quoting *Canal Auth. of State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The Supreme Court "has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the adequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). But a plaintiff "must demonstrate a likelihood of irreparable harm—not just a possibility—in order to obtain preliminary relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 21 (2008). A preliminary injunction is just that—*preliminary* relief to prevent events that would frustrate a court's ability to provide meaningful relief following trial on the merits.

A motion for injunctive relief becomes moot when "the 'harm' that the plaintiffs had sought to enjoin [is] . . . complete." *McClelland v. Gronwaldt*, 155 F.3d 507, 514 (5th Cir. 1998), *overruled on other grounds by Arana v. Ochsner Health Plan*, 338 F.3d 433 (5th Cir. 2003). Accordingly, established Circuit precedent holds that "once the action that the plaintiff sought to have enjoined has occurred," the request for injunctive relief "is mooted because 'no order of this

court could affect the parties' rights with respect to the injunction we are called upon to review.'" *Seafarers Int'l Union of N. Am. v. Nat'l Marine Servs., Inc.*, 820 F.2d 148, 151 (5th Cir. 1987), *abrogated on other grounds by Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190 (1991) (citation omitted); *see also Marilyn T., Inc. v. Evans*, 803 F.2d 1383, 1384 (5th Cir. 1986), *abrogated on other grounds by Litton*, 501 U.S. at 190 ("We find no need to decide whether the district court should have issued the preliminary injunction because the issue is now moot."); *Harris v. City of Houston*, 151 F.3d 186, 189 (5th Cir. 1998) (similar).

Because the 2022 elections occurred under the challenged electoral system, and this Court "lacks the power to turn back the clock," *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 72 (1st Cir. 2004), the irreparable harm Plaintiffs have asserted has materialized and passed. The temporary relief Plaintiffs demanded was a second majority-Black district, and the district court based its injunction on its holding that Plaintiffs "have demonstrated that they will suffer an irreparable harm if voting takes place in the 2022 Louisiana congressional elections" under the enacted plan. *Robinson*, 605 F. Supp. 3d at 851. The actual conduct of the 2022 elections under the challenged scheme moots Plaintiffs' assertion of irreparable harm as to those elections. Thus, they have no live claim of irreparable harm.

To be sure, this case "as a whole remains alive," but "the sole question before [this Court] on this appeal" is "whether the preliminary injunction was properly granted." *Univ. of Tex.*, 451 U.S. at 394 (citation omitted). Trial on the merits can occur in advance of the 2024 elections, which are still 15 months away. If the district court were reviewing a request for a preliminary injunction to prevent use of the enacted maps for the 2024 elections today, there could be no showing of irreparable harm. There is no need for immediate relief, and to adjudicate this appeal on the question of provisional relief would be to issue an advisory opinion. At this stage, Plaintiffs are not "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter*, 555 U.S. at 22 (citation omitted).

Because this appeal is moot, this Court should "vacate as moot the . . . order granting a preliminary injunction" under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950). *Mayorkas v. Innovation L. Lab*, 141 S. Ct. 2842 (2021) (unanimously applying *Munsingwear* vacatur where order granting preliminary injunction became moot); *see also Slatery v. Adams & Boyle, P.C.*, 141 S. Ct. 1262, 1263 (2021) (same); *Univ. of Tex.*, 451 U.S. at 394, 398 (explaining that vacatur is the appropriate course of action where an injunction becomes moot and vacating on that basis).

## II.     Plaintiffs Have Not Shown A Likelihood Of Success On The Merits.

On the merits, the order below cannot be affirmed for at least two reasons.[4] First, Plaintiffs are unlikely to establish the third *Gingles* precondition on the record below, which reveals substantial white crossover voting that renders a majority-minority district unnecessary and unavailable as a VRA remedy. Second, Plaintiffs are equally unlikely to show that Section 2 of the VRA provides a private right of action that they may enforce in this case.

### A.     Plaintiffs Have Not Shown A Likelihood Of Success As To The Third *Gingles* Precondition.

Plaintiffs are unlikely to establish the third *Gingles* precondition, which requires proof that a white voting bloc "normally will defeat the combined strength of minority support plus white 'crossover' votes." *Thornburg v. Gingles*, 478 U.S. 30, 56 (1986) (plurality opinion). The record below confirms that two majority-minority districts are unnecessary for Black voters to elect their preferred candidates, which under *Cooper* would bar Louisiana from lawfully drawing the second majority-minority district. Hence, there was no basis for the district court to mandate that an additional one be created.

---

[4] As noted *supra*, at n.1, Appellants will address issues relating to the first *Gingles* precondition in their forthcoming supplemental brief.

1.     The third *Gingles* precondition generally cannot be satisfied "[i]n areas with substantial crossover voting." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality opinion). This is because the third precondition requires a finding that a white majority votes "sufficiently as a bloc to enable it usually to defeat the minority group's preferred candidate." *Wis. Legislature v. Wis. Election Comm'n*, 142 S. Ct. 1245, 1248 (2022) (citing *Gingles*, 478 U.S. at 50–51 (plurality opinion)). For Section 2 plaintiffs to establish this precondition, they most prove "legally significant racially polarized voting." *Covington v. North Carolina*, 316 F.R.D. 117, 170 (M.D.N.C. 2016) (three-judge court), *aff'd sub nom.*, *North Carolina v. Covington*, 137 S. Ct. 2211 (2017) (citing *Gingles*, 478 U.S. at 55–56). The "legally significant" portion is vital because there is a "crucial difference between legally significant and statistically significant racially polarized voting." *Id.* Mere evidence that white and Black voters generally prefer different candidates may be "statistically significant" but is *not enough* to satisfy the third precondition. *See id.* at 170–71. Rather, crossover voting levels must also be assessed to determine whether the level of polarization is severe enough that "the minority group's candidates of choice were usually defeated by majority bloc voting." *Id.* at 171. And, to be precise, the question is whether minority-preferred candidates will usually lose "without a VRA remedy." *Id.* at 168.

10

In areas where crossover districts can perform, "[i]t is difficult to see how the majority-bloc-voting requirement could be met," given that, "by definition," this means that "white voters join in sufficient numbers with minority voters to elect the minority's preferred candidate." *Bartlett*, 556 U.S. at 16 (plurality opinion). Stated differently, where voting patterns support effective crossover districts, the third precondition is not met, and "majority-minority districts [are] not [] required in the first place." *Id.* at 24. In *Covington*, the North Carolina legislature failed to appreciate this difference—and drew majority-minority districts even where crossover voting enabled districts to perform—which resulted in one of the "largest racial gerrymanders ever encountered by a federal court," *Covington v. North Carolina*, 270 F. Supp. 3d 881, 884 (M.D.N.C. 2017) (three-judge court), and the invalidation of 28 legislative districts.

The *Galmon* Plaintiffs acknowledge (at 61) that *Bartlett*'s reasoning "was just a logical application of *Gingles*." But they fail to persuasively explain why it does not logically apply in the same way here to preclude preliminary relief.[5]

---

[5] Perhaps that is why *Galmon* Plaintiffs suggest (at 60) the Court might ignore *Bartlett*'s discussion of the third precondition, but *Bartlett*'s fulsome two-full-paragraph discussion was essential to its holding, *see* 556 U.S. at 15–16, and even dicta of the Supreme Court cannot be so lightly disregarded, *see Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013).

2. As Appellants' opening brief demonstrated (at 65), the unrebutted record establishes that high levels of crossover voting exist in the regions where Plaintiffs demand a second majority-Black district. All three of Plaintiffs' experts who evaluated polarized voting acknowledged that, due to white crossover voting, the illustrative majority-minority districts could be drawn below 50% BVAP and still perform for Black voters—which precludes a finding of legally significant racially polarized voting.

Robinson Plaintiffs accuse Appellants (at 57) of "misrepresent[ing] the record" on this point, but the record is clear. Dr. Palmer's admission was pellucid:

> Q.    Okay. Is it true that CD2 and CD5 could likely be drawn at below 50 percent BVAP and still elect black preferred candidates?

> A.    Based on this table [in Dr. Palmer's expert report], yes.

ROA.5170:14–17.

Dr. Lichtman, contrary to Robinson Plaintiffs' suggestion that he was not an expert in racial polarization (at 57), testified about racial polarization in Louisiana elections. ROA.6339–6345 (opining about racial polarization on direct examination). On cross-examination, he testified to the following:

> Q.    So it's your – it's your view that the record shows white crossover voting ranging from 20 percent to 26 percent in the three elections on the chart [in Dr. Lichtman's expert report]?

A.    That's correct.

Q.    Okay.  So, and you also believe – if you go to page 62 of your report, and I also believe you just testified to this, but let me just confirm it, that the black candidate of choice can win in a district as low as 40 percent minority population?

A.    In the 40 percent range.  You know, maybe not quite at 40, but certainly – below 50 percent, in a 40 percent range, absolutely; and the crossover and cohesion numbers that out. . .

ROA.6370:14–6371:4.

Finally, Dr. Handley also conceded that a BVAP under 50% could allow Black voters an equal opportunity to elect. She specifically testified, on redirect examination, that it was "possible" that "a BVAP of less than 50 percent in [CD2] would allow black voters to elect their candidate of choice." ROA.6247.

Therefore, as Appellants demonstrated (at 65), it cannot be said that "majority bloc voting exist[s] at such a level that the candidate of choice of African-American voters would usually be defeated without a VRA remedy." *Covington*, 316 F.R.D. at 168. A VRA remedy—i.e., a majority-minority district—is unnecessary and cannot be forced upon Louisiana.

3.    Plaintiffs also respond by arguing that Appellants "focus[ed] on the wrong districts," Galmon Br. 57, and contend that the proper legal standard looks to the "actual challenged districting" and not to "hypothetical" districts like their illustrative majority-minority districts. Robinson Br. 53 (quoting

ROA.6879); Galmon Br. 58.[6] That is not what the Supreme Court held in *Cooper v. Harris*, 581 U.S. 285 (2017), which struck down a majority-minority district as a racial gerrymander because crossover voting in the "area" would support a functioning crossover district. *Id.* at 304–06. The legislature had no reason to fear Section 2 liability, the Court explained, because of that "pattern." *Id.* at 304.

Plaintiffs argue that *Cooper* involved "actual" crossover districts, not "hypothetical" districts, because a crossover district existed under the prior decade's plan. Robinson Br. 53–54; Galmon Br. 59–60. They are confused. *Cooper* explained that a legislature "must assess whether the new districts it contemplates (*not the old ones it sheds*) conform to the VRA's requirements." 581 U.S. at 303–04 (emphasis added). The supposed "actual" district Plaintiffs refer to was the shed version of the challenged district (North Carolina's CD1) from the prior decade, not the version of CD1 as to which the VRA's ongoing "requirements" apply. *Cooper* framed the question not as an analysis of the prior decade's CD1, but rather on "the significance of a longtime pattern of white crossover voting *in the area* that would form the core of the redrawn District 1." *Id.* at 304 (emphasis added). Accordingly, the old crossover district—which no longer existed and

---

[6] This Court reviews de novo, rather than for clear error, the legal standards the district court applied to determine whether § 2 has been violated. *Fairley v. Hattiesburg*, 584 F.3d 660, 667 (5th Cir. 2009).

was based on old census data—was as hypothetical as it gets and was not an "actual" district as Plaintiffs claim.[7]

This is hardly counterintuitive. By definition, Plaintiffs' illustrative districts—which are hypothetical—are focused on the *area* where they claim racial vote-dilution exists, because it is that *area* where they demand Section 2 relief. Galmon Plaintiffs, for example, argue that they "demonstrate[d] that, under Louisiana's existing congressional plan, white bloc voting usually defeats Black-preferred candidates *in the area* encompassed by the illustrative majority-Black districts," and that "Black-preferred candidates have not prevailed and *will not prevail in this area* 'without a VRA remedy[.]'" Galmon Br. 60 (emphasis added). But this statement is not supported by the evidence. A VRA remedy is a majority-minority district, and a majority-minority district is not necessary for Black-preferred candidates to prevail, as Plaintiffs' experts acknowledged below.

4.    *Cooper* then is not distinct from this case, and it signals that the Louisiana Legislature could not have drawn a second majority-minority district consistent with the Constitution. If the Legislature had done so, the new majority-

---

[7] This approach was not new. *Growe v. Emison*, 507 U.S. 25 (1993) also looked at "majority bloc voting in Minneapolis," *id.* at 42, the *area* where the district court had imposed a majority-minority district, to determine if that district was appropriately required. In fact, the Court was not even sure "which legislative districting plan produced the [alleged] vote dilution" at issue. *Id.* at 39.

minority district would have been challenged as a racial gerrymander, and the legislature could not have proven that it was narrowly tailored to Section 2 compliance for the same reason that showing could not be made in *Cooper*. Plaintiffs do not appear to disagree with that proposition, which is a significant omission. It means Plaintiffs understand they are demanding from a court a district the Louisiana Legislature could not have voluntarily adopted. How could Section 2 require this?

Plaintiffs point to crossover districts as the answer to this question. *See* Galmon Br. 61–62; Robinson Br. 55–54. That is a telling assertion. The Supreme Court held in *Bartlett* that "§ 2 does not require crossover districts." 556 U.S. at 23. Rather than admit they are asking this Court to overrule or ignore *Bartlett*— which is what they are in fact doing—Plaintiffs make a confused series of assertions, conceding "that the absence of a crossover district cannot be used to establish liability," but insisting that a crossover district is the very "remedy" Section 2 demands. Robinson Br. 55; *see also* Galmon Br. 62 (arguing that the likelihood of functioning crossover district "demonstrates only that Plaintiffs have identified a viable remedy to the Section 2"). That makes no sense. Liability and remedy cannot be disentangled because, to show liability, a Section 2 plaintiff must establish a viable remedy. *See, e.g.*, *E. Jefferson Coal. For Leadership & Dev. v. Parish of Jefferson*, 926 F.2d 487, 492 (5th Cir. 1991); *Dillard v. Baldwin Cnty.*

*Comm'n*, 376 F.2d 1260, 1266 (11th Cir. 2004); *Nipper v. Smith*, 39 F.3d 1494, 1530, 1533 (11th Cir. 1994). If a crossover district is a VRA remedy, then Section 2 does require crossover districts. But the Supreme Court has held otherwise. Something that a court could impose is plainly something the governing legal regime requires.

Contrary to Plaintiffs' assertion, *Cooper*'s holding that Section 2 can be "*satisfied by* crossover districts," 581 U.S. at 305, does not mean that crossover districts are "a possible VRA remedy." Robinson Br. 55. For Section 2 to be satisfied means that it is not offended—i.e., because there is sufficient white crossover voting to negate the third precondition. It does not mean that crossover districts can be required as Section 2 relief (i.e., as a remedy). Justice Kennedy's opinion in *Bartlett* explained this distinction, finding that "our holding that § 2 does not require crossover districts does not consider the permissibility of such districts as a matter of legislative choice or discretion" and concluding crossover districts were permissible when based on "proper factors." 556 U.S. at 23. *Bartlett* rejected the idea that crossover districts could be imposed, recognizing that such districts are "the result of white voters joining forces with minority voters to elect their preferred candidate," that "the Voting Rights Act was passed to foster this cooperation," and that its reach should not be expanded "to require, by force of law, the voluntary cooperation our society has achieved." *Id.* Read

together, *Cooper* and *Bartlett* make clear that the North Carolina legislature in *Cooper* could have chosen to configure CD1 as a crossover district, not that it *had* to. The same is true of the Louisiana Legislature: it could have added a district that performed as a crossover district, but did not *have* to, and a court cannot impose one. Accordingly, such an omission does not violate Section 2.

5.    Here, it bears repeating that the third precondition asks whether white bloc voting is severe enough that minority-preferred candidates usually lose "without a VRA remedy," *Covington*, 316 F.R.D. at 168, and the only VRA remedy available under Section 2 is a majority-minority district. *Bartlett*, 556 U.S. at 13. Therefore, unless the majority-minority district is necessary to overcome white-bloc voting and afford equal electoral opportunity, there is no available remedy and no liability. *See, e.g.*, *Dillard*, 376 F.2d at 1266. That is the case here.

Galmon Plaintiffs seek to reconcile the divide between liability and remedy by asserting that "affirmative" Section 2 cases demand different legal inquiries from "defensive Section 2 cases." Galmon Br. 58 n.16. That is both wrong and troubling. *Cooper* made clear that offense and defense are two sides of the same coin; the only difference is that it is easier for legislatures to provide "good reasons" to fear Section 2 liability than for Section 2 plaintiffs to prove actual Section 2 liability. *Cooper*, 581 U.S. at 301. Thus, the Supreme Court has made

clear that a reasonable fear of Section 2 liability justifies racially predominant redistricting, even where the race-based line drawing was not "actually necessary." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 194 (2017) (cleaned up). By necessary implication, however, if a legislature would not have good enough reasons to justify racially predominant redistricting, as occurred in *Cooper*, then that must be because there is not even a realistic threat of Section 2 liability. In *Cooper*, that means that Section 2 liability would not have attached, no matter the BVAP of CD1. Here, where a second majority-minority district was certain to be struck down as a racial gerrymander due to high white crossover voting, that only proves just how far Plaintiffs are from a viable claim.

Plaintiffs' contrary assertion would place legislatures in a perfect "Catch-22" scenario where they are forbidden from creating majority-minority districts (as in *Covington* and *Cooper*) that are legally required (as Plaintiffs argue is the case here). If that sounds wrong, that's because it is. Reading the scope of Section 2's authority to compel the creation of a race-based, majority-minority district under circumstances *Cooper* held were not narrowly tailored and unconstitutional would call into question the constitutionality of Section 2. Such an interpretation should be avoided. *See, e.g.*, *Gomez v. United States*, 490 U.S. 858, 864 (1989).

6.    Finally, the provisional posture of this case confirms the error of the order below. Plaintiffs seeking a preliminary injunction must "clearly carr[y] the burden of persuasion" in showing a likelihood of success. *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (citation omitted). At the very most, Plaintiffs here have shown that the Section 2 issues in this case are a muddle. Where there is sufficient white crossover voting such that majority-minority districts are unnecessary, it is uniquely problematic for a district court to impose majority-minority districts as temporary and tentative relief. Congress intended Section 2 remedies only for those "communities in our nation where racial politics do dominate the electoral process." S. REP. 97-417, 33, 1982 U.S.C.C.A.N. 177, 211. Where white crossover voting is pronounced, that is unlikely to be the case, and Plaintiffs cannot clearly show entitlement to temporary relief.

**B.    Plaintiffs Have Failed To Show They Are likely To Establish A Private Right Of Action Under Section 2.**

Appellants' opening brief further showed (at 69–71) that Plaintiffs are unlikely to establish a private right of action under Section 2, and the order below should be reversed on that basis alone. Plaintiffs' responses are unpersuasive.

1.    Neither set of Plaintiffs meaningfully address the VRA's text. Galmon Plaintiffs do not even mention statutory text. *See* Galmon Br. 64–66.

And Robinson Plaintiffs begin with legislative history (at 59), even though courts "always say" that statutory interpretation "begins with the text," *Ross v. Blake*, 578 U.S. 632, 638 (2016).

Robinson Plaintiffs then argue as a subordinate point (at 60) that Sections 3 and 14 establish the requisite remedy-creating language. But they do not mention what text they have in mind, and none is apparent. As Appellants already explained (at 70), VRA § 3 does give standing to "an aggrieved person," but only "to enforce the voting guarantees of the fourteenth or fifteenth amendment" and only for relief through "the appointment of Federal observers by the Director of the Office of Personnel Management." 52 U.S.C. § 10302(a). That is not broad enough language to incorporate the effects test of VRA § 2. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 586 F. Supp. 3d 893, 910 (E.D. Ark. 2022).

Section 14 also does not satisfy the "private remedy" standard. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Robinson Plaintiffs appear to rely on Section 14(e), which authorizes an award to attorney fees to prevailing parties under the VRA. *See* 52 U.S.C. § 10310(e). But that provision says nothing of VRA § 2. Instead, it only awards attorney fees in an "action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment," *id.*,

21

which, again, does not include a § 2 effects claim.[8] Rarely is a legal standard that asks whether an interpretation is "supported by the text of the statute," *Alexander*, 532 U.S. at 288, claimed to be met with so little reference to text itself.

2.    Both sets of Plaintiffs principally rely on precedent, but they cite none that binds this Court for the relevant proposition and none that is persuasive.

As Appellants explained (at 70–71), *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996), assumed—based solely on legislative history—"the existence of the private right of action under Section 2." *Id.* at 186 (plurality opinion) (quoting S. REP. 97-417, at 30). Galmon Plaintiffs call (at 63) this brief discussion "an essential part of [the Court's] rationale" in *Morse*, but do not explain how that could be so when there is no rationale to be had, just an assumption. For their part, Robinson Plaintiffs (at 60) characterize the sentence as something the Supreme Court "acknowledged," but cite no authority for the proposition

---

[8] If Plaintiffs in fact seek to enforce the guarantees of the Fourteenth and Fifteenth Amendments, then the single-judge district court lacks jurisdiction because constitutional challenges to the "apportionment of congressional districts" must be heard by a three-judge panel. 28 U.S.C. § 2284(a). *See Thomas v. Bryant*, 919 F.3d 298, 304 (5th Cir. 2019) (motions-panel) (identifying "consensus in the caselaw" that § 2284(a) is jurisdictional). The district court denied a motion filed by Appellants to appoint a three-judge panel in this case in part because "counsel for Plaintiffs stipulated . . . that they are not lodging a constitutional claim" but only a statutory claim. ECF No. 137 (May 3, 2022) (text-only order).

that this type of so-called acknowledgment, without more, binds the lower courts. It does not. *See Armour & Co. v. Wantock*, 323 U.S. 126, 132–33 (1944). Just last month, the Supreme Court once again "admonished that 'general language in judicial opinions' should be read 'as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.'" *Turkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940, 950 (2023) (citation omitted). Besides, if two members of the Supreme Court understand this to be "an open question" then it likely is at least that. *Brnovich v. DNC*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring).

Plaintiffs collectively cite two other court of appeals decisions concluding that VRA § 2 provides a private right of action. Galmon Br. 65–66; Robinson Br. 60–61 n.13. But neither case contains persuasive statutory reasoning, their arguments were rebutted above, and Plaintiffs say nothing to defend that reasoning. *See Alabama State Conf. NAACP v. Alabama*, 949 F.3d 647, 651 (11th Cir. 2020), *vacated sub nom. Alabama v. Alabama State Conf. of NAACP*, 141 S. Ct. 2618 (2021); *Mixon v. State of Ohio*, 193 F.3d 389, 406 (6th Cir. 1999) (no reasoning at all).

The one case thoroughly addressing the statutory text under the private-right-of-action legal standard is *Arkansas State Conference of the NAACP*, *see* 586 F.

23

Supp. 3d at 906–24.[9] Plaintiffs have nothing to say of the reasoning in this deci-

sion; they both dismiss it as an "outlier." Galmon Br. 66; Robinson Br. 60. But

this Court's role is "not merely to count noses. The parties are entitled to [its]

independent judgment." *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 785 (7th

Cir. 2019).[10] Where one court's decision contains comprehensive and compel-

ling reasoning, and other courts generally assume the existence of a right of ac-

tion that simply does not exist in the text, the Court is best served by reading the

statutory text and siding with the minority view.

### III.    The District Court's Preliminary Injunction Erroneously Provides Final Relief That Changes the Status Quo On A Provisional Basis.

Appellants' opening brief demonstrated (at 73–74) that the district court

erred in entering preliminary relief that does not preserve the status quo pending

trial; it creates an entirely new state of affairs that is the functional equivalent of

---

[9] An appeal in that case is pending before the United States Court of Appeals for the Eighth Circuit in *Arkansas State Conf. of the NAACP v. Arkansas Bd. of Apportionment*, Case No. 22-1395, and was argued on January 11, 2023. The appeal remains pending before the Eighth Circuit as of the date this brief was filed.

[10] Indeed, in *Credit Bureau*, the Seventh Circuit construed the FTC Act differently than every court of appeals to have read it for decades, *see* 937 F.3d at 783–86, and the Supreme Court later—by a unanimous vote—held that the Seventh Circuit got the statute right, and every other court of appeals got it wrong. *See AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341 (2021).

final relief. A preliminary injunction serves "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex.*, 451 U.S. at 395; *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) ("The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits."). But Plaintiffs argue that an alteration of the status quo was permissible as provisional relief. Robinson Br. at 62-64; Galmon Br. 67-69. Not so.

1.    Galmon Plaintiffs misconstrue Appellants' arguments, contending (at 67) that Rule 65 "does not carve out redistricting cases from its broad recognition that courts may issue preliminary injunctions." That is correct, but Appellants did not suggest otherwise. In redistricting cases where provisional relief would preserve "the status quo," *Exhibitors Poster*, 441 F.2d at 561, a preliminary injunction returning to the status quo would be proper. For example, if Louisiana's past plans had all contained two majority-minority districts, and a new plan eliminated one, to require a plan returning the state to two would "merely preserve the relative positions of the parties," and it would be legitimate provisional relief. *Univ. of Tex.*, 451 U.S. at 395; *see Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 729 (3d Cir. 2004). But that is not the case here.

By the same token, however, in *non*-redistricting cases, plaintiffs must ordinarily await trial to obtain an entirely new state of affairs. Appeals courts have had little trouble reversing preliminary injunctions that go "far beyond freezing the parties in their positions at the time this action was commenced." *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir. 1976); *cf. also Stemple v. Bd. of Ed. of Prince George's Cnty.*, 623 F.2d 893, 898 (4th Cir. 1980). Thus, while an injunction can, for example, restore the status quo by requiring companies to unwind a challenged merger, *FTC v. Weyerhaeuser Co.*, 648 F.2d 739, 741 (D.C. Cir. 1981), it is difficult to imagine a court being justified in ordering a merger that never before existed as temporary relief, even if the plaintiffs have a compelling claim to that as final relief. *See Blaylock*, 547 F.2d at 965 (court could not impose contract that never before existed); *cf. Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1376 (9th Cir. 1985). The problem here is not that Plaintiffs are redistricting plaintiffs but instead that they are seeking temporary relief that is the functional equivalent of final relief. *See Washington Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 476 (9th Cir. 1969).

Plaintiffs cite this Court's statement in *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567 (5th Cir. 1974), that, "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury." *Id.* at 576. But Plaintiffs have no response

to Appellants' argument that this statement was dictum, Opening Br. 73, and that it issued before the Supreme Court held that a preliminary injunction must "merely . . . preserve the relative positions of the parties." *Univ. of Tex.*, 451 U.S. at 395. Galmon Plaintiffs suggest that "mandatory" relief is appropriate at the provisional stage, Galmon Br. 16 n.1, and it certainly can be. But the Supreme Court has made clear that mandatory relief is appropriate to "restore the status quo." *Porter v. Lee*, 328 U.S. 246, 251 (1946). Other courts have followed suit. *See, e.g.*, *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1267 (10th Cir. 2005); *Indus. Bank of Washington v. Tobriner*, 405 F.2d 1321, 1323 (D.C. Cir. 1968); *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 509 (2d Cir. 2005).

      2.     Even assuming that mandatory injunctions that require an affirmative act may go "well beyond simply maintaining the status quo pendent lite," they must be regarded as "particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976); *see also* Black's Law Dictionary 904 (10th ed. 2014). The district court did not consider this heightened standard before issuing mandatory preliminary relief that significantly alters the status quo. Rather than simply enjoining the use of the enacted plan for the 2022 elections, the district court provided Plaintiffs mandatory provisional relief. Specifically, the district

court required the Louisiana Legislature to draw a map "that includes an additional majority-Black congressional district" as preliminary relief—or else see such a map imposed as a judicial remedy. *Robinson*, 605 F. Supp. 3d at 766. That goes far beyond maintaining the status quo or providing relief that protects Plaintiffs right to a trial on the merits in the future.

For that reason, Galmon Plaintiffs' effort to recast the relief as prohibitory (at 16 n.1) falls flat. Galmon Plaintiffs did not ask that all members of the Louisiana congressional delegation to run in at-large elections across Louisiana pending their motion; they wanted a second majority-minority district that never before existed.[11]

3.    "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex.*, 451 U.S at 395; *see also Texas v. Wellington Resources Corp.*, 706 F.2d 533, 537 (5th Cir. 1983) (an appellate court reviewing the appropriateness of a preliminary injunction will not assume

---

[11] In fact, as Appellants pointed out in their opening brief (at 7–9), Louisiana's attempts during the 1990s to create two majority-minority congressional districts were ruled unconstitutional three times in the *Hays* litigation.

the evidence taken at a preliminary injunction hearing will be the same as the evidence developed at a full trial on the merits).

To say that the preliminary injunction proceedings here proceeded on the basis of procedures that were less formal and evidence that is less complete than a trial on the merits is an understatement. The preliminary injunction hearing was held on an extremely expedited basis less than 30 days from the filing of Plaintiffs' motions and less than 45 days from the filing of the complaint. No fact discovery was conducted and Appellants were afforded only two weeks to review and respond to Plaintiffs' expert reports. In addition, Appellants were not even given the opportunity to depose Plaintiffs' experts before the hearing. That is not the fulsome record required to adjudicate claims arising under Section 2 of the Voting Rights Act, including complex analysis of whether there is racially polarized voting and whether white voters act as a sufficient bloc.

4.    Certainly now that the 2022 elections are over, there is no reason to proceed with a final remedy based upon a preliminary injunction. There is ample time before the 2024 elections to proceed with a full trial on the merits and an appropriate remedy, if necessary, following that trial. The district court found that "[t]he focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Robinson*, 605 F. Supp. 3d at 856 (citing *Canal Auth.*, 489 F.2d at 576). But even then, there is no injury for the 2022

elections left to preserve, and there is no need to preserve and remedy any injury for the 2024 elections *before* a review of the merits given the time that is available.[12] This is even more true given that the correctness of the district court's preliminary injunction is currently on appeal before this Court. During the pendency of this appeal, the district court must only maintain the status quo between the parties. *See Coastal Corp. v. Tex. Eastern Corp.*, 869 F.2d 817, 820 (5th Cir. 1989) (court's power over its injunction pending appeal is limited to "maintaining the status quo" between the parties).

Yet that is exactly what Plaintiffs have requested and the district court has agreed to do. In a recent filing, Plaintiffs requested that "the Court recommence the remedial process that was underway when the Supreme Court stayed this case last summer," and "commence remedial proceedings" with "supplemental remedial briefing and maps," an evidentiary hearing, and adoption of a new map that "remedies *the likely* Section 2 violation to preserve the parties' positions." *See Robinson v. Ardoin*, Case No. 3:22-cv-00211-SDD-SDJ, ECF No. 242 at 3

---

[12] Louisiana is holding its next statewide elections in October 2023, with runoff elections to be held in November 2023. A new legislature as well as new governor (and other statewide executive officials) will take office in January 2024. The views of those future elected leaders—the current Governor, House Speaker, Senate President, and Secretary of State will not hold those offices once new officeholders are seated in 2024—are unknowable at this time and may differ from the views of the legislature that was seated in June 2022 when the district court required expedited action of the legislative and executive branches.

(M.D. La. July 12, 2023). Plaintiffs' filing recognizes that the district court has not even reached a final determination that there even is a Section 2 violation, yet they want the district court to proceed with issuing a new statewide congressional map requiring two majority-Black districts before resolution of this appeal and before a trial on the merits. The district court granted that request and set a hearing for the remedial phase in early October. *Robinson v. Ardoin*, Case No. 3:22-cv-00211-SDD-SDJ, ECF No. 250 (M.D. La. July 17, 2023). That goes far beyond simply preserving the parties' positions. It does the opposite.

For this reason, too, the district court's preliminary injunction should be reversed and the case remanded for a trial on the merits.

## CONCLUSION

The Court should vacate or reverse the preliminary injunction and remand this matter to the district court with instructions to conduct a trial on the merits in time for the 2024 congressional elections.

Dated: July 19, 2023

| | |
|---|---|
| */s/ Richard B. Raile\** | */s/ Angelique Duhon Freel* |

RICHARD B. RAILE
KATHERINE L. MCKNIGHT
E. MARK BRADEN
RENEE M. KNUDSEN
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 861-1711
rraile@bakerlaw.com

MICHAEL W. MENGIS
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002

PATRICK T. LEWIS
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, OH 44114

ERIKA DACKIN PROUTY
BAKER & HOSTETLER LLP
200 Civic Center Dr., Suite 1200
Columbus, OH 43215
*Attorneys for Clay Schexnayder and
Patrick Page Cortez*

JEFF LANDRY
  *Louisiana Attorney General*
ELIZABETH B. MURRILL
  *Solicitor General*
SHAE MCPHEE
  *Deputy Solicitor General*
MORGAN BRUNGARD
  *Assistant Solicitor General*
ANGELIQUE DUHON FREEL
CAREY TOM JONES
JEFFREY M. WALE
  *Assistant Attorneys General*
OFFICE OF THE ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
P.O. Box 94005
Baton Rouge, LA 70804
murrille@ag.louisiana.gov

JASON B. TORCHINSKY
PHILLIP M. GORDON
EDWARD M. WENGER
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Highway
Haymarket, VA 20169
*Attorneys for the State of Louisiana*

*/s/ Phillip J. Strach*

PHILLIP J. STRACH
THOMAS A. FARR
ALYSSA M. RIGGINS
NELSON MULLINS RILEY &
SCARBOROUGH LLP
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
phil.strach@nelsonmullins.com

JOHN C. WALSH
SHOWS, CALI & WALSH, LLP
P.O. Box 4046
Baton Rouge, LA 70821
*Attorneys for the Secretary of State*

*\*Signed with permission*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing complies with the length limitations of the Court's Order dated June 25, 2022.  The total word count is 9,042 words, excluding the parts that are exempted under Rule 32(f). It complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it is printed in 14-point Calisto MT font, a proportionally spaced typeface with serifs.

Dated: July 19, 2023

*/s/ Angelique Duhon Freel*
ANGELIQUE DUHON FREEL

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2023, a true and correct copy of the fore-going was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.

Dated: July 19, 2023

*/s/ Angelique Duhon Freel*

ANGELIQUE DUHON-FREEL