No. 22-30333

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

PRESS ROBINSON et al.,
*Plaintiffs-Appellees*

v.

KYLE ARDOIN, in his official capacity as Secretary of State for
Louisiana,
*Defendant-Appellant*

CLAY SCHEXNAYDER et al.,
*Intervenor Defendants-Appellants*

EDWARD GALMON, SR. et al.,
*Plaintiffs-Appellees*

v.

KYLE ARDOIN, in his official capacity as Secretary of State for
Louisiana,
*Defendant-Appellant*

CLAY SCHEXNAYDER et al.,
*Movants-Appellants*

On Appeal from the United States District Court
for the Middle District of Louisiana
(Nos. 3:22-cv-00211-SDD-SDJ, 3:22-cv-00214-SDD-SDJ)

# *GALMON* PLAINTIFFS-APPELLEES' SUPPLEMENTAL BRIEF

*(Counsel listed on next page)*

J.E. Cullens, Jr.**
Andrée Matherne Cullens**
S. Layne Lee**
WALTERS, THOMAS, CULLENS, LLC
12345 Perkins Road,
Building One
Baton Rouge, Louisiana 70810
(225) 236-3636

Abha Khanna
Jonathan P. Hawley
ELIAS LAW GROUP LLP
1700 Seventh Avenue,
Suite 2100
Seattle, Washington 98101
(206) 656-0177

Qizhou Ge*
Jacob D. Shelly
ELIAS LAW GROUP LLP
250 Massachusetts Avenue, NW
Suite 400
Washington, D.C. 20001
(202) 968-4490

*Counsel for the* Galmon *Plaintiffs-Appellees*

*Application for admission forthcoming

**Enrollment forthcoming

# TABLE OF CONTENTS

INTRODUCTION .................................................................... 1

ARGUMENT ......................................................................... 2

I. *Allen* confirmed that the district court applied Section 2 correctly. ................................................................. 2

    A. *Allen* considered and rejected the very arguments that Defendants advance here. ..................................... 3

    B. *Allen* reaffirmed the *Gingles* framework that Plaintiffs followed to demonstrate a Section 2 violation. ....................................................................... 7

        1. Defendants' compactness, community of interest, and core retention arguments misapply *Gingles*. .................................................. 8

        2. *Allen* rejected a proposed new standard that would compare enacted maps to a "race-neutral benchmark." ......................................... 11

II. The Supreme Court did not make new redistricting law in a university admissions decision. .................................. 18

III. Defendants' quarrel with the district court's factfinding remains unsupported. .......................................................... 21

    A. Plaintiffs' illustrative maps protect vulnerable communities of interest. ............................................... 22

    B. The minority community united by Plaintiffs' illustrative maps is compact. .................................... 29

CONCLUSION .................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan,*
143 S. Ct. 1487 (2023) ............................................................. *passim*

*Ardoin v. Robinson,*
142 S. Ct. 2892 (2022) ....................................................................... 7

*Ardoin v. Robinson,*
143 S. Ct. 2654 (2023) ..................................................................... 17

*Cooper v. Harris,*
581 U.S. 285 (2017) ........................................................................ 28

*LULAC v. Perry,*
548 U.S. 399 (2006) ............................................................ 26, 27, 28

*Merrill v. Milligan,*
142 S. Ct. 879 (2022) ............................................................ 3, 4, 17

*Singleton v. Allen,*
No. 2:21-cv-1530-AMM, 2023 WL 5691156 (N.D. Ala.
Sept. 5, 2023) ................................................ 16, 18, 19, 28

*Students for Fair Admissions, Inc. v. President & Fellows of
Harvard Coll.,*
143 S. Ct. 2141 (2023) ............................................................ 18, 19

*Thornburg v. Gingles,*
478 U.S. 30 (1986) ................................................................ 1, 15, 20

*Women's Med. Ctr. of Nw. Hous. v. Bell,*
248 F.3d 411 (5th Cir. 2001) .......................................................... 21

**Statutes**

52 U.S.C. § 10301(a) ...................................................................... 21

52 U.S.C. § 10301(b) ............................................................... *passim*

# CERTIFICATE OF INTERESTED PERSONS

1. In the district court, this case is captioned as *Press Robinson et al. v. Kyle Ardoin*, No. 3:22-cv-00211-SDD-SDJ (lead case), consolidated with *Edward Galmon, Sr. et al. v. R. Kyle Ardoin*, No. 3:22-cv-00214-SDD-SDJ. In this Court, it is captioned as *Press Robinson et al. v. Kyle Ardoin et al.*, No. 22-30333.

2. Counsel for the *Galmon* Plaintiffs-Appellees further certify that the following listed persons and entities as described in the fourth sentence of <u>5th Cir. R. 28.2.1</u> have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### *Galmon* Plaintiffs-Appellees

  a. Edward Galmon, Sr.
  b. Ciara Hart
  c. Norris Henderson
  d. Tramelle Howard

*The following attorneys have appeared on behalf of the* Galmon *Plaintiffs-Appellees either before this Court or in the district court:*

J. E. Culens, Jr.
Andree M. Cullens
S. Layne Lee
Renee C. Crasto
WALTERS, THOMAS, CULLENS, LLC
12345 Perkins Road, Building One
Baton Rouge, Louisiana 70810
(225) 236-3636

Abha Khanna
Jonathan P. Hawley
ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(206) 656-0177

Lalitha Madduri
Jacob D. Shelly
Qizhou Ge
ELIAS LAW GROUP LLP
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20002
(202) 968-4490

### *Robinson* **Plaintiffs-Appellees**

a.  Press Robinson
b.  Edgar Cage
c.  Dorothy Nairne
d.  Edwin René Soulé
e.  Alice Washington
f.  Clee Earnest Lowe
g.  Davante Lewis
h.  Martha Davis
i.  Ambrose Sims

j.   National Association for the Advancement of Colored People Louisiana State Conference

k.   Power Coalition for Equity and Justice

*The following attorneys have appeared on behalf of the* Robinson *Plaintiffs-Appellees either before this Court or in the district court:*

John Adcock
ADCOCK LAW LLC
3110 Canal Street
New Orleans, Louisiana 70119
(504) 233-3125

Leah Aden
Stuart Naifeh
Kathryn Sadasivan
Victoria Wenger
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
(212) 965-2200

R. Jared Evans
Sara Rohani
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, D.C. 20005
(202) 682-1300

Robert A. Atkins
Yahonnes Cleary
Jonathan H. Hurwitz
Daniel S. Sinnreich
Amitav Chakraborty
Adam P. Savitt
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

Nora Ahmed
Megan E. Snider (withdrew on June 6, 2022)
Stephanie Willis
ACLU FOUNDATION OF LOUISIANA
1340 Poydras Street, Suite 2160
New Orleans, Louisiana 70112
(504) 522-0628

T. Alora Thomas
Sophia Lin Lakin
Samantha Osaki
Megan Keenan
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004

Sarah Brannon
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, D.C. 20005

Tracie Washington
LOUISIANA JUSTICE INSTITUTE
3157 Gentilly Boulevard, Suite 132
New Orleans, Louisiana 70122
(504) 872-9134

## Louisiana Legislative Black Caucus Intervenor Plaintiff

    a.    Louisiana Legislative Black Caucus

    b.    Vincent Pierre

*The following attorneys have appeared on behalf of the Louisiana Legislative Black Caucus Intervenor-Plaintiff-Appellee either before this Court or in the district court:*

Stephen M. Irving
STEVE IRVING, LLC
111 Founders Drive, Suite 700
Baton Rouge, Louisiana 70810-8959
(225) 752-2688

Ernest L. Johnson
ATTORNEY AT LAW
3313 Government Street
Baton Rouge, Louisiana 70806
(225) 413-3219

## Defendant-Appellant

    a.    R. Kyle Ardoin, in his official capacity as Louisiana Secretary of State

*The following attorneys have appeared on behalf of Defendant-Appellant either before this Court or in the district court:*

John Carroll Walsh
SHOWS, CALI & WALSH, L.L.P.
628 Saint Louis Street
Baton Rouge, LA 70802
(225) 346-1461

Alyssa M. Riggins
Cassie Holt
John E. Branch, III
Phillip Strach
Thomas A. Farr
NELSON MULLINS RILEY & SCARBOROUGH LLP
4140 Parklake Ave., Suite 200
Raleigh, NC 27612
(919) 329-3800

## State Intervenor Defendant-Appellant

a. The State of Louisiana, by and through Attorney General Jeff Landry

*The following attorneys have appeared on behalf of the State Intervenor-Defendant-Appellant either before this Court or in the district court:*

Elizabeth Baker Murrill
Carey T. Jones
Jeffrey Michael Wale
Morgan Brungard
OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF LOUISIANA
P.O. Box 94005
Baton Rouge, LA 70804-9005
(225) 326-6766
Angelique Duhon Freel
Shae McPhee
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. 3rd Street
Baton Rouge, LA 70802

Jason B. Torchinsky
Dallin B. Holt,
Phillip Michael Gordon
HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC
Suite 643a
2300 N Street, N.W.
Washington, DC 20037

**Legislative Intervenor Defendants-Appellants**

a. Clay Schexnayder, in his official capacity as Speaker of the Louisiana House of Representatives
b. Patrick Page Cortez, in his official capacity as President of the Louisiana Senate

*The following attorneys have appeared on behalf of the Legislative Intervenor-Defendants-Appellants either before this Court or in the district court:*

Richard B. Raile
Katherine L. McKnight
E. Mark Braden
Renee M. Knudsen
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 861-1711

Michael W. Mengis
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002

Patrick T. Lewis
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, OH 44114

Erika Dackin Prouty
BAKER & HOSTETLER LLP
200 Civic Center Dr., Suite 1200
Columbus, OH 43215

**Amici Curiae**

 a. Michael Mislove
 b. Lisa J. Fauci
 c. Robert Lipton
 d. Nicholas Mattei
 e. States of Alabama, Arkansas, Georgia, Indiana, Kentucky, Mississippi, Missouri, Montana, Oklahoma, South Carolina, Texas, Utah, and West Virginia
 f. James F. Blumstein

*The following attorneys have appeared on behalf of the Amici Curiae either before this Court or in the district court:*

Alex S. Trepp
Andrew J. Plague
Jessica Ring Amunson
Keri L. Holleb Hotaling
Sam Hirsch
JENNER & BLOCK LLP
1099 New York Avenue, NW,
Suite 900
Washington, D.C. 20001
(202) 639-6000

Judy Y. Barrasso
Viviana Helen Aldous
BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, LLC
909 Poydras Street, Suite 2350
New Orleans, LA 70112
Tel: (504) 589-9700

Edmund G. LaCour Jr.

OFFICE OF THE ALABAMA ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130

*/s/ Abha Khanna*
Abha Khanna
ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(206) 656-0177


*/s/ J. E. Cullens, Jr.*
Walters, Thomas, Cullens, LLC
12345 Perkins Rd., Bldg. 1
Baton Rouge, LA 70810
(225) 236-3636

## INTRODUCTION

Defendants could have summarized relevant Supreme Court developments in three words: Nothing has changed. Section 2 of the Voting Rights Act endures, and *Thornburg v. Gingles*, <u>478 U.S. 30</u> (1986), remains good law. This steady continuity is a significant reaffirmation of well-established legal principles—and one that entirely upends Defendants' arguments on appeal, originally advanced on the expectation that the Supreme Court would wince at *Gingles*'s straightforward test for proving vote dilution and erect steeper hurdles for voting-rights plaintiffs to clear. The high court entertained a request to do precisely that in *Allen v. Milligan*, <u>143 S. Ct. 1487</u> (2023), a case that Defendants insisted was functionally identical to this one—but the Court emphatically rejected the invitation.

Their only plausible attack on the district court's injunction now defused, Defendants wind their way through an additional 8,000 words of distraction and misdirection. After explicitly rejecting Defendants' arguments in *Allen*, the Supreme Court did not (as Defendants imagine) immediately reverse itself in an entirely unrelated university-admissions case. Nor is this the brief—or this the Court—for Defendants' untenable

request for de novo factfinding. As the district court documented below, Plaintiffs' illustrative maps follow community lines to protect the rights of a compact minority group, just as the first *Gingles* precondition requires.

Last year, Plaintiffs readily satisfied the applicable legal standard to prevail on their Section 2 claims, as the district court determined. Because nothing in the interim has cast doubt on that result, the preliminary injunction should be affirmed.

## ARGUMENT

### I.  *Allen* confirmed that the district court applied Section 2 correctly.

Ordinarily, litigants aiming to reverse a district court's order identify significant evidence that the lower court overlooked or binding precedent that it failed to apply. Here, that approach was foreclosed by the district court's meticulous factfinding and strict adherence to binding precedent in its preliminary-injunction order.

Defendants thus wagered instead that deliverance would come from a higher power—the U.S. Supreme Court—in an anticipated opinion that would blot out reams of Section 2 caselaw as unworkable or even unconstitutional. As this Court's motions panel observed when

rejecting Defendants' stay request, Defendants "put all their eggs in the basket of racial gerrymandering," ROA.6864—at the expense of developing other evidence or arguments—which meant that they could succeed only if the Supreme Court reversed course to determine that plaintiffs' statutory obligations under Section 2 somehow ran afoul of the Fourteenth Amendments' prohibition against unjustified race-based redistricting. Instead, the Supreme Court reaffirmed the familiar standards for proving a violation of Section 2, denying Defendants the legal rewrite that their arguments require.

### A. *Allen* considered and rejected the very arguments that Defendants advance here.

On February 7, 2022—seven-and-a-half weeks before the underlying complaints in this case were filed—the Supreme Court stayed a pair of related district court orders preliminarily enjoining Alabama's congressional map, consolidated the appeals, and calendared argument for the following October. *See Merrill v. Milligan*, 142 S. Ct. 879 (Mem) (2022).[1] Chief Justice Roberts dissented from the stay, recognizing that

---

[1] Wesley Allen succeeded John Merrill as Alabama's secretary of state—and thus as named petitioner in the defense of Alabama's congressional map—on January 16, 2023. Accordingly, citations to *Allen* and *Merrill* reference the same Supreme Court appeal.

"the District Court properly applied existing law," but he pledged to resolve the "considerable disagreement and uncertainty regarding the nature and contours of a vote dilution claim." *Id.* at 882–83 (Roberts, C.J., dissenting from grant of stay).

State officials defending Alabama's map noted that "Alabama's congressional districts have looked largely the same for decades," with only one majority-Black district, and argued that the district court's finding of a likely Section 2 violation based on Plaintiffs' showing that it was possible to draw an additional majority-Black district required "putting racial considerations before race-neutral redistricting criteria" in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution. Br. for Appellants at i, *Allen v. Milligan*, No. 21-1086 (U.S. Apr. 25, 2022) (question presented). Claiming that a districting map could not lawfully be enjoined in these circumstances, the Alabama officials sought reversal. *Id.* at 2.

This argument, combined with Louisiana's apparent determination that the Supreme Court had an appetite for reexamining *Gingles* and its progeny, supplied the template for the State's defense in this case. Rather than marshal any focused opposition to Plaintiffs' evidentiary

presentation at the five-day preliminary injunction hearing in this case, Defendants maintained one all-in refrain: Because Louisiana did the same thing that Alabama did—and because the plaintiffs in each state proved their case in the same way—the outcome of this case could be entrusted to the Supreme Court's resolution of that one. *See* <u>ROA.6864</u> (motions panel recognizing that Defendants' "tactical choice" of exclusively copying racial gerrymandering defense presented in *Merrill* "has consequences," for it left much of Plaintiffs' evidence "largely uncontested").

That tactical choice was unambiguous. "*Merrill* squarely presents the same fundamental questions confronted in this litigation," Defendants told this Court's motions panel last year, copying the question presented in that case for emphasis. Mot. to Stay 10 (June 10, 2022), ECF No. 45. "Furthermore," they continued, "the facts in *Merrill* are essentially identical to the facts here." *Id*. Defendants were eager to highlight the long list of similarities:

> In *Merrill*, Plaintiffs, with largely the same counsel as are representing Plaintiffs here, alleged that because the statewide population of Alabama was such that a second majority-minority district could be drawn, the VRA requires it be drawn. **This is the same claim brought by Plaintiffs here.** The *Merrill* defendants countered that Alabama's

districts were based on core retention of the previous districting plans for the last few decades—**the same defense raised in the instant case**—and that the illustrative plans proposed by Plaintiffs prioritized race over traditional districting principles. The record in this case is clear that Plaintiffs' mapdrawers, including Mr. Cooper, also an expert for Plaintiffs in *Merrill*, prioritized race in drawing their illustrative plans. **Based on the issues raised and the similarity of the facts, it is likely the Supreme Court's decision in *Merrill* will be dispositive of the issues here, including whether Plaintiffs can show a likelihood of success on the merits.** In fact, this Court need look no further than the fact that the district court cited the corresponding district court case in *Merrill* 16 times in its preliminary injunction opinion.

*Id.* at 10–11 (emphases added). Defendants replayed this one-note tune at every opportunity. *See, e.g.*, *id.* at 2 ("The claims and defenses . . . in *Merrill* are essentially identical to the claims and defenses in this case."); *id.* at 8 ("On February 7, 2022, the United States Supreme Court announced that it will consider issues associated with claims identical to the claims in this case . . . . The specific legal issues common to *Merrill* are dispositive issues in the instant case."); Opening Br. for Appellants ("Opening Br.") 1–2, ECF No. 155-1 (highlighting that "a three-judge court in Alabama issued a materially identical injunction"); *id.* at 47 ("In *Merrill*, the Supreme Court stayed a strikingly similar preliminary injunction[.]"); *id.* at 48 (anticipating "the meaningful prospect that the

Supreme Court will intervene and abrogate" unfavorable precedent); Emergency Appl. for Admin. Stay at 2, *Ardoin v. Robinson*, No. 21A814 (U.S. June 17, 2022) ("Because this case presents the same question as *Merrill*, the Court should grant certiorari in advance of judgment [and] consolidate the cases[.]"); *id.* at 11 ("This case, like *Merrill*, presents the important question whether prioritizing race under Section 2 is inconsistent with the federal Constitution."). Persuaded, the Supreme Court granted Defendants' request to stay the injunction below and held this case in abeyance pending its decision in *Allen*. *See Ardoin v. Robinson*, 142 S. Ct. 2892 (Mem) (2022).

Having fastened their fate so tightly to Alabama's defense, Defendants are now desperate to squirm out of that decision's plain implications. But when parties profess with such clarity the condition that will defeat their claim—here, an adverse decision in *Allen*—this Court should take them at their word.

**B.** *Allen* **reaffirmed the** *Gingles* **framework that Plaintiffs followed to demonstrate a Section 2 violation.**

On June 8, 2023, the Supreme Court published its decision in *Allen* and affirmed the lower court's finding that the plaintiffs were likely to prevail in their Section 2 challenge to Alabama's congressional map. *See*

143 S. Ct. at 1498. After providing a brief background on the history of Section 2 and Alabama's redistricting efforts, Chief Justice Roberts's opinion for the Court proceeded in two parts: First, he affirmed the district court's application of *Gingles*'s three-part framework for identifying violations of Section 2, *id.* at 1502–06, and second, he rejected the contention that an enacted map challenged under Section 2 must be evaluated against a "race-neutral benchmark," *id.* at 1506–17. Both points directly refute Defendants' arguments here.

1. **Defendants' compactness, community of interest, and core retention arguments misapply *Gingles*.**

To establish that a political process violates Section 2 by providing members of a racial minority with less opportunity than other members of the electorate to elect representatives of their choice, *see* 52 U.S.C. § 10301(b), plaintiffs must satisfy the three preconditions first identified in *Gingles*, *see Allen*, 143 S. Ct. at 1503. Specifically, plaintiffs must (1) identify a minority group that is sufficiently large and compact to comprise a majority in a reasonably configured district, (2) show that this group is politically cohesive, and (3) demonstrate that the white majority reliably defeats the minority's preferred candidates. *Id.* at 1503 (citing *Gingles*, 478 U.S. at 46–51). The first precondition—the locus of dispute

in *Allen* and here—establishes whether the minority group has the potential to elect its representatives of choice in an additional single-member district. *Id.*

The *Allen* Court affirmed that the Alabama plaintiffs satisfied this first precondition by producing illustrative maps that contained two majority-Black districts and complied with traditional districting criteria. *Id.* at 1504. To confirm that these districts were reasonably configured, the Court recognized that the plaintiffs' illustrative maps were consistent with traditional districting principles: They achieved similar or better compactness than Alabama's enacted map, did not contain any "bizarre shapes" or "obvious irregularities," contained equally populated districts, were contiguous, and split the same number or fewer county lines than the enacted map. *Id.*

The *Allen* Court rejected Alabama's argument that the plaintiffs' illustrative maps were not reasonably configured due to their division of a Gulf Coast population into two different districts. *Id.* at 1504–05. First, the Court noted that testimony identifying the Gulf Coast as a cognizable community was "partial, selectively informed, and poorly supported" or offered "'simply' to preserve 'political advantage.'" *Id.* at 1505. But even

if the Gulf Coast contained a community of interest, the Court emphasized, "plaintiffs' maps would still be reasonably configured because they joined together a different community of interest." *Id.* The illustrative maps protected a region that "contains a high proportion of black voters" who shared socioeconomic disadvantages and a "lineal connection" to antebellum slaves. *Id.* By explicitly recognizing this community's common racial identity, the Court necessarily rejected Defendants' argument here, *see* Opening Br. 32; Suppl. Br. for Appellants ("Suppl. Br.") 1, 12, that a single-race community that shares political interests—like the one concentrated within the Delta Parishes, Baton Rouge, and St. Landry Parish—somehow does not count.

The *Allen* Court made similarly quick work of Alabama's argument that the enacted map deserved credit (and legal immunity) for better approximating the state's previous congressional configurations. 143 S. Ct. at 1505. The Court explained that it "has never held that a State's adherence to a previously used districting plan can defeat a [Section] 2 claim," for "[i]f that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Id.* But "[t]hat is not

the law; [Section] 2 does not permit a state to [violate voters' rights] just because the State has done it before." *Id.* Defendants' indignance at the district court's injunction blocking a districting configuration that had appeared in previous decades, *see* Opening Br. 1, is due the same repudiation that Alabama's parallel entreaties received from the high court.

> **2.** ***Allen* rejected a proposed new standard that would compare enacted maps to a "race-neutral benchmark."**

Alabama's (and Louisiana's) perfunctory compactness, community-of-interest, and core-retention defenses, the Supreme Court made clear, were essentially a sideshow. "The heart of these cases," Chief Justice Roberts explained, "is not about the law as it exists. It is about Alabama's attempt to remake our [Section] 2 jurisprudence anew." *Allen*, 143 S. Ct. at 1506. That attempt failed.

Alabama argued that the district court erred by judging its enacted map against the challengers' illustrative maps—which were drawn to satisfy the first *Gingles* precondition's requirement of identifying a new, reasonably-configured majority-Black district—instead of against a "race-neutral benchmark" produced by averaging the number of

majority-minority districts that appear in a set of computer-simulated maps generated without regard to race. *Id.* This doctrinal revision was necessary, Alabama maintained, to avoid "requiring racial proportionality in districting." *Id.* Defendants parrot the same argument here. *See, e.g.*, Opening Br. 40–59 (criticizing "[r]ace-based comparators"); *id.* at 34 (characterizing Plaintiffs' claim as "one of abstract *proportionality*"); Suppl. Br. 20–24 (doubling down on rejected proportionality arguments).

But, as the *Allen* Court confirmed, these arguments are "compelling neither in theory nor in practice." 143 S. Ct. at 1507. Plaintiffs' illustrative maps serve to identify whether "it is *possible* that the State's map has a disparate effect on account of race," which can then be confirmed according to "[t]he remainder of the *Gingles* test." *Id.* And "the *Gingles* framework itself imposes meaningful constraints on proportionality" by declining to require majority-minority districts that cannot be drawn without flouting traditional districting criteria. *Id.* at 1508–09. Contrary to the *Gingles* caricature attacked by Alabama and Defendants—that where "another majority-black district could be drawn, it must be drawn," *id.* at 1506; *see also* Opening Br. 34 (similar)—the

*Allen* Court catalogued examples where Section 2 claims failed because an illustrative majority-minority district stretched "for much of its length, no wider than the interstate corridor," <u>143 S. Ct. at 1508</u> (cleaned up), or resembled a "monstrosity," *id.* at 1509, or sprouted "narrow and bizarrely shaped tentacles," *id.*, or traced the shape of "a sacred Mayan bird," *id.* No similar charge could be leveled here, where Plaintiffs' illustrative maps unite one compact Black population from the Delta Parishes down the traditional migratory route to Baton Rouge. *See* <u>ROA.6671</u>.[2]

Again tracking Alabama's briefing, Defendants suggested that "a plaintiff could use computer-generated plans to show that non-racial criteria consistently yield a certain number of majority-minority districts." Opening <u>Br. 34</u>; *see also id.* at 55 (criticizing district court for "declin[ing] to consider the *20,000* alternative simulated plans"); *id.* at 56

---

[2] Defendants are quick to quote Section 2's acknowledgement that it does not establish a "right" to proportionality, *see* Suppl. Br. 20, but they ignore the statute's immediately preceding sentence: "The extent to which members of a protected class have been elected to office . . . is *one circumstance which may be considered*[.]" <u>52 U.S.C. § 10301(b)</u> (emphasis added). That circumstance obtains particular relevance here because Louisiana's disproportionate electoral outcomes are achieved by diluting the votes of a compact and cohesive minority group.

(attributing significance to fact that "Plaintiffs did not run their own simulations demonstrating that race neutral principles would likely yield two majority-minority districts"). But the *Allen* Court explained that "Section 2 cannot require courts to judge a contest of computers when there is no reliable way to determine who wins, or even where the finish line is." 143 S. Ct. at 1514. Given that redistricting involves "difficult, contestable choices" requiring human deliberation beyond what wire and silicon can offer—and that a comprehensive computer simulation would require maps numbering "at least in the 'trillion trillions'"—Defendants' proposed exoneration-by-algorithm amendment to Section 2 was easily dispatched. *Id.* at 1513–14.

Finally, the Supreme Court rejected arguments that the district court's application of Section 2 will require racial gerrymandering in violation of the Fourteenth and Fifteenth Amendments. *Compare* Suppl. Br. 1 ("Appellants filed this appeal more than a year ago to challenge 'a flawed view of §2' of the [VRA] 'that conflicts with the Fourteenth Amendment.'" (quoting Opening Br. 23)), *with Allen*, 143 S. Ct. at 1519 (Kavanaugh, J., concurring) ("As the Court explains, the constitutional argument presented by [Defendants] is not persuasive in light of the

Court's precedents."). Indeed, federal courts have for decades "authorized race-based redistricting as a remedy for state districting maps that violate [Section] 2." *Allen*, <u>143 S. Ct. at 1516</u>.[3]

Elaborating on this point for a four-justice plurality, Chief Justice Roberts recognized that it would make little sense to require plaintiffs to produce illustrative maps created behind a veil of racial ignorance because "[t]he question whether additional majority-*minority* districts can be drawn, after all, involves a 'quintessentially race-conscious calculus.'" *Id.* at 1510 (plurality op.) (quoting *Johnson v. De Grandy*, <u>512 U.S. 997, 1020</u> (1994)). Chief Justice Roberts refused to chastise plaintiffs' map-drawer, Bill Cooper—the same map-drawer, as Defendants have eagerly highlighted, retained by Plaintiffs below—for drawing illustrative districts that hit an express racial target of at least 50%-Black population, as the *Allen* dissenters and Defendants here

---

[3] Defendants appear particularly hung up on the notion that decreasing a minority population "in one district to bring it up in others" necessarily constitutes racial predominance. Suppl. Br. 36. But *Gingles* itself recognized that unlawful racial vote dilution might be caused by "the concentration of blacks into districts where they constitute an excessive majority," <u>478 U.S. at 46</u> n.11—in other words, the familiar concept of "packing." How else is such a violation to be remedied if not by drawing down the excess minority population to unpack the district?

would urge, *see* Suppl. Br. 34–35, because finding fault with that method would necessarily distort the Section 2 inquiry and require *Gingles* to be overruled altogether, *see Allen*, 143 S. Ct. at 1512. After all, Chief Justice Roberts explained, all illustrative Section 2 maps "were created to show, as [the Supreme Court's] cases require, that an additional majority-minority district could be drawn. That is the whole point of the enterprise." *Id.*[4]

Justice Kavanaugh's concurrence sounded the same themes. *See id.* at 1517–19 (Kavanaugh, J., concurring). He rejected Alabama's (and Defendants') implicit request to alter or replace *Gingles*'s test. *Id.* at 1517. He rejected Alabama's (and Defendants') accusation that the district court's application of *Gingles* "inevitably requires a proportional number of majority-minority districts." *Id.* at 1517–18. He rejected Alabama's (and Defendants') proposal to judge its enacted plan against

---

[4] In remand proceedings, Alabama previewed—without any success—Defendants' current efforts to evade the plain implications of this discussion in *Allen*. *See, e.g.*, *Singleton v. Allen*, No. 2:21-cv-1530-AMM, 2023 WL 5691156, at *55 (N.D. Ala. Sept. 5, 2023) ("[W]e presume the preliminary injunction would not have been affirmed if there were an open question whether race played an improper role in the preparation of [maps drawn by Mr. Cooper], given that the State squarely presented this argument to the Supreme Court.").

race-blind computer simulations. *Id.* at 1518–19. And he rejected Alabama's (and Defendants') assertion that Section 2, as construed by *Gingles* and applied below, requires race-based redistricting beyond Congress's constitutional authority. *Id.* at 1519. Justice Kavanaugh's only caveat to Chief Justice Roberts's opinion was to reserve any opinion about whether Section 2's allowance for race-based redistricting can "extend indefinitely into the future" consistently with the U.S. Constitution, noting that there—like here—it was not presented by the appeal. *Id.*

In sum, the Supreme Court entertained every critique lodged against the plaintiffs' case and the district court's reasoning and, one-by-one, rejected them. The affirmance was absolute and unequivocal. Every "disagreement and uncertainty" that Chief Justice Roberts identified at the application stage, *Merrill,* 142 S. Ct. at 883 (Roberts, C.J., dissenting from grant of stay), the Court resolved in favor of the Section 2 plaintiffs. *Allen* governs this case and requires the same result.[5]

---

[5] Shortly after the Supreme Court issued its *Allen* decision, Defendants implored the justices to retain jurisdiction in this case by previewing the various issues they contend "suitably distinguish" *Allen.* Pet'rs' Letter at 2, *Ardoin v. Robinson,* No. 21A814 (U.S. June 8, 2023). Without any noted

- 17 -

## II. The Supreme Court did not make new redistricting law in a university-admissions decision.

Having crashed into the dead end that *Allen* poses for their *Gingles* arguments, Defendants now spin their wheels and seek refuge in an altogether-unrelated case. Three weeks after deciding *Allen*, the Supreme Court reviewed a pair of university-admissions programs and held that the pedagogical interests proffered on behalf of racial preferences in that context were insufficient to satisfy strict scrutiny. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023) (*SFFA*). That case had nothing to do with Section 2—or voting rights at all—as Chief Justice Roberts could be the first to explain, given that he authored both opinions and never recognized any analogy. *Cf. Singleton v. Allen*, No. 2:21-cv-1530-AMM, 2023 WL 5691156, at *71 (N.D. Ala. Sept. 5, 2023) (recognizing "affirmative action cases, like [*SFFA*], are fundamentally unlike this case").[6]

---

dissent, the Court denied the request, vacated the stay, and dismissed the writ of certiorari as improvidently granted. *Ardoin v. Robinson*, 143 S. Ct. 2654 (Mem) (2023).

[6] Nor do any of *SFFA*'s three concurring opinions or two dissenting opinions so much as mention *Allen*.

In *SFFA*, the Court reiterated that "race-based government action" is permissible to "remediat[e] specific, identified instances of past discrimination that violated the Constitution or a statute." 143 S. Ct. at 2162. This is the principle that requires states to remedy Section 2 violations by enacting maps that consciously correct racial discrimination. University admissions, as the Court explained, are altogether different. Evaluating the constitutionality of admissions standards employed by Harvard College and the University of North Carolina, the Chief Justice rejected the interests that those institutions offered in defense of race-conscious admissions programs as "not sufficiently coherent for purposes of strict scrutiny." *Id.* at 2166. He found the "racial categories" used by the universities to be "opaque." *Id.* at 2168. He was persuaded by evidence that universities used race to stereotype. *Id.* at 2170. And he emphasized the universities' concession that there was no conceivable circumstance whereby their system of racial preferences would no longer be necessary. *Id.* at 2170–73.

Section 2's application differs in every respect. The same court has found interests in remedying unlawful vote dilution to be concrete and compelling. *See Allen*, 143 S. Ct. at 1517 ("[W]e are not persuaded by

Alabama's argument that [Section] 2 as interpreted in *Gingles* exceeds the remedial authority of Congress."); *see also Singleton*, 2023 WL 5691156, at *71 (noting faulty affirmative-action analogy "would fly in the face of forty years of Supreme Court precedent—including precedent *in this case*"). Black Louisianians plainly comprise a discrete racial minority. *See* ROA.6721 (district court finding the "Any Part Black definition is deeply rooted in Louisiana history"). *Gingles* requires cohesive racial voting to be proved rather than assumed. *See* 478 U.S. at 51; *cf.* ROA.6757 (district court finding that "Plaintiffs have demonstrated that Black voters in Louisiana are politically cohesive"). And Section 2's functional expiration date for vote-dilution claims, *Allen* explains, is built directly into the *Gingles* test: Precisely because plaintiffs must prove that minority groups are geographically compact, their task will grow increasingly difficult "as residential segregation decreases—as it has 'sharply' done since the 1970s." *Allen*, 143 S. Ct. at 1509. Regrettably, this segregation presently remains a fact of Louisiana's residential geography, which is revealed (and not somehow created, *contra* Suppl. Br. 28 n.4) by Plaintiffs' illustrative maps, *see* ROA.6662 (district court recognizing "well-known and easily

demonstrable fact" of "historical housing segregation" in Louisiana, "which still prevails in the current day").

It is no wonder, then, that Defendants' "analysis" of *SFFA* never scratches deeper than quoting a few context-free lines about how "eliminating racial discrimination means eliminating all of it," Suppl. Br. 2, 28 (quoting *SFFA*, 143 S. Ct. at 2161), and that courts strive to "vindicate the Constitution's pledge of racial equality," *id.* at 27–28 (quoting *SFFA*, 143 S. Ct. at 2161). It is *Plaintiffs*, after all, who seek to secure the promise of this aspirational rhetoric. Louisiana's enacted congressional map results in vote dilution "on account of race or color." 52 U.S.C. § 10301(a). In response, Black Louisiana voters petitioned a federal court to enjoin this unlawful racial discrimination—to *eliminate all of it*. The district court's preliminary injunction was thus a first step toward vindicating the U.S. Constitution's essential pledge.

## III. Defendants' quarrel with the district court's factfinding remains unsupported.

With their legal arguments foreclosed, Defendants resort to lobbing shots at the district court's careful, fully supported findings of fact. None of those shots land; the illustrative districts' satisfaction of the *Gingles* preconditions is strongly supported by record evidence, which *Allen* does

nothing to disturb. *Cf. Women's Med. Ctr. of Nw. Hous. v. Bell*, <u>248 F.3d 411, 418</u>–19 (5th Ci<u>r. 2001</u>) (reiterating that "[a] district court's grant of a preliminary injunction is reviewed for abuse of discretion" and "[f]indings of fact are reviewed only for clear error").

## A. Plaintiffs' illustrative maps protect vulnerable communities of interest.

Defendants' scramble to contest Plaintiffs' community-of-interest evidence arrives much too late.[7] At the week-long preliminary-injunction hearing, Defendants "did not call any witnesses to testify about communities of interest," which the district court recognized as "a glaring omission." <u>ROA.6735</u>. Now, Defendants are reduced to excavating a handful of quotations delivered at legislative hearings. *See* Suppl. B<u>r. 8–9</u>. But none of these legislators or lay witnesses were put on the stand, where their testimony could have been explored, contextualized, or challenged on cross-examination, and where the district court would

---

[7] Besides one "*cf.*" cite, Defendants' supplemental brief—which was solicited to address *Allen* and any other developments "appropriate for Rule 28(j) letters over the past year," Directive, ECF No. 242—wanders through eight pages of district-configuration discussion without ever referencing *Allen* or any other opinion published within the last *five years*, *see* Suppl. Br. 13–20. These arguments were all considered and properly rejected below.

have had an opportunity to assess the witnesses' qualifications and credibility. By contrast, the district court was able determine that Plaintiffs' lay witness testimony "contributed meaningfully to an understanding of communities of interest," ROA.6735, and Plaintiffs' experts "demonstrated that they gave careful thought to selecting objectively verifiable indicators to identify for assessing communities of interest and calculating how often their maps split them," ROA.6737. Far from clear error, the district court's decision to credit Plaintiffs' evidence on this issue was the only plausible choice.

Defendants also oversell the importance of legislative record evidence, citing a racial-gerrymandering case in which the relevant inquiry was whether race predominated *during legislative deliberations*. *See* Suppl. Br. 19–20 (citing *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189 (2017)). The Section 2 inquiry, in contrast, tasks plaintiffs with identifying a minority group that is sufficiently large and geographically compact to constitute a majority, taking into account traditional districting principles like maintaining communities of interest. *See Allen*, 143 S. Ct. at 1503. Because this framework does not investigate legislative intent, it does not prioritize statements by

legislators in the legislative record. In any event, Plaintiffs presented a witness who spoke to "the data, the testimony of the public, [and] the issues raised in legislative hearings." ROA.6708. And Plaintiffs' experts' opinions about communities of interest were informed by the legislative record. *See* ROA.6668 (Plaintiffs' expert "explains that he considered the testimony of Louisiana residents from the roadshows held by the legislature during the redistricting process to validate his impressions of communities of interest" and "cites particular testimony and explains how the testimony specifically influenced his consideration of communities of interest"). Even as Defendants now try to shift the *Gingles* goalposts, Plaintiffs' evidence still finds the net.

Additionally, Defendants now claim that it is *Plaintiffs* who should have called more witnesses to discuss communities of interest, *see* Suppl. Br. 6—a bold suggestion from parties that neglected to call any witnesses at all on the topic. They latch onto *Allen*'s observation that "[o]nly two witnesses" testified on behalf of a proposed community of interest in that case. *Id.* (quoting 143 S. Ct. at 1505). But the Supreme Court was *affirming* the district court's dissatisfaction with *Alabama's* showing, and thus this remark further condemns Defendants' own evidentiary

deficiency. As in *Allen*, the district court's credibility determinations are entitled to deference, and the same criticism of Defendants' meager showing applies. Moreover, *Allen* did not insist on a magic number of witnesses necessary to confirm a community of interest—the real problem was the quality, not quantity, of Alabama's witnesses, whose testimony was "partial, selectively informed, and poorly supported" or offered in service of "political advantage." 143 S. Ct. at 1505. As the motions panel summarized here, by contrast:

> **The plaintiffs introduced extensive lay testimony supporting their claim that the black populations in the illustrative CD 5 were culturally compact.** Those witnesses testified that the black populations in those regions share family, culture, religion, sports teams, and the media they consume. [ROA.6671–72] They also emphasized the educational ties between northeastern Louisiana and the Baton Rouge area, including the fact that many residents of the delta parishes attend college at Southern University in Baton Rouge. *Ibid.* Likewise, they noted that the black voters in those regions share the same economic interests in the petroleum and sugarcane industries. *Ibid.* And all this testimony went unrebutted[.]

ROA.6867 (emphasis added).

Defendants' remaining critique posits that the community of interest protected by Plaintiffs' illustrative maps is not perfectly homogeneous. *See* Suppl. Br. 16–17. Of course, no community ever is. The Delta Parishes invariably will exhibit some differences with any other

parishes they are grouped with, *see* ROA.6671, but, as a knowledgeable witness explained, the Delta Parishes share close connections to Baton Rouge visible through historical migratory patterns, faith, family, culture, and destinations for higher education, *see* ROA.6671. Defendants respond by plucking a few stray references from witness Charles Cravins, a civic figure in St. Landry Parish, to "south Louisiana." Suppl. Br. 6. But that testimony was in the context of distinguishing St. Landry Parish from the *northwestern* part of Louisiana to which it was joined in the challenged map. *See* ROA.5064–72. The main thrust of Mr. Cravins's testimony was to highlight St. Landry Parish's cultural ties to Baton Rouge, which often mirrored ties invoked by the Delta Parishes. *Compare* ROA.5063 (describing St. Landry connections to Southern University in Baton Rouge), *with* ROA.6671 (describing Delta Parish connections to Southern University). But Mr. Cravins also explained that St. Landry Parish maintained closer connections with *northeastern* Louisiana, ROA.5069, further confirming that a congressional district grouping the Delta Parishes, Baton Rouge, and St. Landry Parish would appropriately track a discrete community of interest.

Defendants seem to prefer *LULAC v. Perry*, <u>548 U.S. 399</u> (2006), to *Allen*, but they misread that case as well. Contradicting Defendants' complaints about an illustrative district joining urban Baton Rouge with rural Delta Parishes, *LULAC* explicitly recognized that "members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district." *Id.* at 435. The problem in *LULAC* was "the enormous geographical distance separating the Austin and Mexican-border communities" that Texas attempted to string together in a single district, "coupled with the disparate needs and interests of these populations." *Id.* Here, by contrast, Baton Rouge sits just downstream on the same Mississippi River creating the delta from which the northeastern parishes derive their colloquial name; the drive from Baton Rouge to the heart of the adjacent Delta region is less than half of the "300-mile gap" that so troubled the Court in *LULAC*, *id.* at 402; and voters in this area share all kinds of priorities and interests, *see, e.g.,* <u>ROA.6668</u>–70 (summarizing testimony that areas grouped in illustrative CD-5

exhibited common socioeconomic and educational obstacles and were "united by a higher level of risk to the impact of disasters").[8]

Defendants might view communities of interest differently, but the district court "did not have to conduct a 'beauty contest'" between the competing approaches. *Allen*, 143 S. Ct. at 1505; *see also Singleton*, 2023 WL 5691156, at *65 ("[W]e cannot reconcile the State's position that communities of interest work as a trump card with the Supreme Court's ruling in this case."). The Supreme Court has never put Section 2 plaintiffs to the impossible task of showing that every voter in an illustrative district belongs to a single community of interest. *LULAC* simply reminds that where a district is drawn to unite a racial community, the proponents must show rather than assume that members of that community "share the same political interests, and will prefer the same candidates at the polls." 548 U.S. at 433. Plaintiffs easily cleared that bar. *See, e.g.*, ROA.6737 (finding that "Plaintiffs made a

---

[8] Defendants seem to suggest that the *Gingles* preconditions require plaintiffs to prove that a minority group and surrounding white voters suffer the *same* socioeconomic obstacles and share the *same* "common interests." Suppl. Br. 15–16; *see also id.* at 30. This is flatly incorrect. Permitting a state to avoid liability for racial discrimination by showing that a discrete minority population continues to languish under the unique burdens of that discrimination would turn Section 2 on its head.

strong showing that their maps respect [communities of interest] and even unite communities of interest that are not drawn together in the enacted map"). Defendants have failed their burden on appeal to supply "the definite and firm conviction that a mistake has been committed" by the district court's acceptance of Plaintiffs' witness testimony on this issue. *Cooper v. Harris*, 581 U.S. 285, 309 (2017).

**B.    The minority community united by Plaintiffs' illustrative maps is compact.**

Defendants' quarrel with the district court's factfinding on the compactness of Plaintiffs' illustrative maps is similarly too little, too late. As the motions panel recognized, Defendants' strategy at the preliminary-injunction hearing left "the plaintiffs' evidence of compactness largely uncontested." ROA.6864; *see also* ROA.6731 (district court finding Plaintiffs' "*Gingles I* experts Cooper and Fairfax qualitatively superior and more persuasive on the requirements of numerosity and compactness"). Recent caselaw does not entitle Defendants to a mulligan.

Under *Gingles*, a "minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Allen*, 143 S. Ct. at 1503 (cleaned up). A "reasonably

configured district," in turn, is one that "comports with traditional districting criteria, such as being contiguous and reasonably compact." *Id.* Thus, the minority group at issue will be sufficiently compact for the first *Gingles* precondition if the illustrative district drawn to protect it is itself "reasonably compact." *See id.* Helpfully elucidating the contours of this test, the *Allen* majority approved the lower court's finding that Mr. Cooper's illustrative maps satisfied this precondition because they "produced districts roughly as compact as the existing plan," avoided introducing "bizarre shapes, or any other obvious irregularities," contained equal populations, were contiguous, and respected political subdivision lines at least to the same degree as the enacted map. *Id.* at 1504.

Here, illustrative map-drawers Mr. Cooper and Anthony Fairfax took the same approach as that described in *Allen* and satisfied the same standards. As the district court found, Messrs. "Cooper and Fairfax demonstrated, without dispute, that in terms of the objective measures of compactness, the congressional districts in the illustrative plans are demonstrably superior to the enacted plan." ROA.6726. Even now, Defendants do not suggest that any of the illustrative maps are

malapportioned, lack contiguity, or cross more political subdivision lines than the enacted map. *See* <u>ROA.6733</u>–34 (district court finding that equal population and contiguity are not disputed and that "illustrative plans split fewer parishes than the enacted plan"). In short, Plaintiffs' illustrative maps confirmed that the minority group they protect is at the very least "reasonably compact," which is all that *Gingles*—and *Allen*— require. *Allen*, <u>143 S. Ct. at 1503</u>.

## CONCLUSION

The district court followed the law and the facts to preliminarily enjoin Louisiana's congressional map. The legal test that the district court applied has now been reaffirmed by the U.S. Supreme Court, defeating Defendants' attacks. And the record facts are well supported and no longer up for debate. This Court should affirm.

Dated: September 6, 2023

Respectfully submitted,

J.E. Cullens, Jr.**
Andrée Matherne Cullens**
S. Layne Lee**
WALTERS, THOMAS, CULLENS, LLC
12345 Perkins Road,
Building One
Baton Rouge, Louisiana 70810
(225) 236-3636

By: */s/ Abha Khanna*
Abha Khanna
Jonathan P. Hawley
ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(206) 656-0177

Qizhou Ge*
Jacob D. Shelly
ELIAS LAW GROUP LLP
250 Massachusetts Ave, NW
Suite 400
Washington, D.C. 20002
(202) 968-4490

*Counsel for the* Galmon
*Plaintiffs-Appellees*

*Application for admission
forthcoming

**Enrollment forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that counsel for Appellants are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Abha Khanna
Abha Khanna

# CERTIFICATE OF COMPLIANCE

This document contains 6,096 words, excluding parts exempted by Federal Rule of Appellate Procedure 32(f), and is in compliance with the Court's June 28, 2023, Directive, ECF No. 242. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1) because it has been prepared in a proportionally spaced, serifed typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Abha Khanna*
Abha Khanna