No. 22-30333

# In the United States Court of Appeals for the Fifth Circuit

PRESS ROBINSON, et al.

*Plaintiffs - Appellees*

v.

KYLE ARDOIN, et al. in his official capacity as Secretary of State for Louisiana,

*Defendant-Appellant,*

and

CLAY SCHEXNAYDER, et al. ,

*Intervenor-Defendant-Appellants,*

_____

On Appeal from the United States District Court
for the Middle District of Louisiana
Case Nos. 3:22-cv-211, 3:22-cv-214

**PETITION FOR REHEARING EN BANC**

*(Counsel Listed on Next page)*

RICHARD B. RAILE
KATHERINE L. MCKNIGHT
E. MARK BRADEN
RENEE M. KNUDSEN
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Phone: (202) 861-1711
Email: rraile@bakerlaw.com

MICHAEL W. MENGIS
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
PATRICK T. LEWIS
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, OH 44114

ERIKA DACKIN PROUTY
BAKER & HOSTETLER LLP
200 Civic Center Dr., Suite 1200
Columbus, OH 43215

*Attorneys for Clay Schexnayder
and Patrick Page Cortez*

JEFF LANDRY
  Louisiana Attorney General
ELIZABETH B. MURRILL
  Solicitor General
SHAE MCPHEE
  Deputy Solicitor General
MORGAN BRUNGARD
  Assistant Solicitor General
ANGELIQUE DUHON FREEL
CAREY TOM JONES
JEFFREY M. WALE
  Assistant Attorneys General
OFFICE OF THE ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
P.O. Box 94005
Baton Rouge, LA 70804
murrille@ag.louisiana.gov

JASON B. TORCHINSKY
PHILLIP M. GORDON
EDWARD M. WENGER
DREW C. ENSIGN
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Highway
Haymarket, VA 20169

*Attorneys for the State of Louisiana*

PHILLIP J. STRACH
THOMAS A. FARR
ALYSSA M. RIGGINS
NELSON MULLINS RILEY &
SCARBOROUGH LLP
301 Hillsborough St., Suite 1400
Raleigh, NC 27603
phil.strach@nelsonmullins.com

JOHN C. WALSH
SHOWS, CALI & WALSH, LLP
P.O. Box 4046
Baton Rouge, LA 70821

*Attorneys for the Secretary of State*

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.2.1, movants, as governmental parties, need not furnish a certificate of interested persons.

/s/ *Jason B. Torchinsky*
Jason B. Torchinsky
*Attorney for Intervenor*
*Defendant-Appellants*

## INTRODUCTION AND RULE 35(b)(1) STATEMENT

This petition presents two issues that each independently warrant rehearing en banc.

*First*, the panel erred by finding an implied right of action for private litigants to enforce §2 of the Voting Rights Act ("VRA"). The Eighth Circuit recently reached the opposite conclusion. *See Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, __ F.4th __, 2023 U.S. App. LEXIS 30756 (8th Cir. Nov. 20, 2023). The panel did not analyze the VRA's text and instead relied on precedent analyzing an unrelated issue (sovereign immunity) for a different section of the VRA (§208). That reasoning is mistaken and conflicts with the Eighth Circuit's thorough analysis of the VRA's text and structure. The result of the circuit split is an untenable scenario where a VRA claim by private litigatns can proceed in Louisiana but not in neighboring Arkansas.

*Second*, the panel failed to consider whether the district court's mandate for race-based state action is warranted by current circumstances. It is well-established that the VRA "'imposes current burdens [that] *must be justified by current needs*.'" *Shelby County v. Holder*, 570 U.S. 529, 536 (2013) (emphasis added) (citation omitted).

And Justice Kavanaugh made plain in *Allen v. Milligan* that this applies specifically to—and remains an open question for—redistricting under §2 of the VRA. 143 S. Ct. 1487, 1519 (2023) (Kavanaugh, J., concurring) ("Alabama did not raise that temporal argument in this Court, and [the Court] therefore [did] not consider it at this time.").

Unlike Alabama, Louisiana has raised that issue here—only for the panel to overlook it. Given *Shelby County* and Justice Kavanaugh's *Milligan* concurrence, this full Court's review is warranted. Indeed, that issue is acutely presented here: rather than limiting the use of race-based remedies, as the Supreme Court has instructed, the panel opinion promotes (even mandates) escalation and intensification of race-based decision-making under §2 without justification under current circumstances.

Notably, for the first 40 years after the 1982 VRA amendments, §2 has *never* been construed to require Louisiana to draw a second majority-minority district. When the Department of Justice ("DOJ") directed the State to do so in the 1990s, citing the more onerous standards of VRA §5, federal courts *twice* struck down the resulting racial gerrymanders. Since

then, DOJ under both Republican and Democratic administrations pre-cleared maps with only a single majority-minority district.

The district court's decision thus represents a dramatic augmentation of the race-based mandates of §2—even though racially polarized voting in Louisiana has since *decreased*. Put simply, if the VRA did not require a second majority-minority district after the 1990, 2000, and 2010 Censuses, it cannot do so now given the *decrease* in racial polarization in voting over that time. But that is precisely what the panel ratified. This departure from the bedrock principles of the Equal Protection Clause warrants rehearing.

Rehearing is further warranted due to the "exceptional importance" of the issues presented, including the "conflict[] with the authoritative decision[]" of the Eighth Circuit. Fed. R. App. P. 35(b)(1)(B). The panel's decision usurps the traditional role of the Louisiana Legislature in redistricting and demands a more aggressive role of race in governmental decision-making than current needs justify—even though the "'core purpose' of the Equal Protection Clause [is] 'doing away with all governmentally imposed discrimination on the basis of race.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 143

S. Ct. 2141, 2147 (2023). Before the district court engages in the "sordid business [of] divvying us up by race," the full Court should evaluate whether that sordidness is required by §2 and constitutionally permissible. *LULAC v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part). It is neither.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS............................................ i

INTRODUCTION AND RULE 35(b)(1) STATEMENT........................... ii

TABLE OF CONTENTS ............................................................ vi

TABLE OF AUTHORITIES.................................................... vii

STATEMENT OF THE ISSUES ............................................. 1

PROCEEDINGS, DISPOSITION, AND FACTUAL BACKGROUND .... 2

ARGUMENT ........................................................................ 4

   I.   The Panel's Recognition Of A Private Right of Action To Enforce §2 Warrants Rehearing ...................................................... 4

   II.   The Panel's Ratification Of A Race-Based Injunction Unjustified By Current Circumstances Warrants Rehearing ................................ 9

   III.   The Issues Presented Are Exceptionally Important ................... 15

CONCLUSION ...................................................................... 17

CERTIFICATE OF SERVICE ................................................. 19

CERTIFICATE OF COMPLIANCE ........................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) .................................................................. 16

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ............................................................. 5, 6, 8

*Allen v. Milligan,*
    143 S. Ct. 1487 (2023) ...................................................... *passim*

*Allen v. State Bd. of Elections,*
    393 U.S. 544 (1969) ...................................................................... 7

*Alpha Phi Alpha Fraternity v. Raffensperger,*
    __ F. Supp. 3d __,
    2023 U.S. Dist. LEXIS 192080 (N.D. Ga. Oct. 26, 2023) ............. 15

*Ardoin v. Robinson,*
    142 S. Ct. 2892 (2022) ................................................................ 16

*Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment,*
    ___ F.4th ___,
    2023 U.S. App. LEXIS 30756 (8th Cir. Nov. 20, 2023) ......... ii, 4, 5

*Brnovich v. DNC,*
    141 S. Ct. 2321 (2021) .................................................................. 8

*Egbert v. Boule,*
    142 S. Ct. 1793 (2022)............................................................... 5, 9

*Gomez v. United States,*
    490 U.S. 858 (1989) .................................................................... 13

*Hays v. Louisiana,*
    839 F. Supp. 1188 (W.D. La. 1993) ............................................ 11

*Hays v. Louisiana,*
    936 F. Supp. 360 (W.D. La. 1996) .............................................. 11

*Lane v. Pena,*
    518 U.S. 187 (1996) ........................................................ 7

*LULAC v. Perry,*
    548 U.S. 399 (2006) ..................................................... v, 12

*Morse v. Republican Party,*
    517 U.S. 186 (1996) ........................................................ 7

*Nairne et al v. Ardoin,*
    3:22-cv-00178-SDD-SDJ (M.D. La.) ............................. 12

*OCA-Greater Houston v. Texas,*
    867 F.3d 604 (5th Cir. 2017) ................................... 3, 6, 7

*PennEast Pipeline Co. v. New Jersey,*
    141 S. Ct. 2244 (2021) ................................................... 8

*Robinson v. Ardoin,*
    ___ F.4th ___,
    2023 U.S. App. LEXIS 30039 (5th Cir. Nov. 10, 2023) .............. 2, 7

*Shelby County v. Holder,*
    570 U.S. 529 (2013) ............................................. *passim*

*Soto Palmer v. Hobbs,*
    ___ F. Supp. 3d ___,
    2023 U.S. Dist. LEXIS 139893 (W.D. Wash. Aug. 10, 2023) ....... 15

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ......................................................... 8

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,*
    143 S. Ct. 2141 (2023) ......................................... iv-v, 17

## Statutes

52 U.S.C. § 10301 ............................................................ 12

52 U.S.C. § 10302 .......................................................... 6, 8

52 U.S.C. § 10308 .......................................................... 4, 6

**Rules**

Fed. R. App. P. 35 ........................................................................ iv, 15

S. Ct. R. 11 .................................................................................... 16

## STATEMENT OF THE ISSUES

1.  Did the panel err in holding that §2 of the VRA provides an implied
    private right of action?

2.  Did the panel err in declining to consider whether the district
    court's mandated use of race in drawing a second majority-minority
    district comports with §2 and the Constitution—*i.e.*, is justified by
    "'current needs.'" *Shelby County v. Holder*, 570 U.S. 529, 536 (2013)
    (citation omitted).

## PROCEEDINGS, DISPOSITION, AND FACTUAL BACKGROUND

The procedural background of this case is set forth in greater detail in the panel's opinion. *See Robinson v. Ardoin*, __ F.4th __, 2023 U.S. App. LEXIS 30039 (5th Cir. Nov. 10, 2023). In brief: this case is a challenge under §2 of the VRA brought by individual voters and non-profit entities who advocate for a second majority-minority congressional district in Louisiana. *Id.* at *9.

The district court issued a preliminary injunction granting that request as provisional relief. *Id.* at *11. After this Court declined to stay that injunction, the Supreme Court intervened, issued a stay, granted certiorari before judgment, and held the case in abeyance pending resolution of *Milligan*. *Id.* at *11–12.

Following *Milligan*, the panel resumed briefing and held oral argument. On November 10, the panel ratified the district court's §2 merits reasoning but vacated the injunction on the ground that it is no longer necessary given that the 2022 elections were conducted under the challenged plans. *Id.* at *14–43, 46.

In particular, the panel (in a single paragraph) held that the VRA contains an implied right of action by which private plaintiffs may

2

enforce §2. *Id.* at *16 (citing *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017)). That decision reasoned that because the VRA has been held to waive sovereign immunity for a different provision of the VRA, §208, it must have done so for "some purpose." *Id.* The panel did not analyze the text or structure of §2 or any related VRA provision.

The panel, moreover, did not consider the State's argument that the district court's race-based reading of §2 "lacks a logical end point," and thereby violates the principle that "'the authority to conduct race-based redistricting cannot extend indefinitely into the future.'" Louisiana Supp. Br. (Dkt. #260) at 30–31 (quoting *Milligan*, 143 S. Ct. at 1519 (Kavanaugh, J., concurring)).

As noted, however, the panel concluded that "a preliminary injunction is no longer needed to prevent an irreparable injury from occurring before said trial" given that the 2022 elections were conducted under the challenged plan and trial on the merits can be held before the 2024 elections. 2023 U.S. App. LEXIS 30039, at *46. It therefore vacated the preliminary injunction.

Ten days after the panel's decision, the Eighth Circuit held, in a lengthy and thorough opinion, that the VRA includes no private right of

action to enforce §2. *See Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, __ F.4th __, 2023 U.S. App. LEXIS 30756 (8th Cir. Nov. 20, 2023).[1]

The State now petitions this Court to review en banc (1) whether the VRA contains an implied private right of action to enforce §2 and (2) whether §2 as applied to compel race-based governmental action here is "justified by current needs." *Shelby County*, 570 U.S. at 536 (citation omitted).

## ARGUMENT

## I. The Panel's Recognition Of A Private Right of Action To Enforce §2 Warrants Rehearing

At issue here is a question striking at the heart of the Constitution's finely calibrated separation of powers: when, if ever, may the federal judiciary (rather than Congress) decide who may sue? VRA §2 expressly authorizes the U.S. Attorney General to bring civil actions to enforce enumerated VRA provisions, including §2. *See* 52 U.S.C. §10308(d). But it does not expressly authorize private litigants to enforce §2. Thus,

---

[1] The plaintiffs in *Arkansas State Conference* have indicated they intend to seek rehearing en banc, and have sought an extension for that purpose.

unless the VRA includes an *implied* right of action, the Plaintiffs' §2 claims must be dismissed.

Court-identified implied causes of action have been controversial since *Bivens*.[2] And in recent years, the Supreme Court has reiterated that "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Because "[s]tatutory intent ... is determinative," implied causes of action exist only if Congress's "intent to create not just a private right but also a private remedy" that is manifest from statutory "text and structure." *Id.* at 286, 288.

The Eighth Circuit addressed this precise question, finding from the "[t]ext and structure" of §2 "that the answer is no." *Arkansas State Conf.*, 2023 U.S. App. LEXIS 30756, at *3. There, as here, "[e]veryone agree[d] that §2 itself contains no private enforcement mechanism." *Id.* at *11. Based on Congress's enumeration of the Attorney General as the sole party expressly authorized to enforce §2, the Eighth Circuit reasoned that "[t]he express provision of one method of enforcing a substantive rule

---

[2] *See, e.g., Egbert v. Boule*, 142 S. Ct. 1793, 1799 (2022) ("Over the past 42 years, however, we have declined 11 times to imply a similar [*Bivens*-like] cause of action for other alleged constitutional violations.").

suggests that Congress intended to preclude others." *Id.* *12 (alteration in original) (quoting *Sandoval*, 532 U.S. at 290). At bottom, the two-pronged question that the plaintiffs in that case were unable to answer was simply this: "If the 1965 Congress 'clearly intended' to create a private right of action, then why not say so in the statute? If not then, why not later, when Congress amended §2?" *Id.* at *20.

The panel here also did not answer this question. It did not consider Section 2's "text and structure" at all. *Sandoval*, 532 U.S. at 286. The entirety of its analysis consists of a single paragraph citing one case. 2023 U.S. App. LEXIS 30039, at *16.

The panel's reasoning suffers from three fatal defects. *First*, *OCA-Greater Houston* did not address §2. Instead, it "concern[ed] a more recent, and less visible, addition to the VRA," §208. *OCA-Greater Houston*, 867 F.3d at 607. The Voting Rights Act has many sections: some can give rise to criminal liability (e.g., §§2, 3, 4, 5, 10), others are enforceable in civil suits by the Attorney General (e.g., §§2, 3, 4, 5, 7, 10, 11), and only one authorizes lawsuits by private parties (§3). *See* 52 U.S.C. §§10302(a), 10308. When deciding the private-cause-of-action question, the Supreme Court has consistently addressed each section on

6

its own. *See, e.g.*, *Morse v. Republican Party*, 517 U.S. 186, 191 (1996); *Allen v. State Bd. of Elections*, 393 U.S. 544, 555 (1969). The panel's failure to do so conflicts with those binding precedents.

*Second*, it is not clear that *OCA-Greater Houston*'s holding reaches §2 at all. Any immunity waiver must be strictly construed in favor of a sovereign and against waiver. *See*, *e.g.*, *Lane v. Pena*, 518 U.S. 187, 192 (1996). Thus, a waiver of sovereign immunity for purposes of §208 says nothing relevant for purposes of whether there is an implied right of action under §2. *See OCA-Greater Houston*, 867 F.3d at 607. The panel was wrong to conclude otherwise.

*Third*, even if (counterfactually) *OCA-Greater Houston* could be construed to address §2, it does not follow from its determination that Congress waived sovereign immunity that Congress intended an unenumerated private right of action. The panel reasoned that a sovereign-immunity waiver must serve "some purpose." *Robinson*, U.S. App. LEXIS 30039, at *16. But even assuming that purposivist premise were correct, that "some purpose" is readily satisfied for waiving sovereign immunity for private suits under §3—which, unlike §2,

7

expressly authorizes private suits. *See* 52 U.S.C. §10302 (authorizing suits by "an aggrieved person").

Moreover, state sovereign immunity sounds in jurisdiction, *see PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2259 (2021); whether a party has a cause of action does not, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction."). Because *OCA-Greater Houston* only speaks to the former, the panel erred by relying on it to resolve the latter question.

*    *    *

Simply put, the Eighth Circuit's thorough decision correctly reads the statute's interlacing provisions, but the panel in this case failed to analyze §2's "text and structure." *Sandoval*, 532 U.S. at 286. The panel's holding thus now conflicts with the Eighth Circuit's, and with the opinion of at least two U.S. Supreme Court Justices, *see Brnovich v. DNC*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch J., joined by Thomas, J., concurring). This issue is profoundly important as a matter of jurisprudence. Because implying a "cause of action 'is an extraordinary act that places great stress on the separation of powers," the Court has a "responsibility to

8

evaluate any grounds that counsel against" doing so. *Egbert*, 142 S. Ct. at 1806 n.3 (cleaned up) (citation omitted). It is equally important as a practical matter. This split of authority creates the untenable scenario where §2 private enforcement can occur in Louisiana, Mississippi, and Texas, but not in neighboring Arkansas. En banc review is warranted.

## II.  The Panel's Ratification Of A Race-Based Injunction Unjustified By Current Circumstances Warrants Rehearing

The panel's analysis of whether the district court's decision excessively relied upon race also failed to consider a crucial aspect: whether the *current* use of race-based decision-making compelled by the district court's reading of the VRA comports with the Fourteenth and Fifteenth Amendments ("Reconstruction Amendments"). It is, after all, well-established that the VRA "'imposes current burdens and *must be justified by current needs.*'" *Shelby County*, 570 U.S. at 536 (emphasis added) (citation omitted).

Put simply, even if the district court's heavy-handed consideration of race was constitutionally permissible when the VRA was amended in 1982, "the authority to conduct race-based redistricting *cannot extend indefinitely into the future.*" *Milligan*, 143 S. Ct. at 1519 (Kavanaugh, J., concurring) (emphasis added). Whatever the appropriate time period for

such intensive use of race in drawing districts might have been (if any),
it has now expired.

*Milligan* left this question open, as Justice Kavanaugh observed:
"Alabama did not raise that temporal argument in this Court, and [the
Court] therefore [did] not consider it at this time." *Id*. But Louisiana
has—and is—advancing this issue. *See* Louisiana Supp. Br. (Dkt. #260)
at 30-31; Louisiana Supp. Reply (Dkt. #325-1) at 23-25. And the issue is
sharply presented here: §2 is being read to compel a second majority-
minority district held to be unconstitional thirty years ago. That is a *more*
aggressive application of §2 than ever, even as the degree of racially
polarized voting continues to decline in the State. Thus, as the Supreme
Court has predicted the use of race will decline over time, *see Milligan*,
143 S. Ct. at 1519 (Kavanaugh, J., concurring), the panel decision
compels the most aggressive racial line drawing Louisiana has ever seen.
This conflict warrants rehearing en banc.

**More Aggressive Use Of Race.** In the forty years between the
1982 VRA amendments and the district court's 2022 preliminary
injunction, §2 has never been construed to require Louisiana to draw two
majority-minority districts. That was so even when the State had seven

house seats; today it has six. In fact, DOJ directed Louisiana to create two majority-minority districts following the 1990 census, but federal courts twice found those districts unconstitutional racial gerrymanders. *See Hays v. Louisiana ("Hays I")*, 839 F. Supp. 1188 (W.D. La. 1993), *vacated as moot*, 512 U.S. 1230 (1994) (mem); *Hays v. Louisiana ("Hays IV")*, 936 F. Supp. 360 (W.D. La. 1996) (not appealed). It was clear even then that a second majority-minority district "embrace[d] considerably more racial gerrymandering—and thus more segregation—than [was] needed to satisfy any advanced state interest." *Hays I*, 839 F. Supp. at 1209. The three-judge court in *Hays IV* thus affirmatively imposed a map on the State with a single majority-minority district as a remedy for the unlawful two-district map. 936 F. Supp. at 372.

Louisiana did not attempt to draw a second district in either its post-2000 and post-2010 redistricting plans, and both obtained pre-clearance from DOJ under Republican and Democratic administrations as satisfying the VRA. The correctness of that bipartisan conclusion was sufficiently apparent that no one challenged the post-2000 and post-2010 maps under §2, recognizing the untenability of compelling a second majority-minority district.

That all changed last year. The district court abruptly read §2 to compel *substantially* greater use of race in drawing districts—*doubling* the number of majority-minority districts in Louisiana. And while the district court relied on the mushy language of *Gingle*'s muddy standards, the upshot is clear: under its approach, §2 creates a one-way ratchet in which the number of majority-minority districts will continue to increase inexorably at least until demographic proportionality is reached—even though §2(b) expressly prohibits any proportionality standard.[3] *See* 52 U.S.C. §10301(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). Moreover, while "[i]t is a sordid business, this divvying us up by race." *LULAC*, 548 U.S. at 511 (Roberts, C.J., concurring in part), the the panel's decision makes it the law of the Circuit.

The panel-backed gloss on §2 thus exceeds Congress's enforcement powers under the Reconstruction Amendments by not only upholding

---

[3] A §2 case is currently being tried to the same district court where the plaintiffs demand nine new legislative majority-minority districts—which is even greater than the strict proportionality that §2(b) prohibits. *Nairne et al v. Ardoin*, 3:22-cv-00178-SDD-SDJ (M.D. La.).

"race-based redistricting … extend[ing] indefinitely into the future," *Milligan*, 143 S. Ct. at 1519 (Kavanaugh, J., concurring), but also by endorsing an ever-more-aggressive use of race-based decision-making. Under the panel's approach, §2 in 2022 and 2023 *compels* what the same provision and the Fourteenth Amendment *prohibited* in 1993 and 1996.

The panel's construction of §2 thus exceeds Congress's enforcement powers under the Reconstruction Amendments and violates the Constitution. At a bare minimum, §2 under the panel's reading invites severe constitutional doubts that should have compelled the panel to adopt a narrower interpretation. *See*, *e.g.*, *Gomez v. United States*, 490 U.S. 858, 864 (1989) ("It is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question.").

By failing to recognize any temporal limitations on §2, and instead blessing increasingly severe, crude, and perpetual uses of race, the panel's decision warrants rehearing en banc.

***Diminished Justification For Race-Based Remedies Under §2.*** The panel decision is even more problematic when considered against the context of developments in the past forty years. Specifically, voting

in Louisiana has become less racially polarized—thus *decreasing* the justification for intrusive §2 remedies, rather than inviting the district court's amplification of them. As even Plaintiffs' own experts recognized, cross-over voting by white voters has increased substantially such that minority candidates can be elected in districts with Black Voting Age Population ("BVAP") percentages in the 40s. *See* ROA.6370–72; 6247–48; *see also* ROA.1854; ROA.1858; ROA.1865–66. This decrease in racial polarization necessarily decreases the justification for §2 to impose race-based line-drawing as a putative remedy for racially polarized voting. But the district court and the panel went in the opposite direction: while polarization has decreased since 1993 and 1996, when federal courts *twice* invalidated two-majority-minority-district maps under §2, that decreased polarization somehow demands a second district now. None of this is constitutionally tenable. *See also Shelby County*, 570 U.S. at 536 (recognizing that the VRA "'imposes current burdens and *must be justified by current needs*'" (emphasis added) (citation omitted)).

The panel and district court are not alone in committing these errors though: mandating intensified and ever-cruder uses of race under §2 is becoming pervasive throughout the country. For example, the

Western District of Washington recently held that a district that was "approximately 51.5%" Hispanic, which elected a Hispanic Republican over a White Democrat by a thirty-five-point margin in 2022, somehow violated §2. *See Soto Palmer v. Hobbs*, __ F. Supp. 3d __, 2023 U.S. Dist. LEXIS 139893, at \*37 (W.D. Wash. Aug. 10, 2023) (holding that a district that was "slightly more than 50% [Hispanic] [wa]s insufficient to provide equal electoral opportunity"). Similarly, the Northern District of Georgia recently mandated that Georgia draw as many as *five* additional majority-minority districts for the state legislature. *See generally Alpha Phi Alpha Fraternity v. Raffensperger*, __ F. Supp. 3d __, 2023 U.S. Dist. LEXIS 192080 (N.D. Ga. Oct. 26, 2023). The panel's opinion invites similar race-based mischief in this Circuit.

This Court should correct the panel's failure to address this crucial "current needs" issue by rehearing en banc.

## III.   The Issues Presented Are Exceptionally Important

Rehearing en banc is further supported by the "exceptional importance" of the issues presented. Fed. R. App. P. 35. Rule 35(b)(1)(B) recognizes that a "panel decision conflict[ing] with the authoritative decisions of other United States Courts of Appeals" is one basis for en

banc review. And the panel's private-cause-of-action holding squarely conflicts with the Eighth Circuit's decision on the identical issue.

The importance of the issues presented here is further demonstrated by the fact that the panel's decision will compel the redrawing of Congressional Districts in Louisiana and usurp the Louisiana Legislature's traditional and sovereign prerogative of drawing districts itself. Indeed, the State is "seriously and irreparably harm[ed]" by the panel's affirmance of an order "barring the State from conducting [next] year's elections pursuant to a statute enacted by the Legislature." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). Preventing such sovereign irreparable injury warrants rehearing.

The Supreme Court has further recognized the enormous importance of the issues presented here when it stayed the district court's decision pending appeal after this Court refused to do so and further granted certiorari before judgment. *See Ardoin v. Robinson*, 142 S. Ct. 2892 (2022). In doing so, the Supreme Court necessarily recognized that this case was of "imperative public importance," S. Ct. R. 11—thus easily satisfying the less stringent standards of Rule 35.

This case is also of exceptional importance because the panel's decision will compel district courts in this Ciruit to make ever-greater use of race in drawing districts—even though the "'core purpose' of the Equal Protection Clause [is] 'doing away with all governmentally imposed discrimination on the basis of race.'" *Students for Fair Admissions*, 143 S. Ct. at 2147 (cleaned up) (citation omitted). Compelling the State to take actions in severe tension with—if not violation of—the Equal Protection Clause is an issue of exceptional importance. And this Court has recognized as much by its recent grant of rehearing en banc in *Petteway v. Galveston County, Texas*, No. 23-40582 (5th Cir. Nov. 28, 2023). Rehearing en banc is even more appropriate here.

## CONCLUSION

For these reasons, the Court should grant the State's petition to rehear this case en banc.

December 1, 2023

Very respectfully submitted,

*/s/ Jason B. Torchinsky*

RICHARD B. RAILE
KATHERINE L. MCKNIGHT
E. MARK BRADEN
RENEE M. KNUDSEN
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Phone: (202) 861-1711
Email: rraile@bakerlaw.com

MICHAEL W. MENGIS
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
PATRICK T. LEWIS
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, OH 44114

ERIKA DACKIN PROUTY
BAKER & HOSTETLER LLP
200 Civic Center Dr., Suite 1200
Columbus, OH 43215

*Attorneys for Clay Schexnayder
and Patrick Page Cortez*

JEFF LANDRY
   Louisiana Attorney General
ELIZABETH B. MURRILL
   Solicitor General
SHAE MCPHEE
   Deputy Solicitor General
MORGAN BRUNGARD
   Assistant Solicitor General
ANGELIQUE DUHON FREEL
CAREY TOM JONES
JEFFREY M. WALE
   Assistant Attorneys General
OFFICE OF THE ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
P.O. Box 94005
Baton Rouge, LA 70804
murrille@ag.louisiana.gov

JASON B. TORCHINSKY
PHILLIP M. GORDON
EDWARD M. WENGER
DREW C. ENSIGN
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Highway
Haymarket, VA 20169

*Attorneys for the State of Louisiana*

PHILLIP J. STRACH
THOMAS A. FARR
ALYSSA M. RIGGINS
NELSON MULLINS RILEY &
SCARBOROUGH LLP
301 Hillsborough St., Suite 1400
Raleigh, NC 27603
phil.strach@nelsonmullins.com

JOHN C. WALSH
SHOWS, CALI & WALSH, LLP
P.O. Box 4046
Baton Rouge, LA 70821

*Attorneys for the Secretary of State*

## CERTIFICATE OF SERVICE

I certify that on December 1, 2023, I filed this petition for rehearing en banc with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

/s/ *Jason B. Torchinsky*
Jason B. Torchinsky
*Attorney for Intervenor*
*Defendant-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this brief complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 35(b)(2) because it contains 3,769 words, excluding the parts of the brief exempted by Rule 32(f); and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ Jason B. Torchinsky*
Jason B. Torchinsky
*Attorney for Intervenor*
*Defendant-Appellants*

December 1, 2023

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 10, 2023

Lyle W. Cayce
Clerk

———————

No. 22-30333

———————

PRESS ROBINSON; EDGAR CAGE; DOROTHY NAIRNE; EDWIN
RENE SOULE; ALICE WASHINGTON; CLEE EARNEST LOWE;
DAVANTE LEWIS; MARTHA DAVIS; AMBROSE SIMS; NATIONAL
ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE
LOUISIANA STATE CONFERENCE, *also known as* NAACP; POWER
COALITION FOR EQUITY AND JUSTICE,

*Plaintiffs—Appellees*,

*versus*

KYLE ARDOIN, *in his official capacity as Secretary of State for Louisiana*,

*Defendant—Appellant*,

CLAY SCHEXNAYDER; PATRICK PAGE CORTEZ; STATE OF
LOUISIANA - ATTORNEY GENERAL JEFF LANDRY,

*Intervenor Defendants—Appellants*,

———————————————————

EDWARD GALMON, SR.; CIARA HART; NORRIS HENDERSON;
TRAMELLE HOWARD,

*Plaintiffs—Appellees*,

*versus*

Kyle Ardoin, *in his official capacity as Secretary of State for Louisiana*,

*Defendant —Appellant*,

Clay Schexnayder; Patrick Page Cortez; State of Louisiana - Attorney General Jeff Landry,

*Movants—Appellants.*

_____

Appeal from the United States District Court
for the Middle District of Louisiana
USDC Nos. 3:22-CV-211, 3:22-CV-214

_____

Before King, Elrod, and Southwick, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

Plaintiffs challenge the Louisiana Legislature's 2022 redistricting map for electing the state's six members of the United States House of Representatives. The district court preliminarily enjoined use of that map for the 2022 congressional elections. The United States Supreme Court stayed that injunction, pending resolution of a case involving Alabama's congressional redistricting plan. About a year later, the Supreme Court resolved the Alabama case. We now apply the Court's reasoning to the Louisiana redistricting.

We are reviewing the grant of a preliminary injunction and not a final judgment in this case. The district court did not clearly err in its necessary fact-findings nor commit legal error in its conclusions that the Plaintiffs were likely to succeed on their claim that there was a violation of Section 2 of the Voting Rights Act in the Legislature's planned redistricting. Nevertheless, the district court's 2022 preliminary injunction, issued with the urgency of establishing a map for the 2022 elections, is no longer necessary. After oral

argument, we are convinced the parties can proceed beyond the stage of a preliminary injunction to accomplish the following tasks.

We will allow the Louisiana Legislature time to consider enacting a new congressional redistricting plan before the district court proceeds with the merits of the case. It is true the State did not request such an opportunity in its briefing here, but an opportunity to adopt a new plan is appropriate since redistricting is a quintessential obligation of a state after a census. Further, in recent filings with the Supreme Court, the State did urge allowing the Legislature to act. The district court is not to conduct any proceedings on the merits of the claim until after the Louisiana Legislature concludes its consideration of adopting a new plan, or the district court is informed that no new plan will be considered, or January 15, 2024, whichever comes first. The district court will also have discretion to grant limited additional time if requested.

The present uncertainty of what will occur by January 15 leaves the next steps contingent. If the Legislature adopts a new plan, then proceedings in district court can begin immediately after that occurs. If the Plaintiffs object to the plan, then the district court will again need to consider whether the plan is consistent with Section 2 of the Voting Rights Act or, instead, whether another preliminary injunction is needed. On the other hand, as soon as it becomes clear there will be no new plan to consider, the district court should proceed beyond the preliminary injunction stage for review of H.B. 1. It should conduct a trial on the merits of the validity of the plan, and, if held to be invalid, decide on a plan for the 2024 elections.

At oral argument before this court, defense counsel suggested a February 15, 2024, start date for a trial on the merits to allow newly elected officials to play an effective role in the process. He additionally suggested a May 30 deadline for a new map to be drawn, approved, and enacted for the 2024

elections.  We mention those only to indicate the State has offered sugges-
tions.  The district court will need to make its own decision on the proper
scheduling.  The court is to conclude all necessary proceedings in sufficient
time to allow at least initial review by this court and for the result to be used
for the 2024 Louisiana congressional elections.

## PROCEDURAL AND FACTUAL BACKGROUND

All states must redraw their congressional district boundaries follow-
ing each decennial census.  U.S. Const. art. I, § 2, cl. 3.  The 2020 census
showed Louisiana's population had increased since 2010, especially the mi-
nority populations.  This census data was delivered in April 2021 and re-
vealed that Louisiana would continue to have six congressional seats.  *Robin-
son v. Ardoin*, 605 F. Supp. 3d 759, 767 (M.D. La. 2022).

At its 2021 regular session, the Louisiana Legislature adopted Rule 21
of the Joint Rules of the Senate and House of Representatives, which estab-
lished redistricting criteria.[1]  The first paragraph of the Rule states: "To pro-
mote the development of constitutionally and legally acceptable redistricting
plans, the Legislature of Louisiana adopts the criteria contained in this Joint
Rule, declaring the same to constitute minimally acceptable criteria for con-
sideration of redistricting plans in the manner specified in this Joint Rule."
La. Leg. J.R. 21A.  The district court considered the requirements of the Joint
Rule throughout its opinion granting the preliminary injunction.

In preparation for its redistricting session, the Legislature held public
meetings throughout the state, starting in October 2021 and ending in Janu-
ary 2022.  The meetings presented information about the redistricting pro-
cess and solicited public comment.  *Robinson*, 605 F. Supp. 3d at 767.

---

[1] Joint Rule 21 was adopted by the approval of H. Con. Res.  90, 2021 Reg. Sess.,
eff. June 11, 2021.  *See* http://legis.la.gov/legis/Law.aspx?d=1238755.

Legislators stated these meetings were "absolutely vital to this process." *Id.* The parties refer to these as the "roadshow" meetings. *Id.* The Legislature then convened in an extraordinary session on February 1, 2022, to begin the redistricting process. *Id.* at 767–68. House Bill 1 and Senate Bill 5 were identical bills that set forth a congressional district map for the 2022 election. *Id.* at 768. Each was passed in its respective chamber on February 18, 2022. *Id.* "[T]he congressional districts in the 2022 enacted plan strongly resemble the previous districts" the Legislature adopted in 2011. *Id.* at 796. The Second Congressional District remained the only one of the six with a black majority. *Id.* at 768.

On March 9, 2022, Louisiana Governor John Bel Edwards separately vetoed H.B. 1 and S.B. 5. Governor's Veto Letters to Speaker of the House and President of the Senate, *reprinted in* 2022 OFFICIAL JOURNAL AND LEGISLATIVE CALENDAR OF THE PROCEEDINGS OF THE HOUSE OF REPRESENTATIVES AND SENATE OF THE STATE OF LOUISIANA, 48TH EXTRAORDINARY SESSION AND 2ND VETO SESSION, at 188–89, 194–95 (2022). He wrote each chamber "that this map violates Section 2 of the Voting Rights Act of 1965 and further is not in line with the principle of fundamental fairness that should have driven this process." *Id.* Governor Edwards applauded proposed maps that would have created two majority-black districts. *Id.* On March 30, 2022, the Legislature overrode Governor Edwards's veto of H.B. 1, and the map became law. *Id.* at 189 (House); 195 (Senate).

The same day the veto of H.B. 1 was overridden, two separate Plaintiff groups filed complaints against Louisiana Secretary of State Kyle Ardoin in district court, alleging the enacted map diluted black voting strength. *Robinson*, 605 F. Supp. 3d at 768. The Plaintiffs claimed that the majority of black voters were "packed" into the single black-majority district, and the remaining were "cracked" among the other five districts. *Id.* They argued this caused the black voters to be sufficiently outnumbered so as to ensure

unequal participation in the voting process, *id.*, and Louisiana was required under the Voting Rights Act to create a second black-majority district. *Robinson v. Ardoin*, 37 F.4th 208, 215 (5th Cir. 2022).

After the complaints were filed, Patrick Page Cortez, President of the Louisiana State Senate; Clay Schexnayder, Speaker of the Louisiana House of Representatives; and Louisiana Attorney General Jeff Landry all moved to intervene as Defendants. *Robinson*, 605 F. Supp. 3d at 768–69. The Louisiana Black Caucus was also allowed to intervene. *Id.* at 769. The district court then consolidated the two suits. *Id.*

The Plaintiffs filed motions for a preliminary injunction on April 15, 2022. The Plaintiffs sought to enjoin Secretary Ardoin from utilizing the enacted map in the 2022 congressional elections, to set a deadline for the Legislature to enact a Section 2-compliant map, and, if the Legislature failed to do so, to order the November 2022 election be conducted under one of the illustrative plans proposed by the Plaintiffs.

The district court conducted an expedited five-day evidentiary hearing on the preliminary injunction in May 2022. *Id.* Mere days before the hearing was to begin, Attorney General Landry had filed an emergency motion with the district court, arguing the court should wait for the Supreme Court's decision in the Alabama congressional redistricting case on which a writ of certiorari had been granted on February 7, 2022. *See Merrill v. Milligan*, 142 S. Ct. 879 (2022). The motion alleged that the decision was "likely to substantially affect or be fully dispositive" of this case. The district court denied the motion, reasoning that "[t]he blow to judicial economy and prejudice to Plaintiffs that would result from granting the moved-for stay cannot be justified by speculation over future Supreme Court deliberations."

Following the five-day evidentiary hearing, the district court issued a 99-page Ruling and Order granting the Plaintiffs' motions for a preliminary

injection. *Robinson*, 605 F. Supp. 3d 759. The district court concluded that the Plaintiffs had carried their burden to show "that (1) Louisiana's black population is sufficiently large and compact to form a majority in a second district, (2) the black population votes cohesively, and (3) whites tend to vote as a bloc usually to defeat black voters' preferred candidates." *Robinson*, 37 F.4th at 215–16 (citing *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986)). The district court gave the Legislature until June 20, 2022, to enact a remedial plan for the November 2022 election. *Id.* at 216. Governor Edwards called a special session of the Legislature to begin on June 15, 2022, but urged that "further action of the legislature should be delayed until the Fifth Circuit can review the merits." *Id.* at n.1.

The State appealed the district court's decision. It also filed a motion with the district court to stay the preliminary injunction pending resolution of the appeal by this court. The district court denied the stay. The State then filed for a stay by this court. After granting a brief administrative stay, this court denied the State's motion for a stay pending appeal. *Robinson*, 37 F.4th at 232. The court determined that the State had failed to make a "strong showing" of likely success on the merits, and that, further, *Purcell v. Gonzales*, 549 U.S. 1 (2006) (per curiam), did not prevent the injunction from being effective. *Robinson*, 37 F.4th at 215.

On June 17, Attorney General Landry filed an application for a stay with the Supreme Court. *Ardoin v. Robinson*, 142 S. Ct. 2892 (2022). The Court treated the stay application as a petition for a writ of certiorari, granted it, and then ordered the case held in abeyance pending resolution of the Alabama congressional redistricting case. *Id.* Argument in that Alabama case was heard in November 2022, and an opinion was released in June 2023. *Allen v. Milligan*, 599 U.S. 1 (2023). The Supreme Court then dismissed as improvident its grant of a writ of certiorari in the case now before us, vacated its stay, and remarked that "[t]his will allow the matter to proceed before the

Court of Appeals for the Fifth Circuit for review in the ordinary course and in advance of the 2024 congressional elections in Louisiana." *Ardoin v. Robinson*, 143 S. Ct. 2654 (2023).

We received supplemental briefing prior to oral argument. In addition, a separate panel of this court issued a writ of mandamus in October 2023, blocking proceedings in district court regarding the preliminary injunction. *In re Landry*, 83 F.4th 300 (5th Cir. 2023). Though a merits panel is not controlled by an earlier motions panel decision, we agree with the ruling that the Louisiana Legislature has time to create its own remedial plan. Our decision will give the Legislature an opportunity to act or to inform the district court that it will not.

## DISCUSSION

We review a grant of a preliminary injunction by a district court for any abuse of discretion. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 418–19 (5th Cir. 2001). A preliminary injunction is an extraordinary remedy that will only be issued if a movant establishes four elements:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

Each of these four elements presents "a mixed question of fact and law." *Women's Med. Ctr.*, 248 F.3d at 419. The district court's legal conclusions are reviewed *de novo*, and its factual findings for clear error. *Id.* A factual finding is clearly erroneous when the reviewing court is "left with the definite and firm conviction," after reviewing the entire record, that the

district court erred. *NAACP v. Fordice*, 252 F.3d 361, 365 (5th Cir. 2001) (quotation marks and citations omitted).

The State raises three issues on appeal which we discuss in this order.

I.    There is no private right of action under Section 2 of the Voting Rights Act.

II.    The Plaintiffs did not clearly establish a likelihood of proving that Louisiana's congressional districts violate Section 2 of the Voting Rights Act.

In its supplemental briefing following the *Milligan* decision, the State makes four arguments that we consider sub-issues of the second issue:

A. The Plaintiffs' illustrative maps did not satisfy the first *Gingles* precondition.

B. The Plaintiffs' illustrative maps are improper racial gerrymanders where race predominates.

C. The Plaintiffs' illustrative maps did not satisfy the third *Gingles* precondition.

D. Proportionality is an improper factor to consider in a *Gingles* analysis.

III.    The equities did not warrant a mandatory injunction, and, in light of the fact that the 2022 election has been held, the injunction is moot.

I.    *Private right of action under Section 2 of the Voting Rights Act.*

The parties dispute whether Section 2 can be enforced by private parties such as the Plaintiffs here. Whether Section 2 provides for a private right of action is a legal issue of statutory interpretation that we review *de novo. See Carder v. Cont'l Airlines, Inc.*, 636 F.3d 172, 174 (5th Cir. 2011).

No. 22-30333

There is no cause of action expressly created in the text of Section 2. A plurality of the Supreme Court stated that "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (plurality opinion) (citations omitted). The Court acknowledged its prior consideration of Section 2 violations brought by private litigants. *Id.* (citing *Chisom v. Roemer*, 501 U.S. 380 (1991); *Johnson v. De Grandy*, 512 U.S. 997 (1994)). More recently, the Court remarked that "the Federal Government and individuals have sued to enforce § 2, and injunctive relief is available in appropriate cases to block voting laws from going into effect." *Shelby Cnty. v. Holder*, 570 U.S. 529, 537 (2013) (citations omitted).

At least two justices have expressed concern, perhaps even doubt, about a private right. Dissenting in the *Milligan* decision that led to this remand, Justice Thomas referred in a footnote to the fact that the majority declined to "address whether § 2 contains a private right of action, an issue that was argued below but was not raised in this Court." *Milligan*, 599 U.S. at 90 n.22 (Thomas, J., dissenting). The footnote was appended to a protest that the majority "dismisses grave constitutional questions with an insupportably broad holding based on demonstrably inapposite cases." *Id.* at 90. Similarly, Justice Gorsuch wrote a separate concurrence in another case, joined by Justice Thomas, solely to "flag" that the Court's "cases have assumed — without deciding — that the Voting Rights Act of 1965 furnishes an implied right of action under § 2." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring).

There has not been frequent need in the circuit courts to analyze the issue. The Sixth Circuit once held without any analysis that Section 2 conveys a private right of action. *See Mixon v. Ohio*, 193 F.3d 389, 406 (6th Cir. 1999). The Eleventh Circuit discussed the issue at length and also concluded there was a private right of action under Section 2. *Alabama State Conf. of*

*NAACP v. Alabama*, 949 F.3d 647, 651–54 (11th Cir. 2020), *cert. granted, opinion vacated, and case dismissed as moot*, 141 S. Ct. 2618 (2021). The vacation of that opinion raises some questions about its analysis, but the reason for vacating was mootness. A dissenting Eleventh Circuit judge argued that the Voting Rights Act had not abrogated state sovereign immunity. *Alabama State Conf.*, 949 F.3d at 662 (Branch, J., dissenting). In her dissent, Judge Branch rejected one of our precedents — binding on this panel, of course — in which we held that the Voting Rights Act had validly abrogated state sovereign immunity. *Id.* (discussing *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017)).

We consider most of the work on this issue to have been done by our *OCA-Greater Houston* holding that the Voting Rights Act abrogated the state sovereign immunity anchored in the Eleventh Amendment. Congress should not be accused of abrogating sovereign immunity without some purpose. The purpose surely is to allow the States to be sued by someone. One section of the Act provides that proceedings to enforce voting guarantees in any state or political subdivision can be brought by the Attorney General or by an "aggrieved person." 52 U.S.C. § 10302. We conclude that the Plaintiffs here are aggrieved persons, that our *OCA-Houston* decision has already held that sovereign immunity has been waived, and that there is a right for these Plaintiffs to bring these claims.

II.    *Plaintiffs' likelihood of proving that Louisiana's congressional districts violate Section 2 of the Voting Rights Act.*

The State challenges the district court's determination that the Plaintiffs established a likelihood of proving a violation of Section 2 of the Voting Rights Act on the merits. The State argues that the preliminary injunction, issued in advance of the 2022 congressional elections, is now moot. We will consider the mootness issue in the final section of the opinion. We state now

that we will hold it is not moot but also is unnecessary at this point because the balance of the equities has changed.

Under the first preliminary injunction element, the Plaintiffs were required to establish they had a substantial likelihood of success on the merits of their Section 2 claim. *Byrum*, 566 F.3d at 445. Section 2 claims are evaluated under the three-part *Gingles* framework. *Milligan*, 599 U.S. at 17. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47.

To succeed in proving a Section 2 vote dilution claim, plaintiffs must first satisfy three preconditions. *Milligan*, 599 U.S. at 18. "First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Id.* (quotation marks and citations omitted). A district is reasonably configured when it complies "with traditional districting criteria, such as being contiguous and reasonably compact." *Id.* Second, the minority group must be politically cohesive. *Id.* Third, the white majority must be shown to vote sufficiently as a bloc to usually defeat the minority-preferred candidate. *Id.* If a plaintiff fails to establish any one of these three preconditions, a court need not consider the other two, leaving the plaintiff with no remedy. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006) [hereinafter *LULAC*].

Once these three threshold conditions are established, a plaintiff then must "show, under the totality of the circumstances, that the political process is not equally open to minority votes," causing a Section 2 violation. *Milligan*, 599 U.S. at 18 (quotation marks and citations omitted). Courts

consider what are sometimes called the *Zimmer* factors[2] to guide this portion of the analysis. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993). Courts must determine whether plaintiffs have an equal opportunity in the voting process to elect their preferred candidate under the challenged districting map. *Gingles*, 478 U.S. at 44. If the answer is no, there likely is a Section 2 violation.

The State does not challenge the second *Gingles* precondition, so we discuss only the other preconditions and the totality of the circumstances.

### A. The first Gingles precondition.

The first *Gingles* precondition focuses on geographical compactness and numerosity. *Milligan*, 599 U.S. at 18. It establishes whether a minority population has the potential to elect its preferred candidate in a single-member district. *Id.* The "party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." *Bartlett v. Strickland*, 556 U.S. 1, 19–20 (2009). This percentage is analyzed in terms of the black voting-age population ("BVAP") because only eligible voters can affect the *Gingles* analysis. *Robinson*, 605 F. Supp. 3d at 776. The large minority population must also be sufficiently compact such that a reasonably compact majority-minority district can be drawn. *LULAC*, 548 U.S. at 433. The State does not contest

---

[2] The United States Senate, in its 1982 Voting Rights Act amendments report, referred to the factors identified in this court's decision in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973), *aff'd sub nom. E. Carroll Par. Sch. Bd. v. Marshall*, 424 U.S. 636 (1976), *rev'd and remanded sub nom. Marshall v. Edwards*, 582 F.2d 927 (5th Cir. 1978). *See* Report, Voting Rights Extension, S.R. Rep. 97-417 (1982), 23, 28-29, reprinted in 13449 U.S. CONG. SERIAL SET (1982). In 1986, the *Gingles* Court adopted those factors and a few others to consider in vote-dilution cases. *Gingles*, 478 U.S. at 36 n.4.

numerosity, so we analyze only whether the illustrative map was sufficiently compact.

Compactness under Section 2 is an imprecise concept, but traditional districting principles like maintaining communities of interest and traditional boundaries should be considered. *Id.* Communities of interest vary between states, generally defined by the given state's districting guidelines. *See Milligan*, 599 U.S. at 20–21. Here, the district court recognized there was no universal definition for "community of interest" in Louisiana, and the Louisiana Legislature did not define what exactly comprises a community of interest. *Robinson*, 605 F. Supp. 3d at 776, 828. In *Milligan*, the Supreme Court examined the illustrative district maps when deciding whether a "reasonably configured" second majority-black district could be formed. *Milligan*, 599 U.S. at 19–20. The Court found that some of the illustrative maps produced districts at least as compact as the State's plan. *Id.* at 20. The Court concluded that "some of plaintiffs' proposed maps split the same number of county lines as (or even *fewer* county lines than) the State's map." *Id.* (emphasis in original). In addition, there were no "tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to find" compactness. *Id.* (quoting *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1011 (N.D. Ala. 2022)).

Courts must also determine if the illustrative districts have similar needs and interests beyond race. *LULAC*, 548 U.S. at 435. The State insists the Plaintiffs' proposed districts are not reasonably configured because they are based solely on race rather than a community of interest. Each illustrative plan connects the Baton Rouge area and St. Landry Parish with the Delta Parishes far to the north along the Mississippi River. The State argues the two areas' only connection is race. It seems undisputed that unless the part of the Baton Rouge area that is majority black is combined with the Delta Parishes to the north, creating a second black-majority district would be

difficult. The State contends this proves the Plaintiffs were operating under the "prohibited assumption" that a "group of voters' race [means] that they think alike, share the same political interests, and will prefer the same candidates at the polls." *Id.* at 433.

The State also argues the district court made no finding of common interests. The Plaintiffs demographic experts effectively admitted no community of interest exists; and the Legislature arrived at its districting plan based on resident concerns and its own analysis. The "sprawling size and diversity" of the joined communities in the Plaintiffs' maps allegedly exemplify expansiveness, not compactness.

The Plaintiffs contend, however, that the district court was correct that the compactness analyzed in the first *Gingles* precondition is the compactness of the *minority population*, not the *contested district*. Certainly, *Milligan* states that the first *Gingles* precondition is that the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Milligan*, 599 U.S. at 18 (quoting *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam)). The district court heard extensive expert and lay witness testimony from the Plaintiffs witnesses explaining how the Baton Rouge area and the Delta Parishes are communities of interest. *Robinson*, 605 F. Supp. 3d at 778–97, 822–31. In its determination, the district court credited this testimony that Louisiana's black population is compacted into easily definable areas; the illustrative plans offered by the Plaintiffs were more compact on average than the enacted plan both mathematically and visually; and the illustrative plans split very few parishes and political subdivisions. *Id.* at 822–31.

The State asserts that the Legislature identifies the communities of interest, not the courts or parties, and "[t]he Legislature did not arrive at its community goals in a vacuum." The Legislature, the State argues, did not

intend to combine urban and rural areas differing in poverty, education, household income, economic, and other interests into one district with only one common index: race. Splitting these already enacted communities of interest and the sheer distance — 180 miles — between the illustratively joined communities negates the possibility of a community of interest when combining the districts into one.

The district court found, though, that the State offered no evidence as to what the Louisiana Legislature identified as communities of interest. *Id.* at 829. The State produced no witness testimony concerning communities of interest. *Id.* The district court concluded this was "a glaring omission" since Joint Rule 21 requires communities of interest to be prioritized over the preservation of political subdivisions. *Id.*; La. Leg. J.R. 21. Instead, the State relied on the legislative comments made during the districting plan's enactment and ignored the witnesses who testified to the commonalities between the areas and communities utilized in the Plaintiffs' illustrative districting plans.[3] *Id.*

Somewhat similar arguments were rejected by the Supreme Court in *Milligan*, where no clear error existed in separating the district formed after the 2010 census in the region along Alabama's Gulf Coast into two different districts. *Milligan*, 599 U.S. at 20–21. Both the Supreme Court and the Alabama district court found testimony by the same expert used in this case supporting one community of interest as "partial, selectively informed, and poorly supported." *Id.* at 21 (quoting *Merrill*, 582 F. Supp. 3d at 1015).

---

[3] The State does not argue for reversal on the basis that it was given inadequate time to prepare its case prior to the issuance of the preliminary injunction. It did make that argument to the panel that granted a mandamus stopping the scheduling of a hearing on a remedy for the preliminary injunction. *In re Landry*, 83 F.4th at 305. The issue not having been raised with us, we do not consider it. We are ordering that the district court now conduct a trial, allowing any deficiencies in the 2022 hearing to be corrected.

Similarly, here, the State asserts that the Legislature intended to keep the communities separate, lay testimony at roadshows clearly supported the constituency support of the enacted plan, and there was no need to combine clearly distinct urban and rural communities of interest.

The district court determined that these illustrative districts share many cultural, economic, social, and educational ties despite the distance and distinct community identities. *Robinson*, 605 F. Supp. 3d at 786–97, 828–31. There was unrebutted evidence by the Plaintiffs experts, who utilized roadshow testimony and socioeconomic data to construct the plans, that there are commonalities between the districts. *Id.* The Plaintiffs further identified the desire by some voters to split Baton Rouge from New Orleans and the legislative priority behind combining the rural communities of the Delta Parishes with East Baton Rouge to protect the common agricultural interests of the regions while strengthening "the voice" of the people. The Plaintiffs argue this shows the illustrative plans united communities of common interest, like in *Milligan*.

The Supreme Court has recognized that urban and rural communities can reasonably be configured into a compact district if they share similar interests, they are in reasonably close proximity, and if the district is not obviously irregular and drawn into "bizarre shapes." *LULAC*, 548 U.S. at 435; *Milligan*, 599 U.S. at 19–21. Even if a region is a single community of interest, there is no clear error in a district court's determination that the illustrative plans that focused on other, different, overlapping communities of interest are valid; there is no need to conduct a "beauty contest" between the maps. *Milligan*, 599 U.S. at 21.

The parties' arguments here are factual disputes as to whether the district court should have found the illustrative maps reasonably configured. The district court evaluated the evidence that described whether the maps

protected communities of interest for 19 pages in its published opinion. *Robinson*, 605 F. Supp. 3d at 778–97. Over another 9 pages, the court made credibility determinations on the experts and their evidence. *Id.* at 822–31. It ultimately credited the Plaintiffs' experts over the State's, finding the latter's experts' "analys[e]s lacked rigor and thoroughness," "did not account for all of the relevant redistricting principles," and provided unhelpful conclusions. *Id.* at 824–25 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

We review a district court's factual findings for clear error. *Women's Med. Ctr.*, 248 F.3d at 419. Reversal requires us to be "left with [a] definite and firm conviction" that the district court erred after reviewing the record. *Fordice*, 252 F.3d at 365. We are left with no such a conviction. The district court reviewed the evidence before it and made a factual finding as to what the evidence showed, acknowledging throughout its decision the State's omission of contrary testimony. It concluded that the facts and evidence demonstrated the Plaintiffs were substantially likely to prove the geographic compactness of the minority population. *Robinson*, 605 F. Supp. 3d at 822.

There was no clear error by the district court when it found the illustrative maps created a different community of interest and the first *Gingles* precondition was met.

### B. Racial predominance versus racial gerrymandering.

To refute the district court's determination that the Plaintiffs' satisfied the first *Gingles* precondition, the State "put all their eggs in the basket of racial gerrymandering," *Robinson*, 37 F.4th at 217, and "did not meaningfully refute or challenge [the] Plaintiffs' evidence." *Robinson*, 605 F. Supp. 3d at 823. How a party addresses an issue at the time that a preliminary injunction is being sought, particularly when a Supreme Court decision is later handed down before the next stage of the proceedings, does not bind the

party as the case moves along further. We do conclude, though, that the State's initial approach was largely rejected by *Milligan*.

Impermissible racial gerrymandering can be found when a minority population is compacted together and there is "no integrity in terms of traditional, neutral redistricting criteria." *Milligan*, 599 U.S. at 28 (quotation marks and citations omitted). Here, the Plaintiffs' evidence of traditional redistricting criteria went "largely uncontested." *Robinson*, 37 F.4th at 218. Like Alabama in *Milligan*, the State instead argues that the first *Gingles* precondition cannot be established if race predominates the drawing of an illustrative plan in an effort to segregate the races for voting.

The Supreme Court recognized "a difference 'between being aware of racial considerations and being motivated by them.'" *Milligan*, 599 U.S. at 30 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). Awareness of race is permissible, and redistricting will often require awareness of the demographics of proposed districts. *Id.* This "race consciousness does not lead inevitably to impermissible race discrimination" because Section 2 demands such consideration. *Id.* (quotation marks and citations omitted). Awareness becomes racial predominance when the district lines are drawn with the traditional, race-neutral districting criteria considered *after* the race-based decision is made. *Id.* This is admittedly a difficult distinction. *Id.* We review the district court's finding as to whether race predominated for clear error. *Cooper v. Harris*, 581 U.S. 285, 298–99 (2017).

The State argues the district court erred in finding that the Plaintiffs' plans were not racially predominant configurations. The State relies on a Supreme Court racial affirmative action opinion that recognized distinctions between citizens solely based on their ancestry as inherently suspect. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023).

The *Students for Fair Admissions* decision concerned a very different set of facts. Drawing a comparison between voting redistricting and affirmative action occurring at Harvard is a tough analogy. The State contends that the Plaintiffs agree predominance occurs when the map-drawer has a specific racial target, and that target has a direct, significant impact on the district. It argues this is exactly what the Plaintiff experts did when they admitted to applying the *Bartlett* standard, *i.e.*, seeking to create congressional districts in which the minority population is greater than 50 percent. *Bartlett*, 556 U.S. at 19–20.

Certainly, the illustrative plans were designed with the goal of achieving a second majority-minority district of at least 50 percent BVAP, and the Plaintiff mapmakers sought to satisfy this 50 percent standard when drawing the new districts. The 2022 motions panel recognized and the Plaintiff expert testified that he was "specifically asked . . . to draw maps with two minority-majority districts." *Robinson*, 37 F.4th at 222. The Plaintiffs contend, though, that this was simply a *consideration* of race, not racial predominance. The Supreme Court allows race-based redistricting in certain circumstances as a remedy for state redistricting maps that violate Section 2. *Milligan*, 599 U.S. at 33, 41. The Plaintiffs argue this is one of those circumstances. As we will explain, the purpose of illustrative maps is to *illustrate* that creating another majority black district is possible, consistent with other requirements under Section 2 caselaw.

The Supreme Court has categorized some districts maps as being drafted with race as the predominant factor. *See Cooper*, 581 U.S. at 300–01. In *Cooper*, the Court found no clear error in the district court's finding that there had been "an announced racial target that subordinated other districting criteria." *Id.* at 300. Refusing to allow redistricting maps based on race in *any* respect, though, would require *Gingles* to be overruled. *Milligan*, 599 U.S. at 30–33. The Supreme Court in *Milligan* held that expert testimony

showing redistricting maps were designed to establish two majority-black districts, like the testimony here, does not automatically constitute racial predominance. *Id.* at 32–33. Instead, an express racial target is just one consideration in a traditional redistricting analysis under *Gingles*. *Id.* at 32.

The Supreme Court also rejected that a "race-neutral benchmark" must be used. *Id.* 23–24. The Court clarified that *all* illustrative redistricting "maps [are] created with an express target in mind — they were created to show, as our cases require, that an additional majority-minority district could be drawn. That is the whole point of the [*Gingles*] enterprise." *Id.* at 33. Thus, the Plaintiffs' mapmakers using the 50 percent BVAP as a factor when drawing the illustrative maps for Louisiana was appropriate.

The Plaintiffs experts testified to using the 50 percent threshold for pulling the black population into the majority-minority district and to consulting the racial data to determine the location of the black population for the district location in the illustrative plans. The State contends this mirrors *Cooper*, where district borders were moved to incorporate the large black population. The State further argues that racially coded maps presented in the current record establish a consistent tracking of racial patterns by the illustrative plans. The higher, black-populated portions of the parishes were moved from one district to another to create the majority-minority district according to the State.

The Plaintiffs contend their experts acted appropriately under Supreme Court precedent. The Court recognized that the "very reason a plaintiff adduces a map at the first step of *Gingles* is precisely *because of* its racial composition" and to demonstrate that a majority-minority district is possible. *Id.* at 34 n.7. Attempting to reach the needed 50 percent threshold does not automatically amount to racial gerrymandering, and *Cooper* does not say

otherwise. *Cooper* did not address the first *Gingles* precondition at all, as its focus was racial targeting. *Cooper*, 581 U.S. at 302 n.4.

The district court mentioned that the State's expert, who testified there was racial predominance, conceded he could not say much about the racial predominance being the intended result of the expert's mapping decisions as opposed to the segregation of the population. *Robinson*, 605 F. Supp. 3d at 824. The district court therefore found the expert's reliability severely undermined. *Id.* at 823–24. The Alabama district court also gave his similar testimony in *Milligan* little weight. *Milligan*, 599 U.S. at 31–32. The Plaintiff experts testified they did not subordinate other redistricting criteria to race. *Robinson*, 37 F.4th at 223. Instead, their determinations and analysis were based on the traditional factors like communities of interest, and race was only considered "to the extent necessary" under *Gingles*. *Id.*; *Robinson*, 605 F. Supp. 3d at 827.

The State attempts to equate an Equal Protection racial gerrymandering claim to its Section 2 Voting Rights Act claim to overcome the racial awareness that *Gingles* allows. "Racial gerrymandering is prohibited by the Equal Protection Clause of the Fourteenth Amendment." *Robinson*, 37 F.4th at 222 (citations omitted). Racial consciousness as a factor in the drawing of illustrative maps does not, however, defeat a Section 2 *Gingles* claim, which is distinct from an Equal Protection racial gerrymander violation. *Id.*[4]

A racial gerrymander is present when citizens are assigned by the state to legislative districts based on race, such that one district will have racially

---

[4] The Equal Protection Clause of the Fourteenth Amendment can only be violated when there is state action. U.S. Const. amend. XIV, § 1. Although the Plaintiffs' illustrative maps were not state action and do not constitute an Equal Protection violation, a legislatively enacted map would be subject to Equal Protection review. *Robinson*, 605 F. Supp. at 836. Thus, we discuss the Equal Protection implications.

similar individuals who otherwise have little in common geographically or politically. *Id.* The Supreme Court has implemented a high bar to racial gerrymander challenges, requiring a showing of racial predominance such that traditional redistricting criteria are subordinate to the racial consideration. *Id.* We find that this high bar was not met on this record. Rather, race was properly considered by the Plaintiff experts when drawing their several illustrative maps. The target of reaching a 50 percent BVAP was considered alongside and subordinate to the other race-neutral traditional redistricting criteria *Gingles* requires. The Plaintiff experts considered communities of interest, political subdivisions, parish lines, culture, religion, etc. *Id.* at 219–23.

The district court did not clearly err in its factual findings that the illustrative maps were not racial gerrymanders.

## C. *The third* Gingles *precondition.*

The third *Gingles* precondition focuses on racially polarized voting; it requires establishing the plausibility that the challenged legislative districting thwarts minority voting on account of race. *Milligan*, 599 U.S. at 19. This precondition requires proof that white bloc voting "can generally minimize or cancel black voters' ability to elect" their preferred candidate. *Gingles*, 478 U.S. at 56. The question is not whether white bloc voting is present, but whether such bloc voting in a given district amounts to legally significant racially polarized voting. *Id.*; *Clements*, 999 F.2d at 850.

The State contends this precondition also requires proof that a white voting bloc will normally defeat a combined minority vote and white "crossover" voting. A white crossover district is created where enough white voters join minority voters to elect the minority-preferred candidate. *Bartlett*, 556 U.S. at 16. In other words, the BVAP is less than 50 percent but large enough to elect the candidate of its choice with white voters' help. *Id.* at 24. The Supreme Court has recognized that "a white bloc vote that normally will

defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Gingles*, 478 U.S. at 56. The State argues, however, the Plaintiffs presented evidence of *statistical* significance rather than *legal* significance.

The State argued, and the district court accepted, that there is a difference between legally significant and statistically significant racially polarized voting. *Robinson*, 605 F. Supp. 3d at 842–44. Such a distinction was made by a district court when examining legislative redistricting. *Covington v. North Carolina*, 316 F.R.D. 117, 170 (M.D.N.C. 2016), *summary aff'd*, 581 U.S. 1015 (2017). We also find the concept in *Gingles*, where the court questioned the statistical evidence that voters of different races select different candidates, and whether that evidence was "substantively significant." *Gingles*, 478 U.S. at 53. The Court then examined the standard for "legally significant racial bloc voting." *Id.* at 55. It stated that "[t]he purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Id.* at 56.

The State argues the third *Gingles* precondition cannot be satisfied in the relevant geographical areas because there is sufficient white crossover voting. The Plaintiffs experts testified that effective crossover voting could exist because a different district than the Legislature drew *could* be drawn with less than 50 percent BVAP and still allow for a minority-preferred candidate to be elected. The experts did not testify that the legislative plan would allow sufficient cross-over voting. All Plaintiff experts saw a possibility that districts could be drawn below the required BVAP when combined with sufficiently high levels of white crossover voting. The State contends that an effective crossover district with a BVAP less than 50 percent, like those testified to by the Plaintiff experts, which "could perform [is]

tantamount to a concession that white bloc voting is not legally significant." The State argues this is an admission that no remedy is necessary and that the third *Gingles* precondition could not be satisfied.

The district court did not state that crossover voting was irrelevant. It explained that such voting was inherently included in the Plaintiffs experts' analyses. *Robinson*, 605 F. Supp. 3d at 843. The 2022 motions panel of this court explained that the district court correctly relied on the experts to explain the level of crossover voting. *Robinson*, 37 F.4th at 225. Regardless, the State argues the possibility of effective white crossover districts means (1) the third *Gingles* precondition cannot be established, (2) two majority-minority districts are unnecessary for black voters to elect their preferred candidates, (3) Louisiana is barred from drawing one, and (4) it would be unlawful to require the Louisiana Legislature to enact a second majority-minority district.

The Plaintiffs are correct that this argument focuses on the wrong plan. Rather than follow Supreme Court precedent that requires sufficient crossover voting in the Legislature's plan — and no such evidence existed here — the State focused on the *possibility* of creating new districts with crossover voting. The relevant consideration under the third *Gingles* precondition is the *challenged* plan, not some *hypothetical* crossover district that could have been but was not drawn by the Legislature. *Robinson II*, 37 F.4th at 226. The third *Gingles* precondition's purpose is to establish that the challenged district thwarts a distinctive minority vote. *Milligan*, 599 U.S. at 19. While the illustrative plans do have the potential to allow for the minority-preferred candidates to be elected with less than a 50 percent BVAP, the legislative plan did not. *Robinson I*, 605 F. Supp. at 841–42. The record establishes that minority-preferred candidates will usually fail in Louisiana without a different district configuration.

*Bartlett* established the 50 percent BVAP threshold for the first *Gingles* precondition, but it did not change the third precondition analysis. *Bartlett*, 556 U.S. at 6, 12, 16. Illustrative districts that could perform with a BVAP of less than 50 percent with white crossover voting are not the focus of the third *Gingles* precondition analysis. The proper question to ask is this: "If the state's districting plan takes effect, will the voting behavior of the white majority cause the relevant minority group's preferred candidate 'usually to be defeated'?" *Robinson*, 37 F.4th at 224 (citing *Covington*, 316 F.R.D. at 171). The district court's factual findings confirmed the answer under the 2022 state-enacted plan — not the hypothetical districts — would be "yes" because the experts examined the data and concluded that white voters consistently vote to defeat minority-preferred candidates. *Robinson*, 605 F. Supp. 3d at 842–43. This is the proper analysis.

The Supreme Court examined similar evidence of racially polarized voting under the third *Gingles* precondition in *Milligan*. 599 U.S. at 22. The Court analyzed a white crossover voting percentage of 15.4, *id.*, and, here, the district court analyzed a range of 11.7 percent to 20.8 percent. *Robinson*, 605 F. Supp. at 842. The Supreme Court agreed with the Alabama district court's factual determination that the third *Gingles* precondition was met despite the crossover percentage. *Milligan*, 599 U.S. at 22–23.

The State argues the district court applied the wrong legal standard by finding the white crossover information irrelevant, but, as we have discussed, the district court did no such thing. Rather, it focused on expert testimony that included an analysis of crossover voting. Effective crossover voting can be evidence of diminished bloc voting under the third *Gingles* precondition. *Bartlett*, 556 U.S. at 16–17. The analysis, however, of whether white crossover voting undermines the potential of electing minority-preferred candidates is properly determined under the *first Gingles* precondition, not the *third*. *Id.* at 16–20. It dictates the answer to the question of whether a

minority makes up a sufficient BVAP in the relevant geographic area, not solely whether white bloc voting is legally significant. *Id.*

We conclude that *Bartlett*'s discussion of crossover voting and how a Section 2 violation will generally not be found if effective crossover voting is present was limited to the first *Gingles* precondition analysis. The district court's factual determination that a white crossover voting range of 11.7 percent to 20.8 percent can satisfy the third *Gingles* precondition aligns with *Milligan*. We find no clear error in the district court's determination about crossover voting and move to the totality of the circumstances analysis.

### D. Totality of the circumstances & proportionality.

The State's final argument that the district court erred in its *Gingles* analysis is its consideration of racial proportionality as a factor. Once the *Gingles* preconditions are achieved, Section 2 liability is determined based on the totality of the circumstances. *Milligan*, 599 U.S. at 26. This requires application of the *Gingles* analysis specifically to the facts of each case and the state electoral mechanism while also considering the *Zimmer* factors as a guide. *Id.* at 19; *Clements*, 999 F.2d at 849.

While not dispositive, one relevant *Zimmer* factor is proportionality. *Johnson*, 512 U.S. at 1000. "[W]hether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area" is a "relevant consideration" for courts to make. *LULAC*, 548 U.S. at 426. "The *Gingles* framework itself imposes meaningful constraints on proportionality," and "[f]orcing proportional representation is unlawful and inconsistent with" Section 2. *Milligan*, 599 U.S. at 26, 28. The Supreme Court has repeatedly "rejected districting plans that would bring States closer to proportionality when those plans violate traditional districting criteria." *Id.* at 29 n.4.

The State contends the Supreme Court in *Milligan* found no constitutional or Section 2 concerns because the proportional representation had been rejected as a factor. The State argues the opposite occurred here: the district court read a proportionality requirement into *Gingles*.

The Plaintiffs did emphasize that the black population is one-third of Louisiana's residential population, yet it has only one out of six opportunities to elect their preferred candidates. The district court, according to the State, "adopted this line of argument" and held that the black representation was not proportional to the black population. The State argues this holding will amount to unlawful, forced proportional representation, which cannot be the basis for Section 2 relief.

The Plaintiffs assert the district court was not forcing proportional representation but was weighing proportionality in the totality of the circumstances required under *Gingles*. The district court identified the disproportional representation, weighing it in favor of the Plaintiffs throughout its analysis. *Robinson*, 605 F. Supp. 3d at 851. The Plaintiffs contend there was no forced racial proportionality, and argue *Milligan* rejected the same argument that an additional majority-minority district inevitably demands proportionality. *See Milligan*, 599 U.S. at 26. The Supreme Court determined that if a proper *Gingles* analysis results in proportional representation — like here and in *Milligan* — the plan is not automatically invalid or clearly erroneous. *See id.* at 26–30.

The district court considered proportionality only in its *Zimmer*-factors analysis. *Robinson*, 605 F. Supp. 3d at 844–51. The court did not require proportionality but considered it along with the other factors in examining the totality of circumstances. *Id.* at 771. The court recognized there is no right to proportional representation. *Id.* at 851. Instead, proportionality is a relevant consideration and indication of equal opportunity voting, which it

found relevant to this case. *Id.* The district court determined the black representation was not proportional to the black population, and this factor weighed in favor of the Plaintiffs. *Id.*

The Supreme Court has held that proportionality cannot be at the expense of "integrity in terms of traditional, neutral redistricting criteria." *Milligan*, 599 U.S. at 28 (citations omitted). Here, the district court analyzed proportionality as a factor among other redistricting criteria. *Robinson*, 605 F. Supp. 3d at 851. The district court found "that the proportionality *consideration* weighs in favor of Plaintiffs" and that "the totality of the circumstances weighs in favor of Plaintiffs." *Id.* (emphasis added).

We agree with the 2022 motions panel that the Plaintiffs' arguments "are not without weaknesses," *Robinson*, 37 F.4th at 215, and Plaintiffs' analysis is not "entirely watertight." *Id.* at 232. There is nothing unusual about weaknesses, even in arguments of a successful party. This appeal, however, primarily disputes factual findings that are not clearly erroneous.

The district court spent 39 pages in the published opinion discussing the evidence presented and expert testimony heard during its five-day evidentiary hearing, *Robinson*, 605 F. Supp. 3d at 778–817, and 41 pages analyzing those facts and legal authority. *Id.* at 817–858. The district court came to the same conclusion as the Alabama district court that was affirmed in *Milligan*, based on "essentially the same" record and arguments.

The Supreme Court's *Milligan* opinion may require the State here to adjust its arguments as the case moves to its next phase. We conclude the emphasis so far has been on the supposed invalidity of any consideration of race and a rejection of the *Gingles* approach. The *Milligan* opinion refused to accept such arguments. Among the similar arguments in *Milligan* and here is that the plaintiffs' illustrative maps were unreasonably configured due to their division of a cognizable community population into two different

No. 22-30333

districts; the district court should have judged the enacted map against a race-neutral benchmark calculated by a computer-simulated map; the possibility of drawing a majority-minority district does not require the drawing of the district; and the district court's application of Section 2 encourages racial gerrymandering since the Plaintiffs incorporate race into their illustrative plans. *Milligan*, 599 U.S. 1. Most of the arguments the State made here were addressed and rejected by the Supreme Court in *Milligan*.

The district court's preliminary injunction, like the one issued by Alabama, was valid when it was issued. Now, almost 17 months later, we need to consider whether the preliminary injunction is still needed.

III.    *The balance of equities and mootness of the preliminary injunction.*

The State disputes the balance the district court struck in the equities of the case, arguing that a preliminary injunction was not the proper remedy because it did not simply preserve the *status quo*. Unfortunately for that argument, the Supreme Court approved a similar preliminary injunction in *Milligan*. *Id.*

The State's initial concern with the preliminary injunction was that it was issued too close to the election. *See Purcell*, 549 U.S. 1. Both this court and the Supreme Court have applied the *Purcell* principle against changing state election rules when staying injunctions that threaten voter confusion and chaos so near an election. *Robinson*, 37 F.4th at 228–29.

*Purcell* stayed an election 29 days prior to an election, and the Supreme Court has stayed injunctions five days, 33 days, 60 days, and less than four months before an election. *Id.* at 229 (citations omitted). Here, the injunction was implemented more than five months prior to the election and more than four months prior to early voting registration. It is not "an injunction entered days or weeks before an election — when the election is already underway," which would require a *Purcell* stay. *Id.* at 228.

The district court recognized that even the State acknowledged the injunction deadline would present no difficulties for Louisiana's election calendar, and the deadlines that impact voters were not until October. *Robinson*, 605 F. Supp. 3d at 854 (citing Petition for Injunction and Declaratory Relief, *Bullman v. Ardoin*, No. C–716690, 2022 WL 769848 (La. Dist. Ct. Mar. 10, 2022) (the pending state court petition regarding the same issue)). Further, Secretary Ardoin's counsel stated that "Louisiana does not have a hard deadline for redistricting," and the election code can be amended if necessary. *Id.* at 854–55.

We agree that *Purcell* did not bar the preliminary injunction nor require it to be stayed.

Where are we now, though? The reasons for urgency in the district court's 2022 preliminary injunction are gone. The district court issued the injunction after determining the Plaintiffs were likely to suffer irreparable harm under the enacted redistricting plan. *Robinson*, 605 F. Supp. 3d at 851–52. It further concluded that, if the 2022 elections were "conducted under a map which has been shown to dilute Plaintiffs' votes, Plaintiffs' injury will persist unless the map is changed for 2024." *Id.* at 852. None of that applies now, though there are new deadlines on the somewhat distant horizon.

The State would have the preliminary injunction declared moot. To avoid mootness, "the controversy posed by the plaintiff's complaint [must] be live . . . throughout the litigation process." *Rocky v. King*, 900 F.2d 864, 866 (5th Cir. 1990). "Mootness is a jurisdictional question" that must be resolved prior to a federal court having jurisdiction. *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (citations omitted).

The Supreme Court's affirmance of the Alabama district court's almost identical preliminary injunction six months after the affected election might be useful precedent, but the Court did not address the possibility of

mootness. *Milligan*, 599 U.S. 1. The irreparable harm articulated by both the Alabama district court and this district court is that forcing black voters to vote under a map that likely violates Section 2 is a continuing and live injury, despite the loss of some of the urgency. *Merrill*, 582 F. Supp. 3d at 1026–27; *Robinson*, 605 F. Supp. 3d at 851–52. Both district courts made factual findings that the plaintiffs would have ongoing and irreparable harm that will persist unless the map is changed. *Id.* That harm is still present, but a trial can likely occur prior to harm occurring in the 2024 elections.

We conclude that a preliminary injunction is no longer needed to prevent an irreparable injury from occurring before said trial. Our conclusion comes from the balance of the equities no longer weighing in favor of the Plaintiffs. Once an "election occurs, there can be no do-overs and no redress" for voters whose votes were diluted. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). Like the Alabama voters, "[t]he Plaintiffs already suffered this irreparable injury . . . when they voted in 2022 under the unlawful" plan. *Singleton v. Allen*, 2:21-CV-1291-AMM, 2023 WL 6567895, at *18 (N.D. Ala. Oct. 5, 2023). The Louisiana elections are on a more lenient time schedule than Alabama's. Both general elections are more than 13 months away, but Alabama's qualifying deadline to participate in the 2024 elections is in November 2023. *Id.*; Ala. Code § 17–13–5(a).

For the 2024 Louisiana elections calendar, though, there is no imminent deadline. The qualifying deadlines are not until July 2024, so a preliminary injunction, which is an extraordinary remedy, is no longer required to prevent the alleged elections violation. We therefore vacate the preliminary injunction, even though the underlying controversy is not moot.

*IV. The role of the Louisiana Legislature.*

There is not much time before initial deadlines for the next congressional election cycle are visible. Nonetheless, we have weighed carefully one of the arguments the State made at the Supreme Court in defending the mandamus ruling by this court. It was a complaint that the district court had not "afforded the legislature with a meaningful opportunity" to prepare a remedial plan. Resp. to Emergency Appl. for Stay of Writ of Mandamus at 15, *Galmon v. Ardoin*, No. 23A282 (U.S. *filed* Sept. 30, 2023). The State acknowledged the Louisiana Legislature would not likely act "while seeking to demonstrate that the district court was wrong to conclude that the Plaintiffs' are entitled to a remedy." *Id.* at 16. The Plaintiffs' reply to that argument was to insist the Legislature clearly stated it did not want to reconsider its map. It quoted House Speaker Clay Schexnayder as saying a new session was "unnecessary and premature until the legal process is played out in the court systems." Reply Br. in Supp. of Emergency Appl. for Stay of Writ of Mandamus at 3, *Galmon v. Ardoin*, No. 23A282 (U.S. *filed* Oct. 11, 2023)**.**

The State's argument to the Supreme Court, though, was in the context of upholding the mandamus that prevented another hearing on the preliminary injunction. We do not interpret the State to have declared that after this court made a decision on the appeal from the preliminary injunction — that decision is made today — the Louisiana Legislature would not want to consider acting.

We cannot conclude on this record that the Legislature would not take advantage of an opportunity to consider a new map now that we have affirmed the district court's conclusion that the Plaintiffs have a likelihood of success on the merits. Federalism concerns are heightened in the present context: "even after a federal court has found a districting plan unconstitutional, 'redistricting and reapportioning legislative bodies is a legislative task

No. 22-30333

which the federal courts should make every effort not to preempt.'" *McDaniel v. Sanchez*, 452 U.S. 130, 150 n.30 (1981) (quoting *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (opinion of WHITE, J.)).

The Court's continuous urging of caution convinces us to allow the Louisiana Legislature until January 15, 2024, to enact a new congressional redistricting plan. The State has not formally requested that opportunity, so we direct counsel for the defendant state officials to inform the district court if they become aware that no special session of the Legislature will be called for this purpose or, if called, it becomes clear no new map will be approved. We anticipate that counsel for the defendant state officials, as officers of the court, will act in good faith and inform the district court of either as soon as possible.

## CONCLUSION

The district court is to conduct no substantive proceedings until the earliest of (1) the completion of legislative action, (2) notice indicating the Legislature will not create new districts, or (3) January 15, 2024. Should the Legislature be considering adopting a new map at that deadline, the district court has discretion to provide modest additional time, though not of such length as to prevent the district court from timely completing its work. The district court is not prevented by our opinion from conducting proceedings to schedule future proceedings. This court's panel that ruled on the mandamus directed further scheduling in the case had to be "pursuant to the principles enunciated herein." *In re Landry*, 83 F.4th at 308. We wish to avoid potential confusion from directives from two panels of our court if any differences are perceived, though we see none. Future district court scheduling needs to follow only the guidance established in this opinion.

If the Legislature adopts a new districting plan and it becomes effective, then that map will be subject to any potential new challenges. If no new

plan is adopted, then the district court is to conduct a trial and any other nec-essary proceedings to decide the validity of the H.B. 1 map, and, if necessary, to adopt a different districting plan for the 2024 elections. The parties can advise the district court as to the necessary timing for completion of such a trial, with allowance for the time for appellate review.

Preliminary injunction VACATED and cause REMANDED to district court for proceedings consistent with this opinion.