No. 22-30333

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

PRESS ROBINSON, *et al.*,
*Plaintiffs-Appellees,*
*v.*
KYLE ARDOIN, SECRETARY OF STATE,
*Defendant-Appellant.*

and

CLAY SCHEXNAYDER, et al.,
*Intervenor Defendants-Appellants*

On Appeal from the United States District Court
Middle District of Louisiana
Case Nos. 3:22-cv-211, 3:22-cv-214

## BRIEF OF ALABAMA AND 12 OTHER STATES AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS' PETITION FOR REHEARING EN BANC

STEVE MARSHALL
*Attorney General*

EDMUND G. LACOUR JR.
*Solicitor General*
State of Alabama
Office of the Attorney General
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................i

TABLE OF AUTHORITIES......................................ii

INTEREST OF *AMICI CURIAE* ...........................1

SUMMARY OF ARGUMENT ...............................2

ARGUMENT .......................................................3

    I.    Section 2 Of The Voting Rights Act Creates No Private Right Of Action..................................................................3

    II.   Plaintiffs Never Proved Unequal Opportunity "To Participate In The Political Process."............................9

CONCLUSION ..................................................14

CERTIFICATE OF COMPLIANCE.....................16

CERTIFICATE OF SERVICE................................17

# TABLE OF AUTHORITIES

## Cases

*Alabama State Conf. of Nat'l Ass'n for the Advancement of Colored
    People v. Alabama,*
    949 F.3d 647 (11th Cir. 2020) *cert. granted, opinion vacated,
    and case dismissed as moot*, 141 S. Ct. 2618 (2021) ........................... 7

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ........................................................................ 4, 7

*Allen v. Milligan,*
    599 U.S. 1 (2023) ............................................................................. 13

*Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment,*
    No. 22-1395, 2023 WL 8011300 (8th Cir. Nov. 20, 2023) .................... 5

*Az. Christian Sch. Tuition Org. v. Winn,*
    563 U.S. 125 (2011) ........................................................................... 8

*Chisom v. Roemer,*
    501 U.S. 380 (1991) ..................................................................... 9, 10

*Dellmuth v. Muth,*
    491 U.S. 223 (1989) ........................................................................... 6

*Hays v. Louisiana,*
    936 F. Supp. 360 (W.D. La. 1996) ..................................................... 1

*Karahalios v. Nat'l Fed'n of Fed. Emps.,*
    489 U.S. 527 (1989) ........................................................................... 4

*League of United Latin Am. Citizens, Council No. 4434 v. Clements,*
    999 F.2d 831 (5th Cir. 1993) ................................................. 1, 3, 9-14

*Miller v. Johnson,*
    515 U.S. 900, 915 (1995) ................................................................... 1

*Mixon v. State of Ohio*,
193 F.3d 389 (6th Cir. 1999).............................................................6

*Morse v. Republican Party of Virginia*,
517 U.S. 186 (1996).........................................................................8

*OCA-Greater Houston v. Texas*,
867 F.3d 604 (5th Cir. 2017)......................................................5, 6, 7

*Robinson v. Ardoin*,
605 F. Supp. 3d 759 (M.D. La. 2022)......................................3, 12, 13

*Robinson v. Ardoin*,
No. 22-30333, 2023 WL 7711063 (5th Cir. Nov. 10, 2023)..............5, 7

*Shaw v. Reno*,
509 U.S. 630 (1993).........................................................................2

*Shelby County v. Holder*,
570 U.S. 529 (2013).......................................................................13

*Stokes v. Sw. Airlines*,
887 F.3d 199 (5th Cir. 2018)......................................................3, 4, 7

*Taggart v. Lorenzen*,
139 S. Ct. 1795 (2019)....................................................................10

*Whitcomb v. Chavis*,
403 U.S. 124 (1971)...........................................................10, 11, 12

*White v. Regester*,
412 U.S. 755 (1973)...........................................................10, 11, 12

## Statutes

52 U.S.C §10301(a).........................................................................9

52 U.S.C. §10301(b) ................................................................ 3, 9, 12

52 U.S.C. §10302(c) ..................................................................... 7

52 U.S.C. §10308 ......................................................................... 4

**Rules**

Fed. R. App. P. 29(b)(2) ............................................................. 1

## INTEREST OF *AMICI CURIAE*

The States of Alabama, Alaska, Georgia, Idaho, Indiana, Iowa, Kansas, Mississippi, Montana, Nebraska, South Carolina, Texas, and West Virginia respectfully submit this brief as *amici curiae* in support of the Louisiana Petitioners.[1] "Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). And the intrusion in this case is especially troubling because, while the case turns on the meaning of the Voting Rights Act of 1965, the district court and panel blew past the statute's text. The result is a newly expanded VRA that, having succeeded in "cutting away … obstacles to full participation," is repurposed to satisfy "demands for outcomes." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 837 (5th Cir. 1993) (en banc). Here, the demand is that Louisiana use race to craft a second majority-black district, even though the last two times Louisiana pursued that goal, courts held that the State violated the Equal Protection Clause. *See Hays v. Louisiana*, 936 F. Supp. 360, 367 (W.D. La. 1996).

---

[1] This brief is filed under Federal Rule of Appellate Procedure 29(b)(2).

*Amici* oppose this statutory mission creep. A VRA untethered from its text places States in an impossible position each redistricting cycle. Worse still, it "threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire." *Shaw v. Reno*, 509 U.S. 630, 657 (1993).

## SUMMARY OF ARGUMENT

Section 2 contains no express private right of action. And the VRA's structure confirms that the provision creates no implied private right of action either. Rather, Section 2's role is important but limited: to provide the federal government authority to enforce the guarantees of the Fourteenth and Fifteenth Amendments, something private parties could already do before 1965. Because the panel decision finding a private right of action never grappled with the VRA's text or structure, its approach conflicts with this Court's usual method for determining whether Congress created such a right. And the panel's result conflicts with the Eighth Circuit's conclusion that Section 2 did not create a private right to sue.

The panel's merits holding likewise departs from Section 2's text and this Court's precedents. There is no Section 2 liability unless "it is shown that" members of a protected class "have less opportunity" not just "to elect representatives of their choice" but also "to participate in the political process." 52 U.S.C. §10301(b). The district court found *no* "specific evidence" of disparities "in political participation outcomes," yet found a likely Section 2 violation anyway. *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 849 (M.D. La. 2022). But "[a]bsent evidence that minorities have been excluded from the political process, a lack of success at the polls is not sufficient to trigger judicial intervention." *Clements*, 999 F.2d at 853.

To resolve these conflicts over these critical issues, the Court should grant Louisiana's petition for rehearing en banc.

## ARGUMENT

## I.    Section 2 Of The Voting Rights Act Creates No Private Right Of Action.

"Whether a given statute should be enforceable through private civil lawsuits is, like any aspect of statutory design, fundamentally up to Congress." *Stokes v. Sw. Airlines*, 887 F.3d 199, 201 (5th Cir. 2018). Thus, "[c]ourts are bound to follow Congress's choices in this arena, and bound

to ascertain those choices through the tools of statutory interpretation." *Id.* The court's job is a familiar one: "'to interpret *the statute Congress has passed*,'" which is done the usual way—"by consulting statutory structure and text." *Id.* at 202 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)) (emphasis added by *Stokes*). Without some "'affirmative' evidence of intent to allow private civil suits, there can be no private right of action—'no matter how desirable that might be as a policy matter, or how compatible with the statute.'" *Id.* (quoting *Sandoval*, 532 U.S. at 286-87, 293 n.8).

Under this Court's approach, it is plain that Section 2 does not create a private right of action. The provision itself says nothing about who enforces it or how. That question is answered in Section 12, which provides the enforcement mechanisms—criminal and civil enforcement actions by the federal government. 52 U.S.C. §10308. Because "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others," *Sandoval*, 532 U.S. at 290, this provision indicates that in passing the VRA, Congress *did not* make a remedy available to private plaintiffs. *See also Karahalios v. Nat'l Fed'n of Fed. Emps.*, 489 U.S. 527, 533 (1989) ("[I]t is ... an 'elemental canon' of

4

statutory construction that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies."). As the Eighth Circuit recently summarized, "If the text and structure of § 2 and § 12 show anything, it is that Congress intended to place enforcement in the hands of the Attorney General, rather than private parties." *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, No. 22-1395, 2023 WL 8011300, at *5 (8th Cir. Nov. 20, 2023) (cleaned up).

The panel missed all this. Despite recognizing that "[w]hether Section 2 provides for a private right of action is a legal issue of statutory interpretation," *Robinson v. Ardoin*, No. 22-30333, 2023 WL 7711063, at *4 (5th Cir. Nov. 10, 2023), almost no statutory interpretation followed. Instead, the panel "consider[ed] most of [its] work" done by this Court's decision in *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017), which held that the VRA abrogated state sovereign immunity. *Robinson*, 2023 WL 7711063, at *5. "[S]urely," the panel concluded, Congress abrogated sovereign immunity "to allow the States to be sued by someone." *Id.*

One glaring problem with *OCA-Greater Houston*, however, is that its holding was pure ipse dixit. Texas had argued that sovereign immunity barred the VRA suit plaintiffs had filed directly against the State. In response, this Court simply declared that the VRA "validly abrogated state sovereign immunity," 867 F.3d at 614, and cited the Sixth Circuit's decision in *Mixon v. State of Ohio*, 193 F.3d 389, 398-99 (6th Cir. 1999). That's it. The decision contains no analysis.

*Mixon*, in turn, provided almost no reasoning to support its flawed holding that the VRA abrogates sovereign immunity. In the Sixth Circuit's view, "Congress intended to abrogate the State's sovereign immunity under the Voting Rights Act" because Section 2 "specifically prohibits 'any State or political subdivision' from discriminating against voters on the basis of race." *Id.* at 398. But the test for abrogation is far more "stringent"—"Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute." *Dellmuth v. Muth*, 491 U.S. 223, 228 (1989). "[N]othing in those five words" relied on by *Mixon* "abrogates state sovereign immunity…." *Alabama State Conf. of Nat'l Ass'n for the Advancement of Colored People v. Alabama*, 949 F.3d 647, 662 (11th

6

Cir. 2020) (Branch, J., dissenting), *cert. granted, opinion vacated, and case dismissed as moot*, 141 S. Ct. 2618 (2021).

This means that "most of the work" underlying the panel's private-right-of-action holding was done by decisions that never considered that question and hardly considered even the question of abrogation. The panel's decision conflicts with the interpretive method demanded by *Stokes*, 887 F.3d 199, and *Sandoval*, 532 U.S. 275. *OCA-Greater Houston* cannot justify the panel's new approach to statutory interpretation, and if it did, *OCA-Greater Houston* should be repudiated.

The only other basis for the panel's mistaken conclusion was its mistaken reading of Section 3 of the VRA. That section confers certain powers on a court if, for example, it finds a constitutional violation in a "proceeding instituted by the Attorney General or an aggrieved person." 52 U.S.C. §10302(c). But Section 3 does not independently "*provide*[] that proceedings to enforce voting guarantees ... can be brought.'" *Robinson*, 2023 WL 7711063, at *5 (emphasis added). It at most *recognizes* the existence of statutes by which private parties could enforce the Fourteenth and Fifteenth Amendments, like Section 1983, which predated the VRA.

To the extent Section 3's "aggrieved person" language, added in 1975, refers to VRA actions, "[t]he most logical deduction … is that Congress meant to address those cases brought pursuant to the private right of action that this Court had recognized as of 1975, *i.e.,* suits under § 5, as well as any rights of action that [the Court] might recognize in the future." *Morse v. Republican Party of Virginia*, 517 U.S. 186, 289 (1996) (Thomas, J., dissenting). Thus, while Section 3 recognizes that other private rights of action exist, the provision does not create a new one or show that Section 2 creates one.

Plaintiffs will undoubtedly note that courts have decided Section 2 cases brought by private parties without passing on whether a private action exists. The short response is that this Court "would risk error if it relied on assumptions that have gone unstated and unexamined." *Az. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 145 (2011). The task is to interpret the text of Section 2, not to entertain unauthorized private suits because "that's the way it's always been done." The text refutes the errant and unexamined practice of letting private plaintiffs sue directly under Section 2.

## II.  Plaintiffs Never Proved Unequal Opportunity "To Participate In The Political Process."

The panel's merits ruling likewise departed from the VRA's text. The result expands VRA liability and race-based redistricting in a way that conflicts with both the Constitution and this Court's en banc decision in *League of United Latin American Citizens, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993).

Section 2 prohibits States from imposing or applying a "standard, practice, or procedure … in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C §10301(a). And to prove a Section 2 claim, it must be "shown" that members of a minority group "have less opportunity than other members of the electorate [1] to participate in the political process ***and*** [2] to elect representatives of their choice." *Id.* §10301(b) (emphasis added). In *Chisom v. Roemer*, the Supreme Court clarified that Section 2 did "not create two separate and distinct rights." 501 U.S. 380, 397 (1991). Rather, "the opportunity to participate and the opportunity to elect" form a "unitary claim." *Id.* at 397-98. Thus, proving only the second prong—less opportunity to elect—"is not sufficient to establish a violation

unless … it can also be said that the members of the protected class have less opportunity to participate in the political process." *Id.* at 397.

The question then is what having "less opportunity to participate in the political process" means. *Clements* points to the answer. "[T]he 1982 amendments to § 2 were intended to 'codify' the results test as employed in" *White v. Regester*, 412 U.S. 755 (1973), and *Whitcomb v. Chavis*, 403 U.S. 124 (1971), two decisions that supplied Section 2's key language. 999 F.2d at 851. Because the phrase "is obviously transplanted from another legal source, it brings the old soil with it." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (internal quotation marks omitted). Thus, "it is to *Whitcomb* and *White* that we should look in the first instance in determining how great an impairment of minority voting strength is required to establish vote dilution in violation of § 2." *Clements*, 999 F.2d at 851.

"In *Whitcomb,* black citizens residing in one part of Marion County, referred to as the 'ghetto' by the Court, claimed that the county's at-large method of electing members to the state legislature unconstitutionally diluted their votes." *Id.* Though "black-preferred candidates were de-

feated in four of the five elections between 1960 and 1968," and the *Whit-comb* Court recognized that at-large elections "caused the 'voting power of ghetto residents [to be] cancelled out,'" *id.* (quoting *Whitcomb*, 403 U.S. at 153) (cleaned up), that alone did not justify relief. *Whitcomb* noted "that blacks enjoyed full access to the political process," and thus held that the "'failure of the ghetto to have legislative seats in proportion to its population emerges more as a function of losing elections than of built-in bias ....'" *Id.* (quoting *Whitcomb*, 403 U.S. at 153).

*Whitcomb* also explained that "participate in the political processes" meant those activities most common to voters: being "allowed [1] to register or vote, [2] to choose the political party they desired to support, [3] to participate in its affairs[,] ... [4] to be equally represented on those occasions when legislative candidates were chosen," and [5] not be "regularly excluded from the slates of both major parties." *Whitcomb*, 403 U.S. at 149-50. Plaintiffs' failure to prove such disparities doomed their claim.

*Clements* contrasted *Whitcomb* with *White*, where "a white-dominated organization that [wa]s in effective control of Democratic Party candidate slating" in Dallas County, Texas in the 1960s ensured that "the

black community [was] effectively excluded from participation in the Democratic primary selection process." *Clements*, 999 F.2d at 852 (quoting *White*, 412 U.S. at 766). The *White* plaintiffs succeeded in their vote dilution claim.

Plaintiffs here, like the plaintiffs in *Whitcomb*, failed to show that they "have less opportunity than other members of the electorate to participate in the political process," and their claim should have failed. 52 U.S.C. §10301(b). There was no finding by the district court or panel that black Louisianans today are denied the opportunity to register to vote, exercise their right to vote, choose the political party they desire to support, or participate equally in its affairs. To the contrary, the district court noted the *lack* of "specific evidence" of disparities in "political participation outcomes" regarding "levels of black voter registration, … turnout among black voters, or any other factor tending to show that past discrimination has affected their ability to participate in the political process." *Robinson*, 605 F. Supp. 3d at 849. That should have been the end of it: "Absent evidence that minorities have been excluded from the polit-

ical process, a lack of success at the polls is not sufficient to trigger judicial intervention." *Clements*, 999 F.2d at 853 (internal quotation marks omitted).

This conclusion is required not only by the text of Section 2, *Clements*, and *Chisom*; it is required to ensure that the VRA's "current burdens" are "justified by current needs." *Shelby County v. Holder*, 570 U.S. 529, 536 (2013). The alternative is "race-based redistricting … extend[ing] indefinitely into the future." *Allen v. Milligan*, 599 U.S. 1, 45 (2023) (Kavanaugh, J., concurring).

For proof, look no further than the district court's opinion. Louisiana's point "that there is no evidence of Black voters being denied the right to vote" today was deemed "irrelevant" to this Voting Rights Act case, because "[t]his case presents claims of vote *dilution*." *Robinson*, 605 F. Supp. 3d at 847. But evidence of whether voting rights are available to all, regardless of race, is needed precisely to mark the line between "actionable vote dilution and political defeat at the polls." *Clements*, 999 F.2d at 850 (internal quotation marks omitted). The district court's contrary rule is circular with no offramp. "[D]emands for outcomes" will per-

sist even decades "follow[ing] the cutting away of obstacles to full partic-ipation." *Id.* at 837. That divisive and undemocratic result is barred by both *Clements* and the Constitution.

## CONCLUSION

This Court should grant the petition for rehearing en banc.

Respectfully submitted,

STEVE MARSHALL
*Attorney General*

*s/ Edmund G. LaCour Jr.*
EDMUND G. LACOUR JR.
*Solicitor General*

State of Alabama
Office of the Attorney General
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for* Amici *States*

# ADDITIONAL COUNSEL

TREG TAYLOR
Attorney General
State of Alaska

LYNN FITCH
Attorney General
State of Mississippi

CHRIS CARR
Attorney General
State of Georgia

AUSTIN KNUDSEN
Attorney General
State of Montana

RAÚL R. LABRADOR
Attorney General
State of Idaho

MICHAEL T. HILGERS
Attorney General
State of Nebraska

THEODORE E. ROKITA
Attorney General
State of Indiana

ALAN WILSON
Attorney General
State of South Carolina

BRENNA BIRD
Attorney General
State of Iowa

KEN PAXTON
Attorney General
State of Texas

KRIS W. KOBACH
Attorney General
State of Kansas

PATRICK MORRISEY
Attorney General
State of West Virginia

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Fed. R. App. P. 29(a)(4), (b)(4) because it contains 2,595 words as measured by Microsoft Word software. The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook.

Dated:  December 8, 2023                    */s/ Edmund G. LaCour Jr.*
                                            Edmund G. LaCour Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Parties in this case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.